# 13-4478-cv(L), 13-4481-cv(CON)

## United States Court of Appeals

*for the*

## Second Circuit

ERIC GLATT, on behalf of himself and all others similarly situated,
ALEXANDER FOOTMAN, on behalf of himself and all others similarly situated,
EDEN M. ANTALIK, DAVID B. STEVENSON, KANENE GRATTS, on behalf
of themselves and all others similarly situated, BRIAN NICHOLS,

*Plaintiffs-Appellees,*

– v. –

FOX SEARCHLIGHT PICTURES INC.,
FOX ENTERTAINMENT GROUP, INC.,

*Defendants-Appellants.*

_____

ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK
CASE NO. 1:11-CV-6784 (HON. WILLIAM H. PAULEY)

## BRIEF AND SPECIAL APPENDIX FOR
## DEFENDANTS-APPELLANTS

ELISE M. BLOOM
MARK D. HARRIS
CHANTEL L. FEBUS
AMY F. MELICAN
JOSHUA S. FOX
PROSKAUER ROSE LLP
11 Times Square
New York, New York 10036
(212) 969-3000

NEAL KUMAR KATYAL
MARY HELEN WIMBERLY
FREDERICK LIU
HOGAN LOVELLS US LLP
555 13th Street, NW
Washington, DC 20004
(202) 637-5600

*Attorneys for Defendants-Appellants*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, undersigned counsel states as follows:

1.     The parent companies of Defendant-Appellant Fox Searchlight Pictures, Inc. are Fox Entertainment Group, Inc. and Twenty-First Century Fox, Inc.  Twenty-First Century Fox, Inc. is a publicly traded corporation.

2.     The parent company of Defendant-Appellant Fox Entertainment Group, Inc. is Twenty-First Century Fox, Inc., which is a publicly traded corporation.

 /s/ Elise M. Bloom
Elise M. Bloom

i

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Fed. R. App. P. 34(a)(1), Defendants-Appellants respectfully submit that oral argument will significantly aid the decisional process in these consolidated cases, numbers 13-4478 and 13-4481. Among other reasons, these cases raise an issue of first impression—the proper test for determining whether an intern is an employee entitled to wages under applicable federal and state law— that has divided the district courts within this Circuit, as well as other courts of appeals. This Court has already recognized the importance of the underlying issues when it granted Defendants-Appellants permission to pursue interlocutory appeals under Fed. R. App. P. 23(f) and 28 U.S.C. § 1292(b). Accordingly, Defendants-Appellants request that this Court hold oral argument. Defendants-Appellants will file an Oral Argument Statement Form within 14 days after the filing of the last appellee brief as required by Local Rule 34.1(a).

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................2

STATEMENT OF ISSUES ............................................................................6

PERTINENT STATUTES AND REGULATIONS ....................................6

STATEMENT OF THE CASE ......................................................................7

    A.    Statutory Background .................................................................7

    B.    Proceedings Below ...................................................................10

        1.    Plaintiffs Eric Glatt and Alexander Footman ...........................10

        2.    Plaintiff Eden Antalik ................................................................12

        3.    The District Court's Decision On Class Certification And Summary Judgment. ................................................................16

        4.    Fox's Interlocutory Appeals .....................................................22

STANDARDS OF REVIEW ......................................................................22

SUMMARY OF ARGUMENT ...................................................................24

ARGUMENT ...............................................................................................27

I.    THE PRIMARY-BENEFICIARY TEST GOVERNS WHETHER AN INTERN IS AN EMPLOYEE UNDER THE FLSA AND THE NYLL. ........................................................................................................27

    A.    An Intern Is Not An "Employee" If He Or She Is The Primary Beneficiary Of The Internship .............................................28

        1.    The Primary-Beneficiary Test is Grounded in *Portland Terminal*. ...............................................................................28

        2.    The Primary-Beneficiary Test Is Consistent With Precedent. ...............................................................................32

        3.    Under The Primary-Beneficiary Test, A Court Should Consider The Totality Of The Circumstances. ........................36

iii

B. Judged Against The Primary-Beneficiary Test, There Is A Genuine Issue Of Material Fact Whether Glatt And Footman Were Employees........................................................................40

II. THE CERTIFIED CLASS DOES NOT MEET THE REQUIREMENTS OF RULE 23................................................45

 A. Plaintiffs Failed To Identify Common Questions That Could Resolve An Issue Central To Liability For Each Class Member "In One Stroke."........................................................46

  1. The Supposedly Common Questions Identified By The District Court Are Legally Insufficient Under *Dukes* To Support A Finding Of Commonality. ...................................47

  2. Antalik Did Not Meet Her Burden To Establish Commonality..........................................................50

 B. The District Court's Predominance Analysis Was Patently Insufficient And Flawed.................................................53

  1. The District Court Did Not Apply The Correct Legal Standard. ............................................................53

  2. Antalik Did Not Meet Her Burden To Establish Predominance...........................................................55

III. THE COLLECTIVE ACTION WAS IMPROPERLY CERTIFIED UNDER THE FLSA.................................................57

 A. After Discovery, Plaintiffs Should Be Required To Meet A Heightened Burden Of Proof To Demonstrate Certification Of An FLSA Collective Action Is Appropriate...........................57

 B. The District Court Failed To Apply An Appropriately Heightened Standard To Antalik's Post-Discovery Certification Motion. .....................................................................60

CONCLUSION ...........................................................................62

iv

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abrams v. Interco Inc.*,
719 F.2d 23 (2d Cir. 1983) (Friendly, J.) ..........................................................23

*Barfield v. New York City Health & Hosps. Corp.*,
537 F.3d 132 (2d Cir. 2008) .................................................... 9-10, 32

*Blair v. Wills*,
420 F.3d 823 (8th Cir. 2005) ..............................................................33, 36, 44

*Brock v. Superior Care, Inc.*,
840 F.2d 1054 (2d Cir. 1988) ....................................................32, 39

*Cano v. DPNY, Inc.*,
287 F.R.D. 251 (S.D.N.Y. 2012) ........................................................7

*Carter v. Dutchess Cmty. Coll.*,
735 F.2d 8 (2d Cir.1984) ....................................................39

*Comcast Corp. v. Behrend*,
133 S. Ct. 1426 (2013).................................................... 53-54

*Cuevas v. Citizens Fin. Grp., Inc.*,
526 F. App'x 19 (2d Cir. 2013) ....................................................53, 57

*Donovan v. Am. Airlines, Inc.*,
686 F.2d 267 (5th Cir. 1982) ..........................................................34

*Espenscheid v. DirectSat USA, LLC*,
705 F.3d 770 (7th Cir. 2013) (Posner, J.)....................................................27, 59

*Goldberg v. Whitaker House Coop., Inc.*,
366 U.S. 28 (1961).........................................................9, 32

*Herman v. RSR Sec. Servs. LTD.*,
172 F.3d 132 (2d Cir. 1999) ....................................................39, 40

*In re Initial Pub. Offerings Sec. Litig.*,
   471 F.3d 24, *decision clarified on rehearing in other part*,
   483 F.3d 70 (2d Cir. 2006) ...................................................................23

*In re Literary Works in Elec. Databases Copyright Litig.*,
   654 F.3d 242 (2d Cir. 2011) .................................................................23

*Kaplan v. Code Blue Billing & Coding, Inc.*,
   504 F. App'x 831 (11th Cir. 2013), *cert. denied*,
   134 S. Ct. 618 (2013)...........................................................................35

*McLaughlin v. Ensley*,
   877 F.2d 1207 (4th Cir. 1989) .................................................34, 36, 37

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*,
   715 F.3d 102 (2d Cir. 2013) .................................................................22

*Morgan v. Family Dollar Stores, Inc.*,
   551 F.3d 1233 (11th Cir. 2008) ............................................................59

*Myers v. Hertz Corp.*,
   624 F.3d 537 (2d Cir. 2010) ..........................................................passim

*Reich v. Parker Fire Prot. Dist.*,
   992 F.2d 1023 (10th Cir. 1993) .......................................................32, 35

*Rutherford Food Corp. v. McComb*,
   331 U.S. 722 (1947)........................................................................9, 32

*Shushan v. Univ. of Colo.*,
   132 F.R.D. 263 (D. Colo. 1990) ...........................................................59

*Solis v. Laurelbrook Sanitarium & Sch., Inc.*,
   642 F.3d 518 (6th Cir. 2011) .........................................................passim

*Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123*,
   321 U.S. 590 (1944)....................................................................... 3-4, 28

*Thiessen v. Gen. Elec. Capital Corp.*,
   267 F.3d 1095 (10th Cir. 2001) ..............................................27, 58, 59

vi

*Tony & Susan Alamo Found. v. Sec'y of Labor*,
   471 U.S. 290 (1985)..............................................................................32

*Torres v. Gristede's Operating Corp.*,
   No. 04-CIV-3316, 2006 WL 2819730 (S.D.N.Y. Sept. 29, 2006).....................21

*Velez v. Sanchez*,
   693 F.3d 308 (2d Cir. 2012) ......................................................passim

*Wal-Mart Stores Inc. v. Dukes*,
   131 S. Ct. 2541 (2011)..............................................................passim

*Walling v. Portland Terminal Co.*,
   330 U.S. 148 (1947)..................................................................passim

*Wang v. Hearst Corp.*,
   293 F.R.D. 489 (S.D.N.Y. 2013) ................................................passim

*Zavala v. Wal-Mart Stores, Inc.*,
   691 F.3d 527 (3d Cir. 2012) ..............................................27, 32, 61

*Zheng v. Liberty Apparel Co.*,
   355 F.3d 61 (2d Cir. 2003) ...........................................7, 32, 39-40

**STATUTES**

28 U.S.C. § 1292(b) ........................................................................2, 22

28 U.S.C. §§ 1331 and 1332 .................................................................2

29 U.S.C. § 203(e)(1) ...........................................................................7

29 U.S.C. § 203(e)(4)(A) .....................................................................43

29 U.S.C. § 203(g) ................................................................................7

29 U.S.C. § 206 .....................................................................................7

Cal. Bus. & Prof. Code §§ 17200 *et seq.* .............................................11

Fair Labor Standards Act (FLSA)....................................................passim

N.Y. Lab. Law § 651(5)........................................................................12

N.Y. Lab. Law § 651(5)(n) ..................................................................43

N.Y. Lab. Law § 652 .............................................................................7

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 ...............................................................................passim

Fed. R. Civ. P. 23(a)(2) ................................................................. 47, 53

Fed. R. Civ. P. 23(b)(3) .................................................................passim

Fed. R. Civ. P. 23(f) .....................................................................2, 22

Fed. R. Civ. P. 56(a) ........................................................................23

N.Y. Comp. Codes R. & Regs. Title 12, § 142-2.14(a) ...........................................7

Rule 23(a)...................................................................... passim

Rule 23(b)(3).................................................................................45

U.S. Dep't of Labor Op. Letter, 1995 WL 1032473, at *1 (Mar. 13, 1995) ...........34

IN THE

# United States Court of Appeals
## for the Second Circuit

Nos. 13-4478 (lead), 13-4481 (consolidated)

ERIC GLATT, on behalf of himself and all others similarly situated, ALEXANDER FOOTMAN, on behalf of himself and all others similarly situated, EDEN M. ANTALIK, DAVID B. STEVENSON, KANENE GRATTS, on behalf of themselves and all others similarly situated, and BRIAN NICHOLS,

Plaintiffs-Appellees,

v.

FOX SEARCHLIGHT PICTURES INC. and FOX ENTERTAINMENT GROUP, INC.,

Defendants-Appellants.

On Appeal from the
United States District Court for the Southern District of New York
Case No. 1:11-cv-6784 (Hon. William H. Pauley)

## BRIEF FOR DEFENDANTS-APPELLANTS

## JURISDICTIONAL STATEMENT

Defendants-Appellants Fox Searchlight Pictures Inc. (Searchlight) and Fox Entertainment Group, Inc. (FEG) (collectively, Fox) appeal from the district court's grant of summary judgment to two Plaintiffs on their claims brought under the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201 *et seq.*, and the New York Labor Law (NYLL), Art. 6, §§ 190 *et seq.* and Art. 19, §§ 650 *et seq.*; its

certification of a class action under Fed. R. Civ. P. 23(b)(3); and its conditional certification of a collective action under § 216(b) of the FLSA. Plaintiffs-Appellees are former interns who claim that they were improperly denied wages under the NYLL and the FLSA. The district court exercised jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332.

On June 11, 2013, the district court granted Plaintiff Eden M. Antalik's motion to certify a class and to conditionally certify a nationwide collective action of former unpaid interns, and granted summary judgment to Plaintiffs Eric Glatt and Alexander Footman on their NYLL and FLSA claims. (Order).[1]  On September 17, 2013, the district court certified that Order for interlocutory review. (A1900-07.) Fox filed timely petitions in this Court seeking permission to appeal pursuant to Fed. R. Civ. P. 23(f) and 28 U.S.C. § 1292(b) on June 25, 2013 and September 17, 2013, respectively, both of which this Court granted on November 27, 2013. The Court therefore has jurisdiction under Fed. R. Civ. P. 23(f) and 28 U.S.C. § 1292(b).

## INTRODUCTION

This appeal raises an issue of first impression for this Court: the standard for determining whether an unpaid intern is an "employee" under federal and state

---

[1]  The district court's Order, as well as relevant statutes referred to herein, are included in a Special Appendix filed with this brief.

labor law or a "trainee" of the sort recognized by the Supreme Court in *Walling v. Portland Terminal Co.*, 330 U.S. 148 (1947). This appeal also asks this Court to review the district court's application of the standards for certifying a class of interns under Fed. R. Civ. P. 23, and to define the appropriate standard for certifying an FLSA collective action after the close of discovery. Each of these questions will determine the future course of not only this case, but also the dozens of pending cases brought by unpaid interns who claim they were improperly denied wages in violation of the FLSA and the NYLL.

To determine whether an intern is an "employee," this Court should apply the "primary-beneficiary" test. That test is the law of the Fourth, Fifth, Sixth, and Eighth Circuits, and no circuit has disagreed with it. Indeed, this Court previously endorsed the test in an analogous context, holding that when determining whether an employment relationship exists, among other relevant factors, "[a] court should . . . consider who is the primary recipient of benefits from the relationship." *Velez v. Sanchez*, 693 F.3d 308, 330 (2d Cir. 2012) (considering the employment status of a domestic worker). The primary-beneficiary test also aligns with basic labor law principles: the Supreme Court has long held that when Congress set out to regulate "work," it meant to regulate that which is "necessarily and *primarily for*

3

*the benefit of the employer* and his business." *Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 598 (1944) (emphasis added).

Judged against the primary-beneficiary test, the decision below cannot stand. The court's certifications of a Rule 23 class and an FLSA collective were incorrect because the question of who primarily benefited from those relationships—the intern or the company—was necessarily individualized. Where, as here, (a) the internships were designed and supervised by different managers, (b) the interns (even those in the same division and department) participated in a wide variety of activities in exchange for academic credit, and (c) the interns performed an array of duties tailored to each intern's unique interests and in furtherance of his or her express academic pursuits, then certification is not appropriate. Indeed, strikingly, the district court ignored black-letter class-certification law, which requires predominance. Its two-sentence long analysis of the issue amounted to nothing more than the flatly incorrect claim that because commonality was shown, predominance was met.

On a more global level, the court's decision calls into question the entire institution of internships, which colleges and universities nationwide have adopted to help their students gain hands-on training and practical development of their skills—critical components of an education program that are often difficult to

obtain at school.  In recognition of the educational benefits conveyed by internships, many colleges and universities offer academic credit for participation. There can be no serious question that many internships—such as the one supervised by Bruce Shirey in the New York office of Fox Networks Group—offer unique opportunities to learn about particular fields and to acquire training, whether through observing professionals in action (*e.g.*, a studio executive in the Cable or Broadcasting Department negotiating contracts or organizing a television schedule), developing contacts in the field (*e.g.*, attending a weekly speaker series in which company executives describe their jobs), or performing tasks critical to and typical of the profession in which they are interested (*e.g.*, participating in a mock sales pitch).  (A1358-59, 1361-62; ¶¶ 23-24, 26-27, 33-34, 38.)

In the district court's view, however, none of those "benefits" should be considered at all.  That is to say, the benefits received by the intern should be ignored, while any benefit to the company—however small—should require paid employment.  That cannot be correct.  Such a rule would bring to a halt the many unpaid internships that offer real value to participants, giving them experiences and opportunities they would not otherwise receive.

By contrast, the primary-beneficiary test takes into account both the value of internships *and* the need to ensure that true employees are paid wages for their

work.  It makes sense of who is an "employee"—and who is not—by accounting for the economic realities of the relationships and considering them in the totality of the circumstances.  This Court should therefore apply that standard, and reverse the decision below.

## STATEMENT OF ISSUES

1.    Whether the district court erred by applying the wrong legal standard to determine whether unpaid interns are employees and by ruling that Eric Glatt and Alexander Footman were employees under the FLSA and the NYLL.

2.    Whether the district court erred by applying the wrong legal standard to the commonality and predominance prongs of the class-certification analysis or otherwise abused its discretion in certifying a class under Fed. R. Civ. P. 23(b)(3).

3.    Whether the district court erred by applying the wrong legal standard or otherwise abused its discretion in certifying a collective action under the FLSA.

## PERTINENT STATUTES AND REGULATIONS

The statutes and regulations pertinent to this appeal are reprinted in the Appendix at SPA37-82.

## STATEMENT OF THE CASE

### A.    Statutory Background

The FLSA and its New York counterpart, the NYLL, require an "employer" to pay its non-exempt "employees" a minimum wage for work performed for the employer. 29 U.S.C. § 206 (SPA44-46); N.Y. Lab. Law § 652 (SPA75-82.) Under the FLSA, an "employee" is "any individual employed by an employer," 29 U.S.C. § 203(e)(1) (SPA37), and the word "employ" is defined to mean "to suffer or permit to work," *id.* § 203(g) (SPA39.) Similarly, under the NYLL, an "employee" is "any individual employed or permitted to work by an employer." N.Y. Lab. Law § 651(5) (SPA63-74); *see also* N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.14(a) (SPA58) ("employee" is "any individual employed, suffered or permitted to work by an employer"). Courts treat the two standards as functionally identical. *See Cano v. DPNY, Inc.*, 287 F.R.D. 251, 260 n.2 (S.D.N.Y. 2012) ("Since the NYLL's definition of employment is nearly identical to the FLSA's[,] courts in this circuit have held that the New York Labor Law embodies the same standard for employment as the FLSA." (brackets, ellipsis, and quotation marks omitted)); *see also Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 78 (2d Cir. 2003) (dismissing the plaintiff's "analogous" NYLL claims "[f]or the same reasons" as the FLSA claims).

7

The Supreme Court has recognized a common-sense principle that a person who, "without any express or implied compensation agreement, might work for [his] own advantage on the premises of another," is not an employee, and need not be paid wages. *Portland Terminal*, 330 U.S. at 152-53. According to the Court, the ultimate question for determining whether one qualifies as an employee is whether the company or the individual "most greatly benefit[ed]" from the work performed. *Id*. at 153.

Both the U.S. Department of Labor (DOL) and the New York Department of Labor (NYDOL) have recognized that this rule may apply to unpaid interns. The two agencies have developed "Fact Sheet[s]" that provide "general information" and "guideline[s]" to help determine whether an intern is subject to the wage law. *See* (A1338-40), (A371-73.) While these Fact Sheets may provide useful guidance, they are non-binding and do not even express the official positions of the agencies that issued them.

According to the DOL, whether an internship creates an employment relationship depends on "all of the facts and circumstances of each such program." The Fact Sheet sets forth six factors that should be considered in making that determination:

1.     The internship, even though it includes actual operation of the facilities of the employer, is similar to training which would be given in an educational environment;

2.     The internship experience is for the benefit of the intern;

3.     The intern does not displace regular employees, but works under close supervision of existing staff;

4.     The employer that provides the training derives no immediate advantage from the activities of the intern; and on occasion its operations may actually be impeded;

5.     The intern is not necessarily entitled to a job at the conclusion of the internship; and

6.     The employer and the intern understand that the intern is not entitled to wages for the time spent in the internship.

*Id.*[2]  Those factors exist against the backdrop of settled jurisprudence concerning the existence of an employment relationship under the FLSA.  *See, e.g.*, *Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008).  As this Court has instructed, that determination "should be grounded in 'economic reality rather than technical concepts,' determined by reference not to 'isolated factors, but rather upon the circumstances of the whole activity.'"  *Id.* (quoting *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961); *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947)).  Employment under the FLSA is "a flexible

---

[2]   In its own guidance, the NYDOL has recognized the DOL's six factors and added another five.  Those additional five factors did not play a role in the district court's analysis.

9

concept to be determined on a case-by-case basis by review of the totality of the circumstances." *Id.* at 141-42.

## B.   Proceedings Below

### 1.   Plaintiffs Eric Glatt and Alexander Footman

As an undergraduate, Eric Glatt had studied multimedia instructional design at New York University.  He was working at AIG[3] when he applied for and obtained a series of unpaid internships with Lake of Tears, Inc., an independent film production company that released movies under Searchlight's name.[4] According to Glatt, he sought out those positions because he was "eager to learn more about the postproduction process on a studio feature."  (A1122.)  He interned on the film *Black Swan* on three separate occasions:  in October 2009 for a single day; again later in October 2009 through February 2010, in the accounting department; and, after applying and interviewing for another internship, from March to August 2010 in the post-production department.  (A1036; ¶¶  88-90), (A1091-92, 1106.)

---

[3]   Glatt voluntarily resigned from a position with AIG in which he was earning an annual salary of $90,000 prior to his engagement as an unpaid intern on the *Black Swan* film.  (A1174-75), (A1135-36.)

[4]   Searchlight is a specialty film company that finances and distributes films, but does not itself produce them.  (A1027; ¶¶ 4-5.)  *Black Swan* was one of the films that Searchlight co-financed and distributed, pursuant to a November 2009 Production/Finance/Distribution Term Sheet Agreement with Lake of Tears. (A1027; ¶¶ 48-49.)  Lake of Tears is not named as a defendant in this lawsuit.

Alexander Footman, likewise, sought out and obtained an unpaid internship with Lake of Tears.  (A1034-35; ¶¶ 72-73, 80-81.)  At the time, he had a degree in film studies from Wesleyan University.  He sought his internship to gain general experience in the film industry, "learn more about different departments," and make "contact with producers" who might help him boost his future job prospects in the industry.  (A1140, 11433-44.)  He interned in the *Black Swan* production office from the end of September 2009 to approximately February or early March of 2010.  (A1070-71, 1073-74.)  Like Glatt, Footman stated that he sought the educational and professional development that the internship could provide, knowing that it was unpaid.  (A1144.)

On September 27, 2011, Glatt and Footman brought suit in the Southern District of New York, alleging that they were unlawfully deprived of wages in violation of the FLSA and NYLL.[5]  After the close of discovery, Glatt and Footman moved for summary judgment, seeking determinations that they were

---

[5]   Glatt and Footman brought claims on behalf of a putative Fed. R. Civ. P. 23 class and a putative FLSA collective of former unpaid interns who worked on the production of one or more films co-financed by Searchlight Films.  (A49-50, 53, 55-56, 62-63; ¶¶ 5-6, 42, 64, 66-70, 72-74, 90, 92, 94.)  Glatt and Footman later abandoned their class and collective claims, and remain the only production interns in this case.  *Id.*  A fourth named plaintiff, Kanene Gratts (a former production intern on the film *500 Days of Summer*) also brought a claim against Searchlight under the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*  (A77-79; ¶¶ 196-208.)  The district court dismissed her claims as time-barred. (SPA8.)

employees covered by the FLSA and NYLL, and that Searchlight was their joint employer, along with Lake of Tears.  D.E. 89, 90.[6]  Fox filed its own cross-motion for summary judgment, opposing Glatt's and Footman's claims to be employees and arguing that, in any event, Searchlight was not their joint employer.  D.E. 93, 94.

### 2.  Plaintiff Eden Antalik

Eden Antalik was an unpaid intern in the East Coast Publicity Department of Searchlight for four months between May 2009 and August 2009, while she was enrolled at Duquesne University.  (A1221-22, 1224.)   She was supervised by individuals in Searchlight's New York Publicity Office.  (A1045; ¶¶ 180.)  During her internship, her duties included researching citations to Fox films in various media, conducting online research, sending mailings, and making travel arrangements.  (A1226, 1233-55, 1262-64.)

On October 19, 2012, over a year after the original complaint was filed—at which point, the only named plaintiffs were former *Black Swan* interns Glatt and Footman and the only named defendant was Searchlight—Antalik joined the lawsuit and asserted claims against Searchlight and an additional defendant, FEG,

---

[6]   District court filings are cited by their docket entry ("D.E.") number.

12

Searchlight's corporate parent.[7]  (A47-81); (A1026; ¶ 1.)  Following the close of

discovery, Antalik moved to certify a nationwide collective of unpaid interns who

interned with certain divisions of Fox between September 2008 and September

2010, and a similar Rule 23 class who interned in New York from September 2005

to September 2010.   Antalik claimed she was part of a "centralized unpaid

internship program" administered by Fox, with a common set of policies

implemented by a small team of intern recruiters.[8]  (SPA3.)

Fox submitted extensive—and largely undisputed—evidence in opposition

to certification.  Fox's evidence showed that there was no "centralized internship

program."  Of FEG's 500-plus subsidiaries, several had independently elected to

offer a wide variety of unpaid internships.  Typically, for each internship, a

different supervisor designed the content and selected the individual who would be

offered it.  (A1322-23), (A1291-92.)  As a result, each internship was truly unique.

For example, Bruce Shirey at Fox Networks Groups (FNG) developed and

supervised an eight-week Ad Sales Internship program in New York for ten interns

---

[7]   Antalik did not participate in the *Black Swan* production and, likewise, had no
relationship with Lake of Tears.

[8]   Fox also moved for summary judgment that FEG was not Antalik's "joint
employer" under the FLSA or NYLL and thus she could proceed only against
Searchlight.  The district court found that the evidence raised factual disputes that
precluded summary judgment in Fox's favor.  (SPA18-19.)

during the summer of 2010.  (A1354-55, 1358; ¶¶ 2, 6-7, 22-23).  During the first two weeks, the interns spent 80 percent of their time "shadowing" FNG employees; that is, observing employees performing their jobs.  (A1358; ¶ 23).  The interns were also assigned to a team and spent the remainder of their internships creating a mock sales pitch for fictional clients.  (A1359-61; ¶¶ 26-29, 30-32).  Mr. Shirey took steps to ensure the interns never performed *any* work that employees would perform.  (A1358-59, 1362-63; ¶¶ 22, 25, 39, 41).  For instance, he instructed employees to allow interns to "shadow," but not perform work for them.  *Id.*  To monitor that requirement, he checked in with the interns at least twice a day.  *Id.*

Fox submitted numerous other declarations, including 13 from employees who had supervised interns, which highlighted the many differences among the internships at Fox.  Indeed, the internships at Twentieth Century Fox (TCF) varied widely from supervisor to supervisor.  An employee in the Theatrical Marketing and Distribution Departments, for instance, offered a program permitting interns to attend only two days a week.  (A1364-65; ¶¶ 3, 7, 9).  During eight weeks of the internship, the intern was engaged *only* in job shadowing.  (A1366-67;  ¶¶ 14, 16).  A TCF Archivist created an internship to supplement the coursework of students enrolled in a master's degree program at UCLA's School of Education and

14

Information Studies.   (A1348, 1351; ¶¶ 2, 14).   He taught interns archiving techniques and photographic processes, and provided the interns with an opportunity to assist, under his close supervision, with an archiving project. (A1351-52; ¶ 15).  And Paul Werner, who oversees three restaurants and catering services on TCF's Studio Lot in Los Angeles, California, created a six-month, three-day-a-week internship—specially designed for a student who wished to strengthen his application to culinary school—that exposed the student to all aspects of food services through rotations, including in delivery and inventory management, knife skills, and food preparation.  (A1341-43; ¶¶ 3, 5-6, 8-10).

To the extent that so-called "intern recruiters" were involved, their role was ministerial at best; they were not involved in the substance of the internship or the selection of the interns.  (A1303, 1307), (A1329-31).  Rather, the role of the recruiters was limited to providing logistical support, such as handling administrative paperwork and verifying the interns' eligibility for academic credit at their respective institutions of learning.   (A1303, 1307), (A1329-31.) Specifically, interns' schools were asked to review the internship before the student began and confirm that each planned internship experience would be related and beneficial to that intern's academic studies, and would be likely to "augment" their classroom preparation "in ways that both complement their

15

studies" and "enhance their professional experience[s]." (A1198, 1208.) As Fox argued, the recruiters' administrative support did not convert a disparate system of uniquely tailored internships into a "centralized" program.

### 3. **The District Court's Decision On Class Certification And Summary Judgment.**

The district court issued an order in June 2013 granting in part and denying in part Glatt's and Footman's motion for partial summary judgment, denying Fox's motion for summary judgment in relevant part, and granting Antalik's motion for class and collective action certification. (SPA35-36.) It concluded that Searchlight was the joint employer of Glatt and Footman, (SPA8-17),[9] genuine issues of material fact existed concerning whether FEG was the joint employer of Antalik, (SPA18-19), Glatt and Footman were Searchlight's employees, (SPA19-26), and certification of Antalik's proposed 23(b)(3) class and conditional certification of Antalik's FLSA collective action were appropriate, (SPA27-35.) Four aspects of the district court's Order are at issue in these consolidated appeals.

*First*, in reaching its decision on Glatt's and Footman's status as employees, as well as its certification of the class and collective action proposed by Antalik,

---

[9]    While Fox disagrees with the district court's decision that Searchlight was Glatt's and Footman's joint employer, it is not raising that issue in the instant appeal. Fox reserves its right to appeal that decision after the district court enters final judgment.

the district court considered the appropriate test for determining whether an intern qualifies as a statutory employee.  It acknowledged that other circuits had adopted the primary-beneficiary test.  (SPA21); *see also* (A1903.)  The court, however, felt that the test was not supported by the Supreme Court's decision in *Portland Terminal* and that its application would be "subjective and unpredictable." (SPA22.)  Instead, the court announced, as a purported alternative to the primary-beneficiary test, that it would follow the six-factor DOL test.  (*Id.*)  The court stressed that no single factor was controlling, and it stated that would consider the "totality of the circumstances"—but only within the confines of the six factors set forth in the DOL test.  (*Id.*; *see* SPA23-26.)

    *Second*, the district court applied the six DOL factors to Glatt and Footman. It found that:

    1.    "Footman did not receive any formal training or education during his internship" and the record was inconclusive on whether Glatt's internship was educational.  (SPA23.)

    2.    Glatt and Footman "[u]ndoubtedly" "received some benefits from their internships," but those were "incidental to working in the office like any other employee and were not the result of internships intentionally structured to benefit them."  (SPA24.)

17

3.     "Glatt and Footman performed routine tasks that would otherwise have been performed by regular employees." (*Id.*)

4.     Fox "obtained an immediate advantage" from the tasks performed by Glatt and Footman, and "[t]he facts they were beginners is irrelevant." (SPA25.)

5.     There was "no evidence Glatt or Footman were entitled to jobs at the end of their internships or thought they would be." (*Id.*)

6.     "Glatt and Footman understood they would not be paid," but "this factor adds little, because the FLSA does not allow employees to waive their entitlement to wages." (*Id.*)

Based on these findings, the district court concluded that Glatt and Footman were not "trainees," but instead were "employees" covered by the FLSA and the NYLL. (SPA26.)

*Third*, the district court considered Antalik's request for certification of a Rule 23(b)(3) class in light of the DOL test that it adopted for determining whether unpaid interns were employees. Antalik proposed three "common" questions: "(1) whether [Fox] derived an immediate advantage from interns' work, (2) whether interns displaced regular employees, and (3) whether [Fox's] internship program was for the benefit of interns." (SPA29-30.) But the district court declined to recognize the first and third as common, reasoning that "[s]ome

18

evidence Antalik claims may answer these questions is either individualized proof or of little evidentiary value." (SPA30.)  For instance, the internship guidelines issued by Fox contained "nothing facially unlawful . . . that might generate common answers." (*Id.*)  Also, the court explained, although blank internship request forms provided common proof, that proof was not capable of resolving any question. (*Id.*)  And although completed internship request forms constituted proof of the duties of a particular internship, that evidence was individualized. (*Id.*)

The district court nevertheless concluded that some common proof existed. It isolated (1) an internal company memorandum, which indicated that the size of the unpaid intern program may have doubled after paid internships were eliminated and other cost-cutting measures were instituted at Fox, and (2) internal correspondence between certain supervisors after DOL issued its 2010 Fact Sheet, expressing uncertainty as to whether their interns should be paid. (SPA30-31.)  In the court's view, this evidence was capable of answering three supposedly common questions on a class-wide basis: whether "interns were recruited to help with busy periods"; whether interns "displaced paid employees"; and whether "those who oversaw the internships did not believe they complied with applicable law." (SPA31.)  It therefore held that commonality was satisfied—without citing any of the contrary evidence submitted by Fox. (*Id.*)

19

The district court also concluded that common issues predominated over individualized ones. The court's reasoning, in its entirety, was as follows:

> As discussed above, Antalik submitted generalized proof on the issue of Defendants' liability. In an FLSA class, common questions of liability predominate over individual calculations of damages. [SPA33-34.]

Based on these two sentences, the district court apparently concluded (without expressly so stating) that Antalik had sufficiently demonstrated predominance. It therefore certified a potentially sprawling class of:

> [A]ll individuals who had unpaid internships in New York between September 28, 2005 and September 1, 2010 with one or more of the following divisions of FEG: Fox Filmed Entertainment, Fox Group, Fox Networks Group, and Fox Interactive Media (renamed News Corp. Digital Media). [SPA27.]

*Fourth* and finally, the district court turned to Antalik's request for the conditional certification of an FLSA collective action. The court recognized that this request was subject to "heightened scrutiny" because discovery was complete. (SPA35.) The court then identified three factors as relevant to determining whether "the plaintiff and proposed class members are 'similarly situated'" such that conditional certification was warranted: "(1) [the] disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to [the] defendant which appear to be individual to each plaintiff; and (3) fairness

and procedural considerations." (*Id.* (quoting *Torres v. Gristede's Operating Corp.*, No. 04-CIV-3316, 2006 WL 2819730, at \*9 (S.D.N.Y. Sept. 29, 2006))).

The court's application of these factors was, to put it mildly, quite abbreviated. It concluded that Antalik had "put forth generalized proof that interns were victims of a common policy to replace paid workers with unpaid interns." (*Id.*) And although it found that "there are disparate factual and employment settings," the court nonetheless reiterated that "common issues of liability predominate over individual issues and defenses." (*Id.*) Lastly, the court determined, "fairness" and "procedural considerations" made a collective action a superior mechanisms for adjudicating the FLSA claims. (*Id.*) The court thus conditionally certified the following nationwide collective action:

> [A]ll individuals who had unpaid internships between September 28, 2008 and September 1, 2010 with one or more of the following divisions of FEG: Fox Filmed Entertainment, Fox Group, Fox Networks Group, and Fox Interactive Media (renamed News Corp. Digital Media). [*Id.*]

On reconsideration, the court modified this definition in light of the FLSA's statute of limitations to include only unpaid internships between January 18, 2010 and September 1, 2010. (A1904.)

21

### 4. **Fox's Interlocutory Appeals**

Fox filed a Rule 23(f) petition with this Court seeking permission to appeal the district court's certification of the Rule 23 class. *See* Case No. 13-2467. In addition, following the district court's certification of its Order under 28 U.S.C. § 1292(b), Fox filed a separate petition for permission to appeal the conditional certification of the FLSA collective action and the granting of summary judgment to Glatt and Footman. *See* Case No. 13-3677. As one of the grounds for these petitions, Fox cited Judge Baer's contrary decision in *Wang v. Hearst Corp.*, 293 F.R.D. 489 (S.D.N.Y. 2013), which denied certification of a proposed class and collective action of unpaid interns and also denied the plaintiffs' motion for partial summary judgment on similar facts.

This Court granted both petitions in November 2013 and consolidated the two appeals. It also granted the petition of the plaintiffs in the *Hearst* case and ordered that the consolidated *Glatt* appeals and the *Hearst* appeal be heard in tandem.

### STANDARDS OF REVIEW

This Court reviews decisions granting summary judgment *de novo*, construing the record in the light most favorable to the party against whom summary judgment is sought. *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*,

715 F.3d 102, 108 (2d Cir. 2013).  Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

This Court reviews decisions granting class and collective action certification for abuse of discretion, "[p]rovided that the district court has applied the proper legal standards in deciding whether to certify a class."  *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 31 (quotation marks omitted), *decision clarified on rehearing in other part*, 483 F.3d 70 (2d Cir. 2006).  The question "whether an incorrect legal standard has been used," however, "is an issue of law to be reviewed *de novo*."  *Id.* at 32.  For that reason, the Court has emphasized that "review of class action determinations for 'abuse of discretion' does not differ greatly from review for error."  *Abrams v. Interco Inc.*, 719 F.2d 23, 28 (2d Cir. 1983) (Friendly, J.).  The Court will also find an abuse of discretion when the district court's decision rests on a "clearly erroneous factual finding" or "cannot be located within the range of permissible decisions."  *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011) (quotation marks omitted).

23

## SUMMARY OF ARGUMENT

The district court's decisions to certify Antalik's proposed Rule 23(b)(3) class and FLSA collective action and to grant summary judgment to Glatt and Footman suffer from a common error:  the court failed to apply the correct legal standard.

*First*, the district court applied the wrong test to determine whether an intern qualifies as an employee under the FLSA or NYLL.  Rather than adopting the primary-beneficiary test derived from *Portland Terminal*—which has been followed time and again by other circuit courts, is grounded in Supreme Court precedent, and approved by this Circuit in an analogous context, *see Velez*, 693 F.3d at 330—the district court considered only the six factors set forth in the DOL Fact Sheet.  That narrow approach failed to appreciate the "economic realities" of the internships at issue and, despite the court's protestations to the contrary, was not grounded in the "totality of the circumstances"—both of which the Supreme Court and this Court have explained dictate whether an employment relationship exists.  This Court should adopt the primary-beneficiary test, reverse the decision below, and remand for application of the correct standard.

A remand is particularly important because the district court compounded its legal error by granting summary judgment to Glatt and Footman.  The record

evidence does not establish as a matter of law that Glatt and Footman were Searchlight's employees, especially when evaluated under the primary-beneficiary standard.  Whatever *de minimis* benefits Searchlight may have received from the *Black Swan* internships, the evidence raised at the very least a genuine issue of material fact regarding whether the tangible and intangible benefits received by Glatt and Footman were more substantial.

*Second*, the district court's certification of Antalik's proposed Rule 23(b)(3) class of unpaid former interns is erroneous because the court applied the wrong legal standard, neglecting wholesale the teachings of the Supreme Court's recent decisions in *Dukes* and *Comcast*.  In addition to failing to evaluate the propriety of aggregate treatment through the lens of the primary-beneficiary test, the court departed from established precedent on the commonality and predominance requirements for class certification.

The court's commonality finding was defective on its face because the "common" evidence identified by the court would not "generate common *answers* apt to *drive the resolution* of the litigation" or "resolve an issue that is central to the validity of each one of the claims in one stroke," as required by the Supreme Court.  *Wal-Mart Stores Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (second emphasis added; quotation marks omitted).  Even if the questions were not facially

deficient, the district court failed to engage in the "rigorous analysis" required by *Dukes* and abused its discretion in concluding that Plaintiffs' evidence demonstrated commonality. *See id.*

With respect to predominance, the district court's analysis of this major issue was limited to two sentences. And those two sentences merely said that the court was assuming that common questions predominated simply because it had earlier found that common questions existed. That is not the correct standard; predominance requires another step. As this Court recognized in *Myers v. Hertz Corp.*, 624 F.3d 537 (2d Cir. 2010), predominance assumes common issues exist and requires a comparative determination whether "those common issues are more substantial than individual ones." *Id.* at 549 (quotation marks omitted). There was no such determination here. The court's decision was a result of its utter failure to address the "main concern in the predominance inquiry," namely "the *balance* between individual and common issues." *Id.* at 549 (quotation marks omitted; emphasis added). The district court's certification of Antalik's Rule 23(b)(3) class must therefore be reversed.

*Third*, the district court's certification of the FLSA collective suffers from similar flaws. The court recognized that "heightened scrutiny" should apply to the motion because it arose after discovery ended, but the court in actuality applied

26

barely any scrutiny at all.  That was error by itself.  While this Court has not articulated the exact test that should be applied in cases like this, at least one other circuit court has concluded that where a court considers FLSA certification at the close of discovery—and particularly where the proposed collective action is considered in combination with a proposed Rule 23 class—courts should engage in the more rigorous analysis required by Rule 23.  *See Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 772 (7th Cir. 2013) (Posner, J.).  Even if the Court adopts the three-factor test identified by the district court and derived from *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001), it should conclude that the test was not met here.  Plaintiff Antalik did not establish by a preponderance of the evidence that potential opt-in plaintiffs—former unpaid interns who participated in a wide variety of internships at various FEG subsidiaries across the nation—are similarly situated.  *See Zavala v. Wal-Mart Stores, Inc.*, 691 F.3d 527, 537 (3d Cir. 2012).  Accordingly, certification of the collective action should also be reversed.

## ARGUMENT

## I.   THE PRIMARY-BENEFICIARY TEST GOVERNS WHETHER AN INTERN IS AN EMPLOYEE UNDER THE FLSA AND THE NYLL.

The district court adopted the wrong standard for determining whether the former interns were employees entitled to wages.  It misconstrued (and at times

27

ignored) binding Supreme Court and Circuit precedent requiring courts to consider which party derives the primary benefits from the supposed employment relationship. Instead, the court considered only the six, non-binding DOL factors, and wrongly evaluated those factors.

### A.    An Intern Is Not An "Employee" If He Or She Is The Primary Beneficiary Of The Internship.

This Court should apply the primary-beneficiary test as the standard for determining whether unpaid interns are employees because it comports with Supreme Court precedent, Circuit precedent, and the well-reasoned views of other courts. The test has its origin in the long-recognized principle that the type of "work" labor laws regulate is that done "necessarily and primarily for the benefit of the employer and his business." *Tenn. Coal, Iron & R.R. Co.*, 321 U.S. at 598. Indeed, this principle drove the Supreme Court's decision in *Portland Terminal*.

### 1. The Primary-Beneficiary Test is Grounded in *Portland Terminal*.

In *Portland Terminal*, the Court considered whether a railroad was required to pay wages to prospective yard brakemen participating in a practical training program run by the railroad. 330 U.S. at 149. The training was a prerequisite to employment with the railroad, but participants were not guaranteed a position at the conclusion of the training. *Id.* at 149-50. During the program, trainees were

28

supervised by yard crew. *Id.* at 149. Prospective brakemen first "learn[ed] the routine activities by observation," and then were "gradually permitted to do actual work under close scrutiny." *Id.* They did not "displace any regular employees," and their "work [did] not expedite the company business, but may, and sometimes [did], actually impede and retard it." *Id.* at 150. Accordingly, the railroad "receive[d] no 'immediate advantage' from any work done by the trainees." *Id.* at 153.

The Court observed that there was "no question" that the brakemen "[did] work in the kind of activities covered by" the FLSA. *Id.* at 150. Notwithstanding that fact and the breadth of the FLSA's coverage, the Court held that Congress "obviously" did not intend to "stamp all persons as employees who, without any express or implied compensation agreement, might work for their own advantage on the premises of another." *Id.* "Otherwise," explained the Court, "all students would be employees of the school or college they attended, and as such entitled to receive minimum wages." *Id.* at 152.

Rather, after making repeated references to the prospective yard brakemen as being akin to those "work[ing] for their own advantage" or "for [their] personal purpose or pleasure," the Court concluded that the railroad was not required to pay wages to the prospective yard brakemen because they were "trainees"—not

29

"employees" covered by the FLSA. *Id.* at 152-53. The Court compared the incidental benefit received by the railroad with the vocational benefits received by the workers and reasoned that the FLSA "was not intended to penalize railroads for providing, free of charge, the same kind of instruction" that, for example, a vocational school would provide, "at a place and in a manner which would *most greatly benefit the trainees*." *Id.* at 153 (emphasis added). This standard for determining when workers are excluded from coverage has come to be known as the "primary-beneficiary test." *See generally Solis v. Laurelbrook Sanitarium & Sch., Inc.*, 642 F.3d 518, 526 (6th Cir. 2011) (citing *Portland Terminal*). It is the standard that should drive any inquiry into whether an intern is properly classified as an employee.

The district court concluded otherwise. It held that the primary-beneficiary test "has little support" in *Portland Terminal*. (SPA21.) Specifically, the district court reasoned that "[t]he Supreme Court did not weight the benefits to the trainees against those of the railroad, but relied on findings that the training program served *only* the trainees' interests and that the employer received '*no* "immediate advantage" from any work done by the trainees." (*Id.* (quoting *Portland Terminal*, 330 U.S. at 153, and adding emphasis)). This is a misreading of the case.

*Portland Terminal* did not in fact conclude that the training program served *only* the trainees' interest; rather, the Supreme Court explained that if labor law did *not* recognize that trainees were different, then it would sweep into its reach even a person who worked "without promise or expectation of compensation, but solely for his personal purpose or pleasure" or "whose work serves only his own interest." *Portland Terminal*, 330 U.S. at 152. The Court's decision plainly does not support a requirement that the training must be *only* for the trainee's interest because the Court expressly recognized that the program in *Portland Terminal* was ultimately to the mutual benefit of both the railroad and the trainees: "This training is a necessary requisite to entrusting them with the important work brakemen must do." *Id.* at 149. Those who completed the training were certified and "their names [were] included in a list from which the company can draw when their services are needed." *Id.* at 150. The district court's suggestion otherwise is without justification.

The district court gave great weight to the fact that *Portland Terminal* concluded that the prospective brakemen were not employees in part by "[a]ccepting the unchallenged findings here that the railroads receive no 'immediate advantage' from any work done by the trainees." *Id.* at 153. But as Judge Baer thoughtfully explained, "it does not logically follow that the reverse is

31

true, i.e. that the presence of an 'immediate advantage' alone creates an employment relationship under the FLSA." *Wang*, 293 F.R.D. at 493. Instead, the existence of an immediate advantage to the employer counts as a benefit to the employer, which should be weighed against the benefits to the trainee. *See, e.g.*, *Laurelbrook*, 642 F.3d at 526 n.2; *Reich v. Parker Fire Prot. Dist.*, 992 F.2d 1023, 1028 (10th Cir. 1993). This conforms to the Supreme Court's longstanding view that an employment relationship must be determined by the totality of the circumstances; no one factor is controlling. *See, e.g.*, *Rutherford Food Corp.*, 331 U.S. at 730. And it is entirely in keeping with the primary-beneficiary test. The district court's view to the contrary falls flat.

## 2. The Primary-Beneficiary Test Is Consistent With Precedent.

The primary-beneficiary test also accords with "economic reality," which is the lynchpin of general FLSA jurisprudence and relevant to wage-and-hour cases like this one. *E.g.*, *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 301 (1985); *Goldberg*, 366 U.S. at 33; *Velez*, 693 F.3d at 326; *Barfield*, 537 F.3d at 141; *Zheng*, 355 F.3d at 66.[10] It makes good economic sense (and comports with

---

[10] Courts have used "economic reality" to describe several different inquiries under the FLSA. For example, courts use it to describe the test for determining whether an entity is the "joint employer" of an employee. *See, e.g.*, *Barfield*, 537 F.3d at 141-42. They also use it to describe the test for distinguishing between employees and independent contractors. *See, e.g.*, *Brock v. Superior Care, Inc.*,

common sense) to conclude that when the primary benefit of the relationship goes to the intern, she is not entitled to wages on top of that benefit.  On the other hand, when the employer receives the primary benefit, it is sensible for that benefit to be shared with the employee in the form of wages.

No doubt that is why in *Velez*, a case involving a domestic worker who claimed she was an employee entitled to wages, this Court approved this test and recognized that "[a] court should . . . *consider who is the primary recipient of benefits from the relationship*."  693 F.3d at 330 (emphasis added).  The Court noted that this test "is the approach taken by courts determining if trainees and students providing services as part of their education are also employees."  *Id.* And lest there be any doubt that this Court was borrowing from the primary-beneficiary test, it cited the key primary beneficiary decisions from both the Sixth and the Eighth Circuits.  *Id.* (citing *Laurelbrook*, 642 F.3d at 528-29; *Blair v. Wills*, 420 F.3d 823, 829 (8th Cir. 2005)).

In fact, the majority of the Circuits that have considered whether an employment relationship exists in the internship context have adopted the primary-beneficiary test, taking the view that it is both required by *Portland Terminal* and consistent with the FLSA. For instance, in *Laurelbrook*, the Sixth Circuit applied

---

840 F.2d 1054, 1059 (2d Cir. 1988).  In all cases, courts base their decision on the totality of the circumstances.

the primary-beneficiary test to determine whether students who performed facility-related tasks as part of an externship at a sanitarium were "employees" under the FLSA. *See Laurelbrook*, 642 F.3d at 528-29. After considering and rejecting the DOL's six-factor test and the traditional economic reality test, the court held that the primary-beneficiary test "readily captures the distinction the FLSA attempts to make between trainees and employees" and is best suited to address the "unique nature of the training situation." *Id.* In *Blair*, the Eighth Circuit applied the primary-beneficiary test and held that students at a boarding school were not employees because the chores they were required to perform instilled positive values, and thus ultimately benefitted the students. *Blair*, 420 F.3d at 829.

The precedent in the Fourth and Fifth Circuits follows suit. *See McLaughlin v. Ensley*, 877 F.2d 1207, 1209 (4th Cir. 1989) ("[T]he general test used to determine if an employee is entitled to the protections of the Act is whether the employee or the employer is the primary beneficiary of the trainees' [sic] labor"); *Donovan v. Am. Airlines, Inc.*, 686 F.2d 267, 272 (5th Cir. 1982) ("[T]he district court's balancing [of relative benefits] analysis appears to us to be more appropriate" than other tests); *Wang*, 293 F.R.D. at 493; U.S. Dep't of Labor Op. Letter, 1995 WL 1032473, at *1 (Mar. 13, 1995) ("If, in fact, this internship

program is *predominantly for the benefit* of the college students, we would not

assert an employment relationship" (emphasis added)).[11]

    The district court rejected the primary-beneficiary test without addressing

this Court's *Velez* decision in any substantive way.  (*See* SPA21 n.59.)  It also

failed to grapple with the reasoning of any of the circuit court decisions that have

adopted the primary-beneficiary test.  Instead, the district court appeared to reject

the test in large part based on its unfounded view that the test is "subjective,"

"unpredictable," and "unmanageable."  (SPA22.)  But the test is decidedly not

subjective; nothing turns on the intern's opinion of the quality or efficacy of the

training he or she receives.  Rather, it requires an objective evaluation of the

purpose and design of the internship.

    The district court worried that the "very same internship position might be

compensable as to one intern, who took little from the experience, and not

compensable as to another, who learned a lot."  (*Id.*)  But that fear is misguided.

---

[11]  The primary-beneficiary test is also entirely consistent with the approach of
those circuits that look only to the economic realities of the relationship.  *See, e.g.,
Kaplan v. Code Blue Billing & Coding, Inc*., 504 F. App'x 831, 834 (11th Cir.
2013), *cert. denied*, 134 S. Ct. 618 (2013); *Reich*, 992 F.2d at 1027.  As the Sixth
Circuit has explained, "[t]o state that economic realities govern is no more helpful
than attempting to determine employment status by reference directly to the
FLSA's definitions themselves.  There must be some ultimate question to answer,
factors to balance, or some combination of the two."  *Laurelbrook*, 642 F.3d at
522-23.  And "the ultimate inquiry in a learning or training situation is whether the
employee is the primary beneficiary of the work performed."  *Id*. at 525.

Again, the question is not whether the intern feels that he or she personally profited from the program; instead, it revolves around the objective characteristics of the program itself.

Finally, the district court's claim of unworkability is belied by the fact that multiple circuits have adopted and applied the primary-beneficiary test without difficulty—some, indeed, for decades.  *See, e.g.*, *id.* at 525-29; *Blair*, 420 F.3d at 829; *McLaughlin*, 877 F.2d at 1209-10 n.2.  Indeed, the primary-beneficiary test has a positive effect on manageability:  it structures the totality-of-the-circumstances inquiry and provides the "ultimate question to answer." Laurelbrook, 642 F.3d at 523.  It is the test that the Court should adopt here, and nothing in the district court's analysis explains otherwise.

### 3. Under The Primary-Beneficiary Test, A Court Should Consider The Totality Of The Circumstances.

Consistent with other standards for determining whether an employment relationship exists, the primary-beneficiary test requires a court to consider all relevant facts and circumstances related to an internship to decide who is the primary beneficiary of the relationship.  These include whether the internship provides value to interns in the form of "tangible" benefits, such as hands-on training, a competitive advantage in future employment, skills training, or approved course credit.  A court should also consider whether the internship

36

provides "intangible" benefits to the intern, such as teaching the values of task completion, leadership, and teamwork.  On the other side of the equation are considerations of whether the internship requires an employer's paid personnel to supervise the intern at the expense of engaging in productive work, disrupts the employer's business operations, displaces compensated employees, or contributes to the company's operations by defraying costs or generating revenue.  An additional relevant consideration may also be whether the internship program carries an expectation of compensation or future employment.  *See, e.g.*, *Laurelbrook*, 642 F.3d at 530-32; *McLaughlin*, 877 F.2d at 1210.

To the extent the DOL factors identify additional relevant facts and circumstances, they too are useful tools.  But they are not, as the district court evidently concluded, the only factors that a court should consider.  (*See* SPA23-26.)  Rather, as the Sixth Circuit explained with respect to the six DOL factors (and in analysis that equally applies to the additional five NYDOL factors), although the factors themselves "may be helpful in guiding that inquiry, the Secretary's test on the whole is not."  *Laurelbrook*, 642 F.3d at 525.  The "Secretary's test" is an all-or-nothing approach that requires all six factors to exist for an intern not to count as an employee.  That test is "overly rigid and inconsistent with a totality-of-the-circumstances approach, where no one factor (or the absence of one factor)

37

controls." *Id.*  It is also, contrary to the district court, not mandated by *Portland Terminal*:  "While the Court's recitation of the facts included those that resemble the Secretary's six factors, the Court gave no indication that such facts must be present in future cases to foreclose an employment relationship."  *Id.* at 526 n.2 (citation omitted).  *Portland Terminal* instead "focus[ed] principally on the relative benefits of the work performed by the purported employees," and "its decision rested upon whether the trainees received the primary benefit of the work they performed."  *Id.* at 526.

The Sixth Circuit got it right.  For one, its view is consistent with the DOL Fact Sheet itself, which states that the Fact Sheet exists "for general information" only, and "is not to be considered in the same light as official statements of position."  (A1339.)  Its view is consistent with this Court's repeated admonishments that courts should not construe a list of factors *relevant* to determining whether an employment relationship exists as *exclusive*.

If a common theme pervades this Court's jurisprudence in this area of law, it is that courts should eschew rigid factor-based tests and should instead look to the totality of the circumstances.  For example, in *Velez*, the Court identified a number of factors relevant to the determination whether a domestic worker was an employee.  693 F.3d at 330.  The Court cautioned, however, that "a court must not

38

apply these factors rigidly, and the list is not all-inclusive." *Id.* The Court explained that the test was grounded in "economic reality," which "'encompasses the totality of circumstances, no one of which is exclusive.'" *Id.* (quoting *Herman v. RSR Sec. Servs. LTD.*, 172 F.3d 132, 139 (2d Cir. 1999)). And because "economic reality is determined based upon *all* the circumstances, any relevant evidence may be examined so as to avoid having the test confined to a narrow legalistic definition." *Id.* (quoting *Herman*, 172 F.3d at 139).

This Court reached the same conclusion in a case evaluating whether a putative employee was instead an independent contractor. The Court reasoned: "The factors that have been identified by various courts in applying the economic reality test are not exclusive. Since the test concerns the totality of the circumstances, any relevant evidence may be considered, and mechanical application of the test is to be avoided." *Brock*, 840 F.2d at 1059.

Similarly, in *Zheng*, the Court vacated the summary judgment that was granted to a manufacturer who the district court had concluded was not a joint employer of the plaintiffs, because the district court (like the court below in this case) "erred when it limited its analysis to the four factors identified" as relevant by this Court in an earlier case, *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8 (2d Cir.1984). *Zheng*, 355 F.3d at 64. The *Zheng* Court explained that *Carter* "did not

39

purport to identify all factors that could bear on the employer status question." *Id.* at 71. Instead, a court's inquiry must be based on *all* relevant circumstances and *any* relevant evidence. *Id.* (quoting *Herman*, 172 F.3d at 139). There is no reason to depart from that rule here, and the Court should not do so.

Accordingly, this Court should conclude that (i) whether unpaid interns are properly classified should be determined by the primary-beneficiary test, (ii) under this test, courts should consider all relevant facts and circumstances and weigh the benefits to each party, and (iii) the ultimate determination should be based on the totality of the circumstances. The Court should remand for application of the proper test.

### B. Judged Against The Primary-Beneficiary Test, There Is A Genuine Issue Of Material Fact Whether Glatt And Footman Were Employees.

A remand is particularly important because the district court compounded its legal error by granting summary judgment to Glatt and Footman. The record evidence does not establish as a matter of law that Glatt and Footman were Searchlight's employees, especially when evaluated under the primary-beneficiary standard. At the very least, there are genuine issues of material fact that independently require reversal and remand.

40

Glatt and Footman received the very production and post-production training they set out to get.  *See* (A1122), (A1140, 1143-44.)  Their tasks related to film production, script review, accounting, and post-production and editing. They gained practical, hands-on experience in a production office, obtained behind-the-scene access, developed contacts, and acquired skills and knowledge to give them a competitive edge in the job market.  *See* (A1161-62, 1165, 1167, 1170-71, 1173), (A1153-54.)    Indeed, when Glatt's internship ended, he applied for another internship on *Black Swan*, this time in post-post production. (A1038 ¶¶ 109-111.)

Despite recognizing that, "[u]ndoubtedly, Glatt and Footman received some benefits from their internships, such as resume listings, job references, and an understanding of how a production office works," the district court nonetheless ruled that "those benefits were incidental to working in the office like any other employee and were not the result of internships intentionally structured to benefit them."  (SPA24.)  It concluded that they were insubstantial because "Glatt and Footman performed routine tasks that would otherwise have been performed by regular employees," and it further held that "[t]he fact they were beginners is irrelevant."  (*Id.* at 24-25.)

Those facts do not, however, swing the balance in Glatt's and Footman's favor, for the same could be said of the potential railroad brakemen in *Portland*

41

*Terminal*, who were beginners doing "work in the kind of activities covered by the Act."  330 U.S. at 150.  Glatt and Footman may also have been allowed to do "actual work" of the kind regularly performed in the industry and under the "supervision" of company employees, but just like in *Portland Terminal*, this may be part and parcel of an internship experience.  *See id.* at 149.  It is not an indicator of employee displacement or—as Glatt and Footman admittedly understood—an implied agreement for compensation.  (SPA25-26.)  To the contrary, if an intern has the opportunity to perform tasks that employees sometimes perform, the internship may have more (not less) value for the interns.

To the extent the district court rejected the benefits to Glatt and Footman because they did not look similar enough to those in *Portland Terminal*, its reasoning is fundamentally flawed.  The court failed both to translate *Portland Terminal* into modern times and to consider the context of the relevant industry.  An internship does not take just one form; training in one industry may look very different from training in another industry; and the supervision required for an intern to learn and experiment in a relatively risk-free environment may vary widely.  For example, although government interns are not covered by the relevant

labor laws,[12] their experience nicely illustrates how an internship may be both educational and mutually beneficial. Judges around the country at all levels typically utilize interns in their chambers to assist with research and tasks that are often performed by paid law clerks. Yet no one doubts the educational value of that experience, even though it may not look exactly like the training experience in *Portland Terminal*. Because judicial interns are not learning a manual skill, they do not need someone standing over their shoulder to teach them appropriate technique. Rather, their completed work product is subject to review and feedback. And they generally are given wider latitude for error because they are trainees. Moreover, like interns in the entertainment industry, a judicial intern gains a valuable entry on her resume, which shows experience in a unique environment.

The district court failed to recognize any of this, and it departed from other circuits that have credited precisely these types of benefits in evaluating whether an intern is an employee. In *Laurelbrook*, for example, the court found that while the tasks performed by the students at a sanitarium benefited its maintenance operations, defrayed costs, and even generated revenue, the value to the sanitarium

---

[12] Government interns are not "employees" under either the FLSA, which excludes "any individual who volunteers to perform services for a public agency which is a State, a political subdivision of a State, or an interstate governmental agency," 29 U.S.C. § 203(e)(4)(A), or the NYLL, N.Y. Lab. Law § 651(5)(n).

was offset by the "the tangible and intangible benefits that accrue[d] to the students."    642 F.3d at 531.    Those benefits included supervised "hands-on, practical training," future "competitive" advantage in the workplace, learning how to operate tools characteristic in their field of study, and learning lessons, such as "responsibility and the dignity of manual labor," "the importance of working hard and seeing a task through to completion," and developing "leadership skills and work ethic."    *Id*. at 530-31.    Notwithstanding the benefits received by the sanitarium, the value of even the intangible benefits the students received was enough to "tip the scale" in their favor.  *Id*. at 531.[13]

Courts have thus recognized that *Portland Terminal* is but an example of the type of program where workers are "trainees"—not "employees"—and not a specific mandatory dictate as to which all other training programs must conform. They appropriately focus on the economic realities of the relationship to determine which party is the primary beneficiary.  And they consider the context of the particular industry in which the internship arose.  The district court below adopted

---

[13]    Similarly, in *Blair*, the Eighth Circuit held that students were not employees of the school where their "'chores were intended to instill in each student a sense of teamwork, responsibility, accomplishment, and pride' and ultimately benefitted the student."    420 F.3d at 829.    This was so even though those tasks offset costs the company would have incurred if it had hired employees to perform them.  *Id.*

44

a one-size-fits-all approach that is antithetical to precedent, as well as common sense. Its decision should be reversed.

## II.   THE CERTIFIED CLASS DOES NOT MEET THE REQUIREMENTS OF RULE 23.

The district court's grant of summary judgment to Glatt and Footman was just one of several errors. Glatt and Footman were production interns; Antalik, by contrast, was an intern in Searchlight's corporate offices in New York. Her internship experience was fundamentally different from those of Glatt and Footman. The district court certified Antalik's proposed Rule 23(b)(3) class of former unpaid interns based on the wrong legal standard; the same one it mistakenly applied to Glatt's and Footman's claims. (Glatt and Footman did not seek class certification.) That alone warrants at least vacatur. But its errors run deeper still: the court's commonality and predominance findings were each stark departures from precedent. The district court's determination that common issues exist is a gross misapplication of *Dukes*. And its categorical decision that the existence of *some* common issues means predominance is satisfied is flatly inconsistent with this Court's decision in *Myers* and the Supreme Court's decision in *Comcast*. Accordingly, the district court's certification order must be reversed.

45

**A.    Plaintiffs Failed To Identify Common Questions That Could Resolve An Issue Central To Liability For Each Class Member "In One Stroke."**

"What matters to class certification is not the raising of common questions— even in droves—but rather the capacity of a classwide proceeding to generate common *answers* apt to *drive the resolution* of the litigation."  *Dukes*, 131 S. Ct. at 2551 (second emphasis added; ellipsis and quotation marks omitted).  The district court identified three questions purportedly capable of common resolution for Antalik's proposed class of individuals who had unpaid internships with certain FEG subsidiaries in New York:  whether "interns were recruited to help with busy periods"; whether interns "displaced paid employees"; and whether "those who oversaw the internships did not believe they complied with applicable law." (SPA31.)  None of those questions meet the *Dukes* threshold for commonality; the district court's finding to the contrary is a misapplication of *Dukes* and an error of law.  Yet even if those questions could satisfy *Dukes*, they do not do so in this case because the record shows that they cannot be answered on a classwide basis, and the district court wrongly concluded otherwise.

### 1. The Supposedly Common Questions Identified By The District Court Are Legally Insufficient Under *Dukes* To Support A Finding Of Commonality.

Before a class action may be certified, the plaintiff seeking certification must demonstrate by a preponderance of the evidence that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2); *Myers*, 624 F.3d at 547.  The Supreme Court has warned that this language "is easy to misread, since any competently crafted class complaint literally raises common questions."  *Dukes*, 131 S. Ct. at 2551 (quotation marks omitted).  But under Rule 23(a), not just any question will do; a common question is one that a court determines—after a "rigorous analysis"—will "generate common *answers* apt to drive the resolution of the litigation."  *Id.* (quotation marks omitted).  There must be some "common contention," which exists only if "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.*

Here, the district court purported to identify "evidence capable of generating common answers to questions of liability."  (SPA31.)  The evidence that the district court believed would generate common answers was supposed proof that the "interns were recruited to help with busy periods," "they displaced paid employees," and "those who oversaw the internships did not believe they complied with applicable law."  (*Id.*)  At most, according to the district court, this evidence

47

could demonstrate an alleged "common policy to replace paid workers with unpaid interns." (*Id.* at 35.) (The subjective beliefs of certain employees at Fox do not bear on any particular factor under either the primary-beneficiary test or the DOL's six-factor test.) But in fact, the entire proof of such a "policy" derived from a single piece of correspondence between two individuals, who assuredly did not and could not speak for the company as a whole. That "evidence" was grossly inadequate to prove the existence of a company-wide policy.

But even accepting that, in some instances, Fox used unpaid interns where employees had previously been utilized, that says nothing about the quality of any particular internship experience, the educational value to the intern, or who the primary beneficiary of the relationship was. In other words, Antalik's supposed common evidence is precisely the sort of evidence that the Supreme Court held would *not* suffice to show commonality in *Dukes*. *See* 131 S. Ct. at 2551.

The plaintiffs in *Dukes* alleged that Wal-Mart had engaged in a pattern or practice of sex discrimination, but "[t]he only corporate policy that the plaintiffs' evidence convincingly establish[ed was] Wal-Mart's 'policy' of *allowing discretion* by local supervisors over employment matters." 131 S. Ct. at 2554. This is analogous to Fox's supposed "common policy to replace paid workers with unpaid interns." (SPA35.) The Court acknowledged that in the appropriate case,

48

giving complete discretion to lower-level managers *could* be the basis of Title VII liability.  131 S. Ct. at 2554.  Similarly, in the appropriate case, the use of unpaid interns where paid workers were once utilized *could* be the basis of NYLL liability.  But as *Dukes* explained, "the recognition that this type of Title VII claim 'can' exist does not lead to the conclusion that every employee in a company using a system of discretion has such a claim in common."  *Id.*  That one manager abused the discretionary policy says nothing about whether another manager did so.  *Id.*  Likewise, that one internship at Fox abused the alleged policy of using interns where paid workers had once been utilized (by, for example, not making the internship experience appropriately educational) says nothing about whether another internship did so.

The *Dukes* Court identified the "crux of the inquiry" in that case as "the reason for the particular employment decision."  *Id.* at 2552.  Because the plaintiffs' claims were based on many different individual employment decisions, they had to demonstrate "some glue holding the alleged *reasons* for all those decisions together," else it would "be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*."  *Id.*  Here, the crux of the inquiry is the primary beneficiary of the relationship (or, under DOL's test, the weight of the six factors).

49

Without some "glue" showing the balance is the same across all Fox internships, it is impossible to say that there could be a common answer to the crucial question *who is the primary beneficiary* (or, how the DOL factors weigh).  The "determination of [the] truth or falsity" of the supposed Fox policy of using interns in place of employees will not "resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.* at 2551.  It won't even determine whether a single internship is an unlawful employment relationship.  Accordingly, the district court erred as a matter of law by concluding that the supposedly common evidence that it identified was capable of generating common answers under *Dukes*.

### 2.    Antalik Did Not Meet Her Burden To Establish Commonality.

Even were the questions identified by the district court capable of satisfying *Dukes*' commonality standard, however, they cannot do so in this case.  Antalik's evidence does not demonstrate that any "crucial question" of liability can be answered with respect to the class as a whole.   The district court's finding otherwise was an abuse of discretion.

In concluding that Antalik had proven commonality, the district court failed entirely to conduct a "rigorous analysis" of the evidence as required by *Dukes*.  131 S. Ct. at 2551.  The court's commonality analysis, spanning barely more than two

pages of its opinion, neither evaluated the dissimilarities within the putative class (of which there were many) nor resolved factual disputes between the parties. *See id.* at 2551-52.

*First*, the district court's commonality finding makes little sense in light of its determination that all of the evidence Antalik presented concerning the duties of interns was hopelessly individualized:  the "FEG internship guidelines" did not create "common answers to drive the litigation," and the "completed [intern] request forms," "which describe various internship positions," constituted only "individualized proof."  (SPA30.)  Given the district court's own findings that the prospective class members worked in "disparate factual and employment settings," (*Id.* at 35), there was no basis for the district court to conclude that Antalik had established commonality.

*Second*, the district court accepted without scrutiny the assertion that Antalik's supposed evidence of commonality—internal correspondence discussing cost-cutting measures in 2008 and questioning compliance with DOL's requirements for an unpaid internship program—proved commonality.  (*Id.* at 30-31.)  But that correspondence standing alone cannot support the full weight of a finding of commonality because it does not prove any common policy or company-wide understanding.  Indeed, in evaluating similar evidence, the *Wang* court

51

reached the *exact opposite conclusion*:  it denied class certification on the ground that the plaintiffs failed to establish that Hearst had a uniform policy or practice governing unpaid internships across its twenty different magazines, despite evidence of emails at two magazines that instructed staff to use unpaid interns rather than paid messengers to cut costs.  *See* 293 F.R.D. at 490-91.  Here, as in *Wang*, the overwhelming evidence of facts that undermine the existence of commonality drowned out whatever inferences might be drawn about company policy from peripheral internal communications.  *See id.* at 495-97.

*Third*, the district court made no effort whatsoever to reconcile Antalik's evidence with conflicting proof.  For example, the court ignored declarations from at least 13 different intern supervisors demonstrating vast differences in the types of duties, levels of supervision and training, and types of experiences the interns received.  *See, e.g.*, (A1355-62; ¶¶ 5-39), (A1341-43; ¶¶ 3, 5-6, 8-10), (A1364-67; ¶¶ 3, 7, 9, 14, 16), (A1370-78; ¶¶ 4, 9, 11-12, 18, 21, 23, 27-29), (A1348, 1351-52; ¶¶ 2, 14-15.)  Similarly, the court failed to address deposition testimony offered by Fox showing that individual supervisors designed the internships' content, selected which individuals were offered internships, and decided whether to offer internships at all, *see* (A1322-23), (A1291-92), with no centralized control by the company, *see* (A1303, 1307),  (A1329-31.)

52

"Dissimilarities within the proposed class . . . impede the generation of common answers." *Dukes*, 131 S. Ct. at 2551 (quotation omitted). Therefore, the district court's failure to "address all of the evidence before it and resolve the material disputed facts arising from the conflicting declarations" would warrant, at an absolute minimum, vacatur of its certification order. *See Cuevas v. Citizens Fin. Grp., Inc.*, 526 F. App'x 19, 22 (2d Cir. 2013) (summary order). However, because the "common" questions identified by the district court are legally insufficient—particularly in light of the court's own findings underscoring the lack of commonality—reversal is warranted.

**B.    The District Court's Predominance Analysis Was Patently Insufficient And Flawed.**

Because there are no "questions of law or fact common to the class" under Fed. R. Civ. P. 23(a)(2), it necessarily follows that no such questions "predominate over any questions affecting only individual members" under Fed. R. Civ. P. 23(b)(3). Moreover, even if common questions did exist, the district court's finding of predominance was deeply flawed.

**1.    The District Court Did Not Apply The Correct Legal Standard.**

As the Supreme Court recently emphasized, courts have the "duty to take a close look at whether common questions predominate over individual ones."

53

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (quotation marks omitted). The district court entirely abdicated that duty. The sum total of its predominance analysis is as follows: "As discussed above, Antalik submitted generalized proof on the issue of Defendants' liability. In an FLSA class, common questions of liability predominate over individual calculations of damages." (SPA33-34.)

As a statement of the law that is simply incorrect. Predominance does not follow automatically from commonality—in an FLSA or any other kind of suit. To the contrary, "Rule 23(b)(3)'s predominance criterion is even *more* demanding than Rule 23(a)." *Comcast Corp.*, 133 S. Ct. at 1432 (emphasis added). Of course predominance assumes that *some* common issues exist, but it requires more—specifically, a comparative determination whether "those common issues are more substantial than individual ones." *Myers*, 624 F.3d at 549 (quotation marks omitted).

As an analysis of predominance, the district court's two short sentences fail entirely to address the "main concern in the predominance inquiry"; that is, "the balance between individual and common issues." *Id.* (quotation marks omitted). Nowhere in the opinion does the district court ever address this balance, make the necessary comparison, or explain its determination that common issues

54

predominate over individual ones. Its finding of predominance is unsupported and insupportable. It must be reversed.

### 2. Antalik Did Not Meet Her Burden To Establish Predominance.

The district court abused its discretion in concluding that Antalik had met her burden to prove predominance by a preponderance of the evidence. We have already explained that the supposedly common questions identified by the court are legally insufficient to establish commonality. *See* Point II.A, *supra*. But even if they were sufficient for commonality purposes, they fall far short of predominating over the many individualized factors that the factfinder would have to evaluate to determine whether the interns are employees.

This Court's decision in *Myers* is particularly on point. There, the Court upheld a district court's refusal to certify a class of Hertz station managers who claimed they were misclassified as exempt employees not entitled to overtime wages. 624 F.3d at 542. The Court agreed that predominance had not been established because even though the evidence generated common answers to *some* subsidiary questions on liability, the evidence did not generate common answers to other questions that predominated the overall liability inquiry. *Id.* at 549-51. Specifically, the Court considered whether the fact that Hertz had a "blanket exemption policy" for all station managers sufficed to establish predominance. *Id.*

at 549.  It answered that question in the negative, taking into consideration that one of the key "'questions of law or fact' that this case will ultimately require resolving" was "whether plaintiffs were *entitled* to overtime under FLSA."  *Id.* at 548.  Keeping that key question in mind, the Court reasoned, "[i]n possible contrast to a uniform corporate policy detailing employees' job duties, the fact of common exemption does not establish whether all plaintiffs were *actually* entitled to overtime pay or whether they were covered by the applicable administrative regulations defining FLSA's exemptions."  *Id.* at 549.  Accordingly, "Hertz's common policy demonstrated little regarding whether the constituent issues that bear on Hertz's ultimate liability are provable in common."  *Id.* at 550.

The same is true here of the only supposed common policy that the district court identified:  the alleged "common policy to replace paid workers with unpaid interns."  (SPA35.)  Like Hertz's blanket exemption policy in *Myers*, this alleged policy demonstrates little about whether the issues that will ultimately determine Fox's liability—such as the key question whether the interns are employees—"are provable in common."  624 F.3d at 550.  Instead, like in *Myers*, there is no "uniform corporate policy detailing employees' job duties," and the evidence leaves open "a number of subsidiary questions" concerning the interns' "actual job characteristics and duties," "each of which may or may not be able to be proven in

common with respect to all [interns]."  624 F.3d at 548; *see also Cuevas*, 526 F. App'x at 22; *Wang*, 293 F.R.D. at 495-96.  Accordingly, there is no basis to conclude that Antalik has or could establish predominance in this case.  The district court's certification of a Rule 23(b)(3) class therefore should be reversed.

## III.  THE COLLECTIVE ACTION WAS IMPROPERLY CERTIFIED UNDER THE FLSA.

The district court's analysis supporting its decision to certify an FLSA collective action merely echoed its decision to certify a Rule 23 class.  (SPA35.) For largely the same reasons Antalik failed to satisfy Rule 23's commonality and predominance requirements, she has failed to satisfy the FLSA's "similarly situated" requirement.  Even were this Court to apply some lesser standard to the FLSA, it should require a more demanding standard than the district court applied below to Antalik's post-discovery motion.  Accordingly, this Court should reverse the district court's FLSA certification, too.

### A.  After Discovery, Plaintiffs Should Be Required To Meet A Heightened Burden Of Proof To Demonstrate Certification Of An FLSA Collective Action Is Appropriate.

The FLSA provides a private cause of action against an employer "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated," 29 U.S.C. § 216(b), but it does not define what it

means for employees to be "similarly situated." Courts have developed widely varying certification procedures as a result. *See Thiessen*, 267 F.3d at 1102.

This Court has approved of the two-stage approach adopted by most courts. *See Myers*, 624 F.3d at 554-55. "The first step involves the court making an initial determination to send notice to potential opt-in plaintiffs who may be 'similarly situated' to the named plaintiffs with respect to whether a FLSA violation has occurred." *Id.* at 555. It requires only "a modest factual showing" that the plaintiffs and potential opt-in plaintiffs "together were victims of a common policy or plan that violated the law." *Id.* (quotation marks omitted). The standard prior to discovery is low "because the purpose . . . is merely to determine *whether* 'similarly situated' plaintiffs do in fact exist." *Id.*

"At the second stage, the district court will, *on a fuller record*, determine whether a so-called 'collective action' may go forward by determining whether the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs." *Id.* (emphasis added). Although *Myers* did not specify the plaintiff's burden of proof at this second stage, the Third Circuit has persuasively read *Myers* to require that plaintiffs "must satisfy their burden . . . by a preponderance of the evidence." *Zavala*, 691 F.3d at 537.

58

In evaluating whether the plaintiff has met that burden, some courts have concluded that the three factors identified by the Tenth Circuit in *Thiessen*, 267 F.3d at 1103, are relevant:  "(1) [the] disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendants that appear to be individual to each plaintiff; and (3) fairness and procedural considerations."  *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1261 (11th Cir. 2008) (brackets and quotation marks omitted), *cited with approval in Myers*, 624 F.3d at 555.

Other courts require plaintiffs to meet Rule 23's requirements at this second stage (at least insofar as they are consistent with the FLSA).  *See, e.g.*, *Espenscheid*, 705 F.3d at 772; *Shushan v. Univ. of Colo.*, 132 F.R.D. 263, 265 (D. Colo. 1990).  For example, the Seventh Circuit has concluded that particularly where a plaintiff proceeds under both federal and state labor law, "there isn't a good reason to have different standards for the certification of the two different types of action, and the case law has largely merged the standards, though with some terminological differences."  *Espenscheid*, 705 F.3d at 772.  The court continued:  "Simplification is desirable in law, especially in the present context, because joining a collective action and a class action or actions in one suit, as in this case, is both common and, we have held, permissible."  *Id.*

59

This Court should adopt the view of the Seventh Circuit. Particularly in a case like this one, where a plaintiff has joined together similar proposed class and collective actions and discovery has come to a close, a district court should consider certification of both actions under Rule 23's standard. Not only will this promote efficiency, but it will also prevent potentially inconsistent results caused when a court must apply two different certification criteria to essentially the same state and federal claims. Applying that standard here would clearly require reversal for the reasons explained above.

### B.     The District Court Failed To Apply An Appropriately Heightened Standard To Antalik's Post-Discovery Certification Motion.

Irrespective of what standard applies, the district court's analysis supporting its decision to certify an FLSA collective action was deficient. The court made cursory findings about commonality, predominance, and superiority, referencing its earlier rulings under Rule 23. Yet the court completely failed even to mention the differences in the proposed class and the proposed collective action. The Rule 23 class is limited to interns in Fox's *New York* office from September 2005 to September 2010. (SPA27.) The FLSA collective action, by contrast, includes former interns who served from January through September 2010 in Fox's *nationwide* offices. (*Id.* at 35), (A1904.) The discrepancy in size and scope of the collective action as compared to the class is stark, as interns were scattered across

60

the country and interned at more entities, where they performed even more functionally disparate tasks and projects. All those factors affected the training, supervision, and educational benefits each intern received.  A separate and thorough analysis of the proposed collective action was essential, but is nowhere to be found in the district court's opinion.

Moreover, the district court's certification decision did not logically follow from its analysis.  The court evaluated two of the three *Thiessen* factors (plaintiffs' employment settings and fairness and procedural considerations), yet found one of them wanting:  it acknowledged that "there are disparate factual and employment settings." (SPA35.)  That conclusion should have resulted in denial because the interns could not be similarly situated in any meaningful sense if their "factual and employment settings" were "disparate."[14]

As the Third Circuit has explained, even under a test less demanding than Rule 23, plaintiffs proposing a collective action must prove the existence of "common links" that would "streamlin[e] resolution of the[] cases."  *Zavala*, 691 F.3d at 538.  The district court cited a grand total of one common link in favor of certification of the collective action:  the alleged "common policy to replace paid

---

[14]  The existence of individualized defenses—the *Thiessen* factor missing entirely from the court's brief analysis—further weighs against certification, given the district court's finding of disparate factual and employment settings.

workers with unpaid workers." (SPA35.) For the reasons already discussed, *see* Point II.A.1, *supra*, this does not fit the bill: It is just one small fraction of the necessary multi-factor analysis (either the primary-beneficiary test or DOL's six-factor test), and it does not answer the relevant question whether unpaid Fox interns across the nation "are in fact 'similarly situated.'" *Myers*, 624 F.3d at 555.

The only reasonable conclusion from the record—and from the district court's own finding of "disparate factual and employment settings"—is that individuals who interned with various divisions of FEG subsidiaries nationwide are *not* similarly situated. Therefore, the district court's certification of the FLSA collective action should be reversed.

## CONCLUSION

For the foregoing reasons, Fox respectfully requests that this Court reverse the district court's order certifying Antalik's class and collective actions and granting summary judgment to Glatt and Footman.

Dated: March 28, 2014                    Respectfully submitted,

                                         /s/ Elise M. Bloom

NEAL KUMAR KATYAL                        ELISE M. BLOOM
MARY HELEN WIMBERLY                      MARK D. HARRIS
FREDERICK LIU                            CHANTEL L. FEBUS
HOGAN LOVELLS US LLP                     AMY F. MELICAN
555 Thirteenth Street NW                 JOSHUA S. FOX
Washington, DC 20004                     PROSKAUER ROSE LLP

(202) 637-5600                          11 Times Square
neal.katyal@hoganlovells.com            New York, New York 10036
                                        (212) 969-3000
                                        ebloom@proskauer.com

*Counsel for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies, pursuant to Fed. R. App. P. 32(a)(7)(C)(i), that the foregoing brief complies with the type volume limitation set forth in Fed. R. App. P. 32(a)(5) and (7)(B)(i), in that the brief uses the Times New Roman 14 point font and contains no more than 14,000 words.

Specifically, in accordance with Fed. R. App. P. 32(a)(7)(C)(i), the Microsoft Word "Word Count" tool indicates that the brief contains 13,493 words. That word count includes "headings, footnotes, and quotations," but excludes the "corporate disclosure statement, table of contents, table of citations, statement with respect to oral argument, any addendum containing statutes, rules or regulations, and any certificates of counsel."  Fed. R. App. P. 32(a)(7)(B)(iii).


  /s/ Elise M. Bloom                    
Elise M. Bloom

**SPECIAL APPENDIX**

# SPECIAL APPENDIX
## TABLE OF CONTENTS

**Page**

Certification and Summary Judgment Memorandum & Order, dated
June 11, 2013 ...................................................................................SPA-1

Fair Labor Standards Act, 29 U.S.C. § 203 ....................................................SPA-37

Fair Labor Standards Act, 29 U.S.C. § 206 ....................................................SPA-44

Fair Labor Standards Act, 29 U.S.C. § 216 ....................................................SPA-47

N.Y. Comp Codes R. & Regs. Tit. 12§ 142-2 ................................................SPA-51

N.Y. Lab. Law § 651 ................................................................................SPA-63

N.Y. Lab. Law § 652................................................................................SPA-75

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                 :

ERIC GLATT, *et al.*,                       11 Civ. 6784 (WHP)
                                 :
                  Plaintiffs,       :     MEMORANDUM & ORDER

                -against-          :

FOX SEARCHLIGHT PICTURES
INC., *et ano.*,                      :

               Defendants      :
- - - - - - - - - - - - - - - - - - - - - - - - - - -X

           Plaintiffs Eric Glatt, Alexander Footman, Kanene Gratts, and Eden Antalik bring

this putative class action under the Fair Labor Standards Act ("FLSA"), New York Labor Law

("NYLL"), and California Unfair Competition Law ("CAUCL") against Defendants Fox

Searchlight Pictures Inc. ("Searchlight") and Fox Entertainment Group, Inc. ("FEG"). Plaintiffs

contend that Searchlight and FEG violated federal and state labor laws by classifying them as

unpaid interns instead of paid employees.

           Glatt, Footman, and Gratts move for summary judgment that (1) they were

"employees" covered by the FLSA and NYLL and (2) Searchlight was their employer. Antalik

moves for class certification of her NYLL claims and conditional certification of a collective

action for her FLSA claims. Defendants move for summary judgment that (1) Gratts's claims

are time-barred; (2) Searchlight did not employ Glatt, Footman, or Gratts; (3) FEG did not

employ Antalik; and (4) Searchlight did not employ any of the production interns on five films

financed by Searchlight. For the following reasons, Plaintiffs' summary judgment motion is

granted in part and denied in part, Defendants' summary judgment motion is granted in part and

denied in part, and Antalik's motions for class certification of her NYLL claims and conditional

certification of an FLSA collective action are granted.

## **BACKGROUND**

### The Parties

Glatt and Footman were unpaid interns who worked on production of the film Black Swan in New York. After production ended, Glatt took a second unpaid internship relating to Black Swan's post-production. Gratts was an unpaid intern who worked on production of the film 500 Days of Summer in California. Antalik was an unpaid intern at Searchlight's corporate offices in New York.

FEG is the parent corporation of approximately 800 subsidiaries, including co-defendant Searchlight. Searchlight produces and distributes feature films. Searchlight does not produce the films itself. Rather, it enters into Production-Distribution-Finance Agreements ("Production Agreements") with corporations created for the sole purpose of producing particular films.

### The Film Productions

Black Swan began as a collaboration between director Darren Aronofsky and producer Scott Franklin. Aronofsky and Franklin incorporated Lake of Tears, Inc. for the purpose of producing Black Swan. On November 2, 2009, Searchlight and Lake of Tears entered into a Production Agreement for Black Swan.

500 Days of Summer was produced by 500 DS Films, Inc., a corporation created solely to produce that film. Searchlight entered into a Production Agreement with 500 DS Films for 500 Days of Summer. The Production Agreements for Black Swan and 500 Days of Summer

2

do not differ materially from one another.[1]  They gave Searchlight the power to hire and fire

production personnel, set budgets, and monitor the progress of films.

FEG's Internship Program

Antalik claims she was part of a "centralized unpaid internship program" in which

unpaid interns at FEG's subsidiaries were subject to a single set of policies administered by a

small team of intern recruiters.  She maintains that two employees oversaw FEG's internship

program during the relevant periods and their responsibilities included soliciting "intern request

forms" from supervisors at subsidiaries interested in hiring interns, approving those requests,

screening internship applicants, and processing interns' paperwork.  According to Antalik, she

and the members of her proposed class and collective action were victims of a common policy of

using unpaid interns to perform work that required them to be paid.

Defendants deny there was any "centralized" internship program.  They argue

internships varied considerably among various FEG subsidiaries and departments, and interns'

experiences were shaped by the particular supervisors they were matched with.

## DISCUSSION

### Summary Judgment Motions

I.    Legal Standard

Summary judgment should be granted if the record shows that "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).

The burden of demonstrating the absence of any genuine dispute as to a material fact rests with

the moving party. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). Once the moving

---

[1] May 10, 2013 Tr. at 52:23-53:4.

party has made an initial showing that there is no genuine dispute of material fact, the non-moving party cannot rely on the "mere existence of a scintilla of evidence" to defeat summary judgment, Liberty Lobby, 477 U.S. at 252, but must set forth "specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis in original); see also Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003) (citation omitted). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita, 475 U.S. at 586-87).

The Court resolves all factual ambiguities and draws all inferences in favor of the non-moving party. See Liberty Lobby, 477 U.S. at 255; see also Jeffreys v. City of N.Y., 426 F.3d 549, 553 (2d Cir. 2005). A party opposing summary judgment "is not entitled to rely solely on the allegations of her pleading, but must show that there is admissible evidence sufficient to support a finding in her favor on the issue that is the basis for the motion." Fitzgerald v. Henderson, 251 F.3d 345, 361 (2d Cir. 2001). "Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir.1998).

II.   Statute of Limitations for Gratts's CAUCL Claim

Defendants argue Gratts's CAUCL claim is time-barred. The CAUCL has a four-year statute of limitations. Cal. Bus. & Prof. Code § 17208. Gratts was not a plaintiff when the

4

action was filed in September 2011.[2]  Pursuant to this Court's individual practices, Plaintiffs

filed a pre-motion letter on August 2, 2012 requesting leave to move to file an amended

complaint.[3]  The pre-motion letter attached a proposed amended complaint, adding Gratts as a

plaintiff.  On September 5, 2012, Plaintiffs filed a motion to amend the complaint.[4]  On October

19, 2012, Plaintiffs filed their amended complaint.

   Gratts's claims do not relate back to the filing of the original complaint.[5]

Defendants contend that Gratts's action was "commenced" on September 5, 2012 because "the

date of the filing of the motion to amend constitutes the date the action was commenced for

statute of limitations purposes." Rothman v. Gregor, 220 F.3d 81, 96 (2d Cir. 2000); see also

Nw. Nat'l Ins. Co. v. Alberts, 769 F. Supp. 498, 510 (S.D.N.Y. 1991).  But "[t]he theory

underlying this rule is that a . . . defendant is on notice at the time a plaintiff files its motion

because the plaintiff attached the proposed amended complaint to the motion." In re Methyl

Tertiary Butyl Ether Prods. Liab. Litig., MDL No. 1358 (SAS), 2007 WL 2979642, at *4

(S.D.N.Y. Oct. 10, 2007).  Here, Defendants were on notice of Gratts's claims when Plaintiffs

submitted their pre-motion letter and included a draft amended complaint.  See Reza v. Khatun,

No. 09 Civ. 233 (MKB), 2013 WL 596600, at *4 (E.D.N.Y. Feb. 15, 2013); Lekic v. 222 E. 8th

St. LLC, No. 11 Civ. 1242, 2012 WL 4447625, at *1, 4 (E.D.N.Y. Sept. 25, 2012).  Thus, Gratts

commenced her claim on August 2, 2012.

   Accordingly, Gratts's claim is timely only if she worked on the 500 Days of

Summer production on or after August 2, 2008.  The amended complaint alleges, somewhat

---

[2] Compl. (Docket Entry #1).
[3] Docket Entry #24.
[4] Docket Entry #27.
[5] Oct. 9, 2012 Tr. at 14:17-15:4 (Docket Entry # 51).

unconfidently, that Gratts's internship lasted from May 1, 2008 "through approximately August 2008."[6] The only evidence that Gratts's internship in fact continued into August is her testimony that when she performed her last internship task, taking down movie sets, "the weather was really hot. It was warm and it was at the end of summer. It was in August."[7] When asked whether she would have any basis to dispute records indicating her internship ended earlier, she conceded "I'm just going by what I remember, so if your records say one thing, I'm going by . . . the way I remember it . . . It was in the first week of August."[8]

Defendants have produced records demonstrating Gratts's internship ended before August. Gratts testified there were approximately six weeks of shooting followed by a "wrap party," about a two week break, and then about five days of taking down sets.[9] Charles Varga, the art director for 500 Days of Summer, maintains that shooting wrapped on June 21, 2008.[10] And the invitation to the wrap party announces June 22, 2008 as the event date.[11] Giving full credit to Gratts's testimony that she worked for five days two weeks after shooting wrapped, her internship would have ended July 9, 2008.

But there is reason to believe Gratts's internship may have ended even sooner. Steven Fox, head of the construction department for 500 Days of Summer, claims that his involvement with the film did not end until the sets were dismantled.[12] His time sheets show that June 25, 2008 was the last date he worked on the film.[13] And Varga moved to other projects in

---

[6] Am. Compl. ¶ 148 (Docket Entry #58).
[7] Dep. of Kanene Gratts dated Dec. 5, 2012 ("Gratts Tr.") at 45:7-9.
[8] Gratts Tr. 45:19-23.
[9] Gratts Tr. 93:19-22, 95:17-97:6.
[10] Declaration of Charles Varga ("Varga Decl."), dated Feb. 13, 2013 ¶ 5 (Docket Entry #100).
[11] Varga Decl. Ex. A.
[12] Declaration of Steven Fox ("Fox Decl."), dated Feb. 14, 2013 ¶ 9 (Docket Entry #101).
[13] Fox Decl. ¶ 5, Ex. A.

July 2008.[14]  As art director, all set work—including dismantling sets—was completed before he moved on.[15]

Moreover, Gratts testified that she only worked at one film location during her internship, where she helped to build sets and then dismantle them.[16]  She recalled that they built cubicles and other rooms to create an office for a greeting card company and built an apartment upstairs.[17]  That construction occurred at the historic Fenton Building, at 833 South Spring Street in Los Angeles.[18]  The call sheets for 500 Days of Summer show that filming at the Fenton Building was completed on May 17, 2008.[19]  The location rental agreement shows that the building was rented by the production only until May 23, 2008.[20]

In sum, the only evidence that Gratts worked in August 2008 is her recollection, four years later, that when her internship ended, "the weather was really hot . . . it was in August."[21]  This "scintilla of evidence" is not "evidence on which the jury could reasonably find for the plaintiff." Liberty Lobby, 477 U.S. at 252.  This conclusion does not require a credibility determination, given her concession that she could be persuaded by documentary evidence.[22]

Plaintiffs argue that even if Gratts's internship ended before August 2008, her claims should be saved by the doctrine of equitable tolling.  "[E]quitable tolling is only appropriate 'in rare and exceptional circumstances in which a party is prevented in some extraordinary way from exercising [her] rights." Zerilli-Edelglass v. N.Y.C. Transit Auth., 333

---

[14] Varga Decl. ¶ 7, Exs. B-C.
[15] Varga Decl. ¶ 6.
[16] Gratts. Tr. 74:24-78:3.
[17] Gratts. Tr. 76:1-10.
[18] Fox Decl. ¶¶ 6-7.
[19] Decl. of Elise M. Bloom, Esq. ("Bloom SJ Decl.") dated Feb. 15, 2013 (Docket Entry #109), Ex. DD.
[20] Decl. of Steven Wolfe ("Wolfe Decl."), dated Feb. 13, 2013 (Docket Entry #99), Ex. A.
[21] Gratts Tr. 45:7-9.
[22] Gratts Tr. 45:19-23.

F.3d 74, 80 (2d Cir. 2003) (internal quotations and alterations omitted).  Equitable tolling is appropriate when the plaintiff (1) filed a defective pleading that otherwise would have been timely, (2) was unaware of her cause of action due to the misleading conduct of the defendant, or (3) has a medical or mental condition preventing her from proceeding in a timely fashion. Zerilli-Edelglass, 333 F.3d at 80.  If one of those conditions applies, the plaintiff must show she "(1) has acted with reasonable diligence during the time period she seeks to have tolled, and (2) has proved that the circumstances are so extraordinary that the doctrine should apply." Zerilli-Edelglass, 333 F.3d at 80-81 (internal quotation omitted).

Gratts has a weaker claim to equitable tolling than her co-plaintiffs because she is the only plaintiff who was aware of her potential wage claim nearly from the day it accrued. Gratts testified that she understood she would earn minimum wage at her internship.[23]  After her internship, she left several messages at the production office and even went to the Fox Studios lot to try to get her paycheck.[24]  Unlike an unpaid intern who does not realize she may be entitled to compensation, Gratts was aware of her claim since 2008 and did not act with reasonable diligence in the time period she seeks to have tolled.

Gratts's CAUCL claim is time-barred because her internship ended before August 2008 and she is not entitled to equitable tolling.

III.    Was Searchlight the Employer of Glatt and Footman?

Plaintiffs and Defendants each move for summary judgment on the issue of whether Searchlight was the "employer" of Glatt and Footman as that term is defined in the FLSA and NYLL.  The FLSA defines "employ" as "to suffer or permit to work." 29 U.S.C. §

---

[23] Gratts Tr. at 66:12-19; 69:12-70:8; 149:19-25.
[24] Gratts Tr. 74:6-19; 185:6-186:5.

8

203(g). The law allows for the possibility of joint employers, and "all joint employers are responsible, both individually and jointly, with all the applicable provisions of the [FLSA]." 29 C.F.R. § 791.2(a).

"[T]he 'striking breadth' of the FLSA's definition of 'employ' 'stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles.'" Barfield v. N.Y.C. Health & Hosps. Corp., 537 F.3d 132, 141 (2d Cir. 2008) (quoting Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 326 (1992)). "[W]hether an employer-employee relationship exists for purposes of the FLSA should be grounded in 'economic reality rather than technical concepts.'" Barfield, 537 F.3d at 141 (quoting Goldberg v. Whitaker House Coop., Inc., 366 U.S. 28, 33 (1961)). "Employment" under the FLSA is "to be determined on a case-by-case basis by review of the totality of the circumstances." Barfield, 537 F.3d at 141-42. "Above and beyond the plain language, moreover, the remedial nature of the statute further warrants an expansive interpretation of its provisions so that they will have 'the widest possible impact in the national economy.'" Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 139 (2d Cir. 1999) (quoting Carter v. Dutchess Cmty. Coll., 735 F.2d 8, 12 (2d Cir. 1984)).

"When it comes to 'employer' status under the FLSA, control is key." Lopez v. Acme Am. Envtl. Co., No. 12 Civ. 511(WHP), 2012 WL 6062501, at *3 (S.D.N.Y. Dec. 6, 2012). The Second Circuit has set out different tests to aid in determining whether an employment relationship exists under the FLSA. Carter adopted a four-factor test to determine whether an alleged joint employer exercised "formal control" over an employee: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of

9

payment, and (4) maintained employment records." 735 F.2d at 12 (quoting Bonnette v. Cal.

Health & Welfare Agency, 704 F.2d 1465, 1470 (9th Cir. 1983)).

      Zheng v. Liberty Apparel Co., 355 F.3d 61 (2d Cir. 2003) articulated another set

of factors for determining whether an alleged employer exercised "functional control" over an

employee even if it lacked formal control: "(1) whether the [alleged employer's] premises and

equipment were used for the plaintiffs' work; (2) whether the [subcontractors] had a business

that could or did shift as a unit from one putative joint employer to another; (3) the extent to

which plaintiffs performed a discrete line-job that was integral to [the alleged employer's]

process of production; (4) whether responsibility under the contracts could pass from one

subcontractor to another without material changes; (5) the degree to which the [alleged

employer] or [its] agents supervised plaintiffs' work; and (6) whether plaintiffs worked

exclusively or predominantly for the [alleged employer]." 355 F.3d at 72.

      The NYLL's definitions are nearly identical to the FLSA's. See N.Y. Lab. Law §

2(7); see also Garcia v. La Revise Assocs. LLC, No. 08 Civ. 9356 (LTS) (THK), 2011 WL

135090, at *5 (S.D.N.Y. Jan. 13, 2011). Courts use the same tests to determine joint

employment under both the NYLL and the FLSA. See Paz v. Piedra, No. 09 Civ. 03977 (LAK)

(GWG), 2012 WL 121103, at *5 (S.D.N.Y. Jan. 12, 2012); Ansoumana v. Gristede's Operating

Corp., 255 F. Supp. 2d 184, 189 (S.D.N.Y. 2003).

    A. Formal Control Test

     1. Hiring and Firing Power

      This factor focuses on the "the power to hire and fire," not whether that power

was exercised. See Carter, 735 F.2d at 12. The Black Swan Production Agreement required

Searchlight's approval to hire key production staff, including the department heads where Glatt

10

and Footman interned.[25]  Though Searchlight did not hire the line producers or department heads

on Black Swan, it often did on other films with similar Production Agreements.[26]  Searchlight's

ability to hire managerial staff is enough to satisfy this factor.  See Herman, 172 F.3d at 140

(Although Defendant's "hiring involved mainly managerial staff, the fact that [Defendant] hired

individuals who were in charge of the [Plaintiffs] is a strong indication of control."); Torres v.

Gristede's Operating Corp., No. 04 Civ. 3316 (PAC), 2011 WL 4571792, at *2 (S.D.N.Y. Sept.

23, 2011) ("There is no evidence that [Defendant] hired any class member, but there does not

have to be.  It stands uncontradicted that he hired managerial employees.").

Searchlight's power to fire Black Swan production staff was unbridled.

Searchlight reserved the right, "in its sole reasonable discretion," to "require [Lake of Tears] to

dispense with the services of any person rendering services with respect to [Black Swan]."[27]

Because Searchlight acquired the power to fire, it is irrelevant that Glatt was offered his

internship and Footman began his before Searchlight became involved with Black Swan.  Glatt's

supervisor told Glatt he needed "to clear with the Fox production executive for interns to be

working for free and getting no college credits."[28]

Defendants argue that Searchlight had the right to fire employees "only if certain

conditions were met."[29]  But Searchlight had the right to require Lake of Tears to fire any worker

---

[25] Decl. of Rachel Bien in Supp. of Pls.' Mot. For Partial Summ. J., dated Feb. 15, 2013, ("Bien SJ Decl.") (Docket Entry #92), Ex. 22 ("Production Agreement").

[26] Dep. of Elizabeth Sayre dated Aug. 15, 2012 ("Sayre Tr.") 22:5-11; 53:5-55:12. The Court may consider evidence of Searchlight's control over the productions of films other than Black Swan, because as Defendants conceded, Searchlight's rights with respect to the films did not differ materially.  May 10, 2013 Tr. at 52:23-53:4; see also Herman, 172 F.3d at 139 ("Since economic reality is determined based upon all the circumstances, any relevant evidence may be examined so as to avoid having the test confined to a narrow legalistic definition." (emphasis in original)).

[27] Production Agreement (emphasis added).

[28] Bien SJ Decl. Ex. 14.

[29] Mem. of Law in Opp. to Pls.' Mot. for Partial Summ. J. ("Defs.' SJ Opp. Br.") (Docket Entry #118) at 11.

11

at Searchlight's "sole reasonable discretion."[30]  Regardless, "[c]ontrol may be restricted, or

exercised only occasionally, without removing the employment relationship from the protections

of the FLSA, since such limitations on control do not diminish the significance of its existence."

Herman, 172 F.3d at 139.

> ## 2.  Searchlight's Ability to Supervise or Control Work Schedules or Conditions

Searchlight closely supervised work on Black Swan.  The production sent

Searchlight "crew lists" with the contact information for all staff, including interns.[31]

Searchlight required them to send daily "call sheets" listing the scenes to be filmed the next day

and the work schedules for all personnel.[32]  The production also sent Searchlight daily "wrap

reports" listing scenes scheduled to be filmed that day, scenes actually filmed, and the hours

worked by production employees.[33]  Searchlight Executive Vice President Elizabeth Sayre

required production employees to call her each morning to let her know what time filming began

and again each evening to let her know what time shooting wrapped.[34]  The production sent

Searchlight weekly schedules and cost reports detailing expenses.[35]  It needed Searchlight's

permission to incur cost overruns.[36]

Status as a joint employer "does not require continuous monitoring of employees,

looking over their shoulders at all times."  Herman, 172 F.3d at 139.  In Herman, the Second

Circuit affirmed the district court's finding that the defendant supervised and controlled

employee work schedules where he "kept himself apprised of [] operations by receiving periodic

---

[30] Production Agreement.
[31] Sayre Tr. 78:1-79:1.
[32] Sayre Tr. 46:21-48:10.
[33] Sayre Tr. 50:11-51:1, 81:15-82:16.
[34] Sayre Tr. 82:3-22.
[35] Sayre Tr. 125:1-22; Production Agreement; Bien SJ Decl. Ex. 6 Ex. B, Ex. 27.
[36] Sayre Tr. 177:22-179:5.

reports from employees," including phoning managerial employees "reasonably frequently." Herman, 172 F.3d at 137.

     3.  Whether Searchlight Determined the Rate and Method of Payment

        Searchlight set the overall budget for Black Swan and set the allocations for each line item.[37] Glatt and Footman argue that through its control of the budget, Searchlight "de facto" set wages for all production workers.[38] In Rutherford Food Corp. v. McComb, 331 U.S. 722 (1947), the Supreme Court held that a slaughterhouse jointly employed meat de-boners even though they were directly controlled by a boning supervisor who contracted with the slaughterhouse. In Zheng, the Second Circuit discussed Rutherford and noted that "the slaughterhouse de facto set the workers' wages, because the boners did no meat boning for any other firm and shared equally in the funds paid to the boning supervisor." Zheng, 355 F.3d at 72. Here, the crucial factor of equally sharing wages is absent. An increase in the wages budget would not necessarily result in across the board raises; the production might have hired additional workers or increased pay to particular employees.

        But even though Lake of Tears hired Glatt, it needed Searchlight's permission to have an unpaid intern who was not receiving college credit.[39] Moreover, Searchlight withheld employees' pay until they signed Searchlight-approved employment agreements.[40] While Searchlight may not have had the power to set employees' rate of pay, it was involved in their method of pay. Cf. Herman, 172 F.3d at 140 ("little evidence" showed defendant determined plaintiffs' rate of payment, "[b]ut he did participate in the method of payment").

---

[37] Sayre Tr. 17:11-18:12.
[38] Mem. of Law in Support of Pls.' Mot. For Partial Summ J. ("Pls.' SJ Br.") (Docket Entry #90) at 26 (citing Zheng, 355 F.3d at 72).
[39] Bien SJ Decl. Ex. 14.
[40] Sayre Tr. 75:24-76:11; Bien Decl. Ex. 19.

    4.  Whether Searchlight Maintained Employment Records

        Searchlight required production staff to sign confidentiality agreements and employment agreements known as "deal memos." Moreover, Searchlight insisted that Black Swan employees sign revised deal memos it drafted even if they had signed memos before Searchlight's involvement.[41] Searchlight did not allow production employees to be paid until they signed one of Searchlight's deal memos.[42] After shooting wrapped, Searchlight required Lake of Tears to send it the signed memos.[43]

        Searchlight takes a narrow view, pointing out there is no evidence that Glatt, Footman, or any other unpaid intern signed a deal memo.[44] But the fact that Searchlight required memos from the paid employees who oversaw the unpaid interns is evidence of control over the interns.

    B.  Functional Control Test

        A district court must "look beyond an entity's formal right to control the physical performance of another's work before declaring that the entity is not an employer under the FLSA." Zheng, 355 F.3d at 69. "[A]n entity can be a joint employer under the FLSA even when it does not hire and fire its joint employees, directly dictate their hours, or pay them." Zheng, 355 F.3d at 70.

    1.  Whether Searchlight's Premises and Equipment Were Used for Plaintiffs' Work

        Glatt and Footman's internships were based at Lake of Tears' offices, which it leased before signing the Production Agreement with Searchlight.[45] There is no evidence either

---

[41] Bien SJ Decl. Ex. 21; Sayre Tr. 172:9-74:4, 115:8-23.
[42] Sayre Tr. 75:24-76:11; Bien Decl. Ex. 19.
[43] Bien Decl. Ex. 42.
[44] Defs.' SJ Opp. Br. at 17.
[45] Dep. of Alexander Footman, dated May 7, 2012 ("Footman Tr.") at 198:2-4.

Glatt or Footman ever visited Searchlight offices or used its equipment. The fact that Lake of

Tears' office space and equipment may have been rented or purchased in part by funds from

Searchlight does not transform them into Searchlight's premises or equipment.

    2.  Whether Lake of Tears Could Shift From One Putative Joint Employer to Another

        This factor is derived from Rutherford, where the plaintiff meat boners "had no

business organization that could or did shift as a unit from one slaughterhouse to another."

Rutherford, 331 U.S. at 730. The Second Circuit observed this is relevant to joint employment

"because a subcontractor that seeks business from a variety of contractors is less likely to be part

of a subterfuge arrangement than a subcontractor that serves a single client." Zheng, 355 F.3d at

72.

        The Black Swan production could not shift from one film studio to another.  The

Production Agreement prohibited Lake of Tears from taking Black Swan elsewhere unless

Searchlight abandoned the project or failed to advance funds.[46] It is irrelevant that the

Production Agreement did not prohibit Lake of Tears from working on other projects. This

ignores economic reality in the film industry, where a film is produced by a single-purpose entity

whose operations cease after the film is made.[47]

    3.  Extent to Which Plaintiffs Performed a Discrete Line-Job That Was Integral to
       Searchlight's Process of Production

        In Rutherford, the meat boners' work was "a part of the integrated unit of

production" at the slaughterhouse. Rutherford, 331 U.S. at 729. "Interpreted broadly, this factor

could be said to be implicated in every subcontracting relationship, because all subcontractors

perform a function that a general contractor deems 'integral' to a product or service." Zheng,

---

[46] Production Agreement.
[47] See Franklin Tr. 16:5-14.

15

355 F.3d at 73 (emphasis in original). But the Second Circuit has held this factor "to mean that work on a production line occupies a special status under the FLSA." Zheng, 355 F.3d at 73. Glatt and Footman's work was not part of an "integrated production unit" comparable to a production line. Zheng, 355 F.3d at 73.

> 4. Whether Responsibility Could Pass From One Subcontractor to Another Without Material Changes

In Rutherford, "even when the boning supervisor abandoned his position and another supervisor took his place . . . the same employees would continue to do the same work in the same place." Zheng, 355 F.3d at 74 (emphasis in the original). "[T]his factor weighs in favor of a determination of joint employment when employees are tied to an entity such as the slaughterhouse rather than to an ostensible direct employer such as the boning supervisor." Zheng, 355 F.3d at 74.

The crew of Black Swan was tied to Searchlight, not Lake of Tears. Searchlight, in its "sole reasonable discretion," had the power to replace key production personnel without material changes to those underneath them.[48] Searchlight could even have dismissed Lake of Tears and taken over the production.[49] The crew was not tied to Lake of Tears, which everyone knew would cease operations after delivering Black Swan to Searchlight.

> 5. Degree to Which Searchlight Supervised the Plaintiffs' Work

Supervision "weighs in favor of joint employment only if it demonstrates effective control of the terms and conditions of the plaintiff's employment." Zheng, 355 F.3d at 75 (citing Rutherford, 331 U.S. at 726)). "By contrast, supervision with respect to contractual warranties of quality and time of delivery has no bearing on the joint employment inquiry."

---

[48] Production Agreement.
[49] Production Agreement.

Zheng, 355 F.3d at 75. As discussed above, Searchlight closely monitored work on the Black Swan production and exercised effective control over it.

### 6. Whether Plaintiffs Worked Exclusively or Predominantly for Searchlight

As Defendants concede, Footman and Glatt worked exclusively on Black Swan, which weighs in favor of finding joint employment.[50]

In sum, the formal and functional control tests "state no rigid rule" and "provide 'a nonexclusive and overlapping set of factors' to ensure that the economic realities test mandated by the Supreme Court is sufficiently comprehensive and flexible to give proper effect to the broad language of the FLSA." Barfield, 537 F.3d at 143 (quoting Zheng , 355 F.3d at 75-76). Summary judgment may be granted to the plaintiffs "even when isolated factors point against imposing joint liability." Zheng, 355 F.3d at 77. Searchlight emphasizes the lack of evidence that Glatt or Footman themselves were ever "controlled" by Searchlight, but "[s]uch a contention ignores the relevance of the totality of the circumstances." Herman, 172 F.3d at 140 (rejecting argument that overall operational control is irrelevant "and that only evidence indicating [] direct control over [Plaintiffs] should be considered").

The fact that all four formal control factors weigh in favor of finding Searchlight was a joint employer is sufficient to find Searchlight was Plaintiffs' employer even if no functional control factors were satisfied. That conclusion is bolstered by the finding that Searchlight also exercised significant functional control. And, in the end, it is all about control. Lopez, 2012 WL 6062501, at *3.

---

[50] Defs.' SJ Opp. Br. at 22.

IV.    Was Searchlight the Employer of All Production Interns?

Discovery in this putative class action has been limited to interns on the productions of five representative Searchlight films: Black Swan, 500 Days of Summer, Our Family Wedding, Cedar Rapids, and The Savages. Defendants move for summary judgment finding that none of the production interns on any of these films were employed by Searchlight. But Glatt, Footman, and Gratts are the only production interns who are plaintiffs in this action. There is no proposed class containing any other production interns. As previously discussed, Gratts's claim is time-barred, and Searchlight was the employer of Glatt and Footman. Summary judgment is denied as moot as to any other production interns, as there are none in this action.

V.    Was FEG Antalik's Employer?

Defendants move for summary judgment holding that FEG was not a joint employer of Antalik under the FLSA or NYLL. Defendants argue that FEG is not liable for its subsidiary's acts except in extraordinary circumstances because of the "strong presumption that a parent is not the employer of its subsidiary's employees."[51] But that standard relates to piercing the corporate veil, not finding joint employment under the FLSA. Cf. Flemming v. REM Conn. Cmty. Servs. Inc., No. 11 Civ. 689 (JBA), 2012 WL 6681862, at *4-5 (D. Conn. Dec. 21, 2012). When a parent is held to be a joint employer under the FLSA, it is not being held liable for the acts of its subsidiary, rather, it is liable for its own acts of control over an employee. The same formal and functional control tests discussed earlier apply in determining whether FEG was Antalik's employer.

Antalik asserts that she was part of a centralized internship program run by FEG. Interns received offer letters welcoming them to "Fox Entertainment Group's internship

---

[51] Defs.' SJ Br. at 26 (quoting Balut v. Loral Elec. Sys., 988 F. Supp. 339, 344 (S.D.N.Y. 1997)).

18

program."[52]  Intern recruiters Aimee Hoffman and Laura Wiggins oversaw internships at various

FEG companies.[53]  Hoffman did not recruit Antalik, but when Hoffman became aware of

Antalik's internship, she required Antalik to submit paperwork to continue her internship.[54]

Hoffman sent internship guidelines applicable to all FEG interns to Antalik's supervisor at

Searchlight.[55]  Hoffman provided training to intern supervisors at FEG.[56]  FEG exercised some

control over interns' schedules at its subsidiaries by requiring interns to work between 16 and 24

hours per week, or 40 hours in the summer.[57]  And FEG maintained employment records and a

personnel file for Antalik.[58]

      This evidence raises factual disputes that preclude summary judgment in favor of

the Defendants.

    VI.   Were Glatt and Footman "Employees" Covered by the FLSA and NYLL?

      Glatt and Footman move for summary judgment holding they were "employees"

covered by the FLSA and NYLL and do not fall under the "trainee" exception established by

Walling v. Portland Terminal Co., 330 U.S. 148 (1947).

      In Walling, a case involving a railroad that held a week-long training course for

prospective brakemen, the Supreme Court determined that "trainees" were not covered

employees under the FLSA.  The trainees "[did] not displace any of the regular employees, who

---

[52] Decl. of Rachel Bien in Opp. to Defs.' Mot. for Summ. J, dated Mar. 29, 2013 ("Bien SJ Opp. Decl.") (Docket Entry #140) Exs. 87, 99.
[53] Dep. of Aimee Hoffman, dated Aug. 16, 2012 ("Hoffman Tr.") at 265:2-268:22.  Defendants emphasize Hoffman was employed by Fox Group, New America Inc. and not by FEG.  Decl. of Aimee Hoffman, dated Mar. 26, 2013 ¶2 (Docket Entry #128).  However, this does not preclude the possibility she administered a centralized FEG internship program.  Her email signature lists her position as "FEG intern recruiter."  Bien Class Cert. Decl. Ex. 22.
[54] Bien SJ Opp. Decl. Ex. 63.
[55] Bien SJ Opp. Decl. Ex. 95.
[56] Bien SJ Opp. Decl. Ex. 86.
[57] Bien SJ Opp. Decl. Exs. 65, 78.
[58] Bien SJ Opp. Decl. Exs. 68, 69.

[did] most of the work themselves, and must stand immediately by to supervise whatever the trainees do." Walling, 330 U.S. at 149-50.  The trainees' work "[did] not expedite the company business, but may, and sometimes [did], actually impede and retard it." Walling, 330 U.S. at 150.  The Court held that the FLSA "cannot be interpreted so as to make a person whose work serves only his own interest an employee of another person who gives him aid and instruction . . . the [FLSA] was not intended to penalize [employers] for providing, free of charge, the same kind of instruction [as a vocational school] at a place and in a manner which would most greatly benefit the trainee." Walling, 330 U.S. at 153.  The Court concluded that "[a]ccepting the unchallenged findings here that the railroads receive no 'immediate advantage' from any work done by the trainees, we hold that they are not employees within the Act's meaning." Walling, 330 U.S. at 153.

A Department of Labor fact sheet helps to determine whether interns at for-profit businesses fall within this exception.  See U.S. Dep't of Labor Fact Sheet #71 (April 2010) ("DOL Intern Fact Sheet").  The Fact Sheet notes that "[t]he Supreme Court has held that the term 'suffer or permit to work' cannot be interpreted so as to make a person whose work serves only his or her own interest an employee of another who provides aid or instruction."  It enumerates six criteria for determining whether an internship may be unpaid:

1. The internship, even though it includes actual operation of the facilities of the employer, is similar to training which would be given in an educational environment;

2. The internship experience is for the benefit of the intern;

3. The intern does not displace regular employees, but works under close supervision of existing staff;

4. The employer that provides the training derives no immediate advantage from the activities of the intern; and on occasion its operations may actually be impeded;

5. The intern is not necessarily entitled to a job at the conclusion of the internship; and

6. The employer and the intern understand that the intern is not entitled to wages for the time spent in the internship.

"This exclusion from the definition of employment is necessarily quite narrow because the FLSA's definition of 'employ' is very broad." DOL Intern Fact Sheet.

The Second Circuit has not addressed the "trainee" exception to the FLSA. Defendants urge that the DOL factors are not the applicable standard and that this Court should apply a "primary benefit test" by determining whether "the internship's benefits to the intern outweigh the benefits to the engaging entity."[59]

While some Circuits have applied a "primary beneficiary" test, it has little support in Walling. The Supreme Court did not weigh the benefits to the trainees against those of the railroad, but relied on findings that the training program served only the trainees' interests and that the employer received "no 'immediate advantage' from any work done by the trainees." Walling, 330 U.S. at 153 (emphasis added).

Thus, Walling created a narrow exception to an expansive definition. "A broader or more comprehensive coverage of employees . . . would be difficult to frame." United States v. Rosenwasser, 323 U.S. 360, 362 (1945). There is "no doubt as to the Congressional intention to

---

[59] Defs.' SJ Opp. Br. at 23. (citing Solis v. Laurelbrook Sanitarium & Sch., Inc., 642 F.3d 518, 525 (6th Cir. 2011) ("[T]he ultimate inquiry in a learning or training situation is whether the employee is the primary beneficiary of the work performed."); Blair v. Wills, 420 F.3d 823, 829 (8th Cir. 2005) (finding students' chores at boarding school were not work where they "were primarily for the students' . . . benefit"); McLaughlin v. Ensley, 877 F.2d 1207, 1209 (4th Cir. 1989) ("[T]he general test used to determine if an employee is entitled to the protections of the Act is whether the employee or the employer is the primary beneficiary of the trainees' labor.")); see also Velez v. Sanchez, 693 F.3d 308, 330 (2d Cir. 2012) (in determining whether a plaintiff is a domestic service worker covered by the FLSA, "[a] court should also consider who is the primary recipient of benefits from the relationship").

include all employees within the scope of the Act unless specifically excluded." Courts should be cautious in expanding the "trainee" exception established in <u>Walling</u>.

Moreover, a "primary beneficiary" test is subjective and unpredictable. Defendants' counsel argued the very same internship position might be compensable as to one intern, who took little from the experience, and not compensable as to another, who learned a lot.[60] Under this test, an employer could never know in advance whether it would be required to pay its interns. Such a standard is unmanageable.

By contrast, the DOL factors have support in <u>Walling</u>. Because they were promulgated by the agency charged with administering the FLSA and are a reasonable application of it, they are entitled to deference.[61] <u>Wang v. Hearst Corp.</u>, --- F.Supp.2d ----, 2013 WL 1903787, at *5 (S.D.N.Y. May 8, 2013) (citing <u>United States v. Mead Corp.</u>, 533 U.S. 218, 234 (2001)). No single factor is controlling; the test "requires consideration of all the circumstances." <u>Archie v. Grand Cent. P'ship</u>, 997 F. Supp. 504, 532 (S.D.N.Y. 1998); <u>see also</u> <u>Wang</u>, 2013 WL 1903787, at *4 ("[T]he prevailing view is the totality of the circumstances test.").

As noted above, "since the NYLL's definition of employment is nearly identical to the FLSA's[,] courts in this circuit have held that the New York Labor Law embodies the same standard for employment as the FLSA." <u>Cano v. DPNY, Inc.</u>, 287 F.R.D. 251, 260 n.2 (S.D.N.Y. 2012) (internal quotation and alterations omitted). The analysis for the trainee

---

[60] May 10, 2013 Tr. 42:23-43:8.

[61] Defendants argue the DOL factors do not deserve deference because DOL opinion letters, which do not stem from "formal agency adjudication or notice-and-comment rulemaking, are not binding authority." Defs.' SJ Opp. Br. at 25 n.14. (quoting <u>Barfield</u>, 537 F.3d at 149). But even if not binding, "such agency letters represent 'a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" <u>Barfield</u>, 537 F.3d at 149 (quoting <u>Gualandi v. Adams</u>, 385 F.3d 236, 243 (2d Cir. 2004)). The DOL Intern Fact Sheet was issued in 2010, but the same six factors "have appeared in Wage and Hour Administrator opinions since at least 1967." <u>Reich v. Parker Fire Prot. Dist.</u>, 992 F.2d 1023, 1027 (10th Cir. 1993).

exception to the NYLL is the same as that for the FLSA.[62]  See Wang, 2013 WL 1903787, at *3 n.3.

### 1. Training Similar to an Educational Environment

While classroom training is not a prerequisite, internships must provide something beyond on-the-job training that employees receive.  "A training program that emphasizes the prospective employer's particular policies is nonetheless comparable to vocational school if the program teaches skills that are fungible within the industry."  Reich v. Parker Fire Prot. Dist., 992 F.2d 1023, 1028 (10th Cir. 1993).

Footman did not receive any formal training or education during his internship.[63]  He did not acquire any new skills aside from those specific to Black Swan's back office, such as how it watermarked scripts or how the photocopier or coffee maker operated.[64]  It is not enough that Footman "learned what the function of a production office was through experience."[65]  He accomplished that simply by being there, just as his paid co-workers did, and not because his internship was engineered to be more educational than a paid position.

The record for Glatt is inconclusive on this factor.  Plaintiffs argue he "did not receive any training on Black Swan."[66]  But Glatt claimed only that he didn't learn much.[67]  Whether someone learned anything does not answer the question of whether training or useful knowledge was offered.  As any student knows, even a classic educational environment sometimes results in surprisingly little learning.

---

[62] The New York State Department of Labor has its own fact sheet for unpaid internships incorporating the six DOL factors and adding five additional considerations.  See Bien SJ Decl. Ex. 35.
[63] Footman Tr. 140:4-10; 221:18-222:8.
[64] Footman Tr. 36:22-27:16; 93:12-21; 96:9-97:5.
[65] Footman Tr. 97:6-14.
[66] Pls. SJ Br. at 4,
[67] See Glatt Tr. 121:4-11; 305:25-306:6.

23

2.  <u>Whether the Internship Experience is for the Benefit of the Intern</u>

Undoubtedly, Glatt and Footman received some benefits from their internships, such as resume listings, job references, and an understanding of how a production office works.[68] But those benefits were incidental to working in the office like any other employee and were not the result of internships intentionally structured to benefit them. Resume listings and job references result from any work relationship, paid or unpaid, and are not the academic or vocational training benefits envisioned by this factor.

On the other hand, Searchlight received the benefits of their unpaid work, which otherwise would have required paid employees. Even under Defendants' preferred test, the Defendants were the "primary beneficiaries" of the relationship, not Glatt and Footman.

3.  <u>Whether the Plaintiffs Displaced Regular Employees</u>

Glatt and Footman performed routine tasks that would otherwise have been performed by regular employees. In his first internship, Glatt obtained documents for personnel files, picked up paychecks for coworkers, tracked and reconciled purchase orders and invoices, and traveled to the set to get managers' signatures.[69] His supervisor stated that "[i]f Mr. Glatt had not performed this work, another member of my staff would have been required to work longer hours to perform it, or we would have needed a paid production assistant or another intern to do it."[70] At his post-production internship, Glatt performed basic administrative work such as drafting cover letters, organizing filing cabinets, making photocopies, and running errands.[71] This is work that otherwise would have been done by a paid employee.

---

[68] Footman Tr. 97:6-14, 212:24-213:10.
[69] Bien SJ Decl. Ex. 9 ¶ 16.
[70] Bien SJ Decl. Ex. 9 ¶ 16.
[71] Bien SJ Decl. Ex. 6 ¶ 7-8.

Footman performed similar chores, including assembling office furniture, arranging travel plans, taking out trash, taking lunch orders, answering phones, watermarking scripts, and making deliveries.[72]  Again, if Footman had not performed these tasks for free, a paid employee would have been needed.  When Footman went from five to three days a week, Black Swan hired another part-time intern.[73]

4.  Whether Searchlight Obtained an Immediate Advantage From Plaintiffs' Work

Searchlight does not dispute that it obtained an immediate advantage from Glatt and Footman's work.  They performed tasks that would have required paid employees.  There is no evidence they ever impeded work at their internships.  Menial as it was, their work was essential.  The fact they were beginners is irrelevant.  The FLSA recognizes this by authorizing the Secretary of Labor to issue certificates allowing "learners" and "apprentices" to be paid less than minimum wage.  See 29 U.S.C. § 214(a).  "An employee is entitled to compensation for the hours he or she actually worked, whether or not someone else could have performed the duties better or in less time."  Donovan v. New Floridian Hotel, Inc., 676 F.2d 468, 471 n.3 (11th Cir. 1982).

5.  Whether Plaintiffs Were Entitled to a Job at the End of Their Internships

There is no evidence Glatt or Footman were entitled to jobs at the end of their internships or thought they would be.

6.  Whether Searchlight and the Plaintiffs Understood They Were Not Entitled to Wages

Glatt and Footman understood they would not be paid.[74]  But this factor adds little, because the FLSA does not allow employees to waive their entitlement to wages.  "[T]he

---

[72] Pls.' Rule 56.1 Statement (Docket Entry #91) ¶ 223.
[73] Footman Tr. 43:3-9.
[74] Glatt Tr. 77:5-18; Footman Tr. 20:24-21:3.

purposes of the Act require that it be applied even to those who would decline its protections.  If

an exception to the Act were carved out for employees willing to testify that they performed

work 'voluntarily,' employers might be able to use superior bargaining power to coerce

employees to make such assertions, or to waive their protections under the Act."  Tony & Susan

Alamo Found. v. Sec'y of Labor, 471 U.S. 299, 301 (1985).  This protects more than the

Plaintiffs themselves, because "[s]uch exceptions to coverage would . . . exert a general

downward pressure on wages in competing businesses."  Tony & Susan Alamo Found., 471 U.S.

at 302.  It also protects businesses by preventing anticompetitive behavior.  "An employer is not

to be allowed to gain a competitive advantage by reason of the fact that his employees are more

willing to waive [FLSA claims] than are those of his competitor."  Brooklyn Sav. Bank v.

O'Neil, 324 U.S. 697, 710 (1945).

        Considering the totality of the circumstances, Glatt and Footman were classified

improperly as unpaid interns and are "employees" covered by the FLSA and NYLL.  They

worked as paid employees work, providing an immediate advantage to their employer and

performing low-level tasks not requiring specialized training.  The benefits they may have

received—such as knowledge of how a production or accounting office functions or references

for future jobs—are the results of simply having worked as any other employee works, not of

internships designed to be uniquely educational to the interns and of little utility to the employer.

They received nothing approximating the education they would receive in an academic setting or

vocational school.  This is a far cry from Walling, where trainees impeded the regular business of

the employer, worked only in their own interest, and provided no advantage to the employer.

Glatt and Footman do not fall within the narrow "trainee" exception to the FLSA's broad

coverage.

26

<u>Class Certification of Antalik's NYLL Claims</u>

Antalik moves to certify a class consisting of

[a]ll individuals who had unpaid internships in New York between September 28, 2005 and September 1, 2010 with one or more of the following divisions of FEG: Fox Filmed Entertainment, Fox Group, Fox Networks Group, and Fox Interactive Media (renamed News Corp. Digital Media).

She asserts Defendants violated the NYLL with respect to the proposed class.

I.    <u>Legal Standard</u>

A party seeking class certification must first satisfy Federal Rule of Civil Procedure 23(a), which "requires that a proposed class action (1) be sufficiently numerous, (2) involve questions of law or fact common to the class, (3) involve class plaintiffs whose claims are typical of the class, and (4) involve a class representative or representatives who adequately represent the interests of the class." <u>Myers v. Hertz Corp.</u>, 624 F.3d 537, 547 (2d Cir. 2010) (citing Fed. R. Civ. P. 23(a)). In addition, "the proposed class must satisfy at least one of the three requirements listed in Rule 23(b)." <u>Wal-Mart Stores, Inc. v. Dukes</u>, 131 S. Ct. 2541, 2548 (2011). Here, Antalik relies on Rule 23(b)(3), which "requires the party seeking certification to show that 'questions of law or fact common to class members predominate over any questions affecting only individual members' and that class treatment would be superior to individual litigation." <u>Myers</u>, 624 F.3d at 547 (quoting Fed. R. Civ. P. 23(b)(3)).

Rule 23 "does not set forth a mere pleading standard." <u>Wal-Mart</u>, 131 S. Ct. at 2551. Rather, "[t]he party seeking class certification must affirmatively demonstrate compliance with the Rule, and a district court may only certify a class if it is satisfied, after a rigorous analysis, that the requirements of Rule 23 are met." <u>In re Am. Int'l Grp., Inc. Sec. Litig.</u>, 689 F.3d 229, 237-38 (2d Cir. 2012).

27

Case 1:11-cv-06784-WHP    Document 163    Filed 06/11/13    Page 28 of 36

II.    Numerosity

The numerosity requirement is met if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[N]umerosity is presumed at a level of 40 members." Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 2005). While a party seeking class certification must prove "there are in fact sufficiently numerous parties," Wal-Mart, 131 S. Ct. at 2551 (emphasis in original), "[c]ourts have not required evidence of exact class size or identity of class members to satisfy the numerosity requirement." Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993).

Antalik offers Defendants' intern personnel database as proof there were at least 45 class members who interned between 2007 and 2010.[75] But Defendants argue that their database can "not be relied upon for its accuracy."[76] If anything, the proposed class is likely to be larger than the database indicates. The proposed class period dates to 2005, but 36 of the 45 interns in the database were hired in 2009, and none before 2007.[77] Based on this, the Court is permitted to draw a "reasonable inference" that there are at least 40 class members. See Alcantara v. CAN Mgmt., Inc., 264 F.R.D. 61, 64-65 (S.D.N.Y. 2009). Moreover, the Defendants cannot argue that the class size "is far too indefinite and speculative"[78] and thereby capitalize on their own inability to produce accurate information. See McNeill v. N.Y.C. Hous. Auth., 719 F. Supp. 233, 252 (S.D.N.Y. 1989) ("[T]he lack of knowledge as to the exact number

---

[75] Decl. of Rachel Bien in Support of Pls.' Mot. for Class Certification and Court-Authorized Notice, dated Feb. 15, 2013 ("Bien Class Cert. Decl.") (Docket Entry #105) ¶ 12, Ex. 74.
[76] Mem. of Law in Opp. to Pl. Eden Antalik's Mot. for NYLL and FLSA Certification ("Defs.' Class Cert. Opp. Br.") at 13 (Docket Entry #138) (emphasis in original).
[77] Bien Class Cert. Decl. Ex. 74; see also Dep. of David Johnson, dated Dec. 13, 2012 111:11-19 (People Soft was only used to track interns for "a relatively short period of time").
[78] Defs.' Class Cert. Opp. Br. at 14.

28

of affected persons is not a bar to maintaining a class action where the defendants alone have access to such data.")

Nor have Defendants rebutted the presumption of numerosity. Joinder is impracticable here because Plaintiffs do not have accurate information regarding potential class members. Thus they cannot invite them to join as plaintiffs. A class action serves judicial economy and makes recovery economically feasible for class members who would otherwise need to retain lawyers for individual actions seeking relatively small recoveries. See Robidoux, 987 F.2d at 936 (citing Deposit Guar. Nat'l Bank v. Roper, 445 U.S. 326, 339 (1980)).

III.    Commonality

A party seeking certification must show "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "That language is easy to misread, since '[a]ny competently crafted class complaint literally raises common 'questions.'" Wal-Mart, 131 S. Ct. at 2551 (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. Law Rev. 97, 131-32 (2009)). Class claims "must depend upon a common contention . . . capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart, 131 S. Ct. at 2551. "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." Wal-Mart, 131 S. Ct. at 2551 (emphasis in original) (quoting Nagareda, supra, at 132).

Antalik has identified several common questions relevant to determining NYLL violations, including: (1) whether Defendants derived an immediate advantage from interns'

29

work, (2) whether interns displaced regular employees, and (3) whether FEG's internship program was for the benefit of interns.[79] Some evidence Antalik claims may answer these questions is either individualized proof or of little evidentiary value. For example, there is nothing facially unlawful about the FEG internship guidelines that might generate common answers to drive the litigation.[80] She also claims FEG's internship request forms, which describe various internship positions, constitute classwide evidence that interns provided an immediate advantage to Defendants. A completed request form may be evidence that a particular internship did not fall within the NYLL's "trainee" exception, but that is individualized proof. Only the blank request form is common to the class, and it is not capable of resolving any question.[81]

But Antalik also identifies evidence that <u>is</u> capable of answering common questions on a classwide basis. Departments at FEG companies requested interns based on their "needs," and they requested more when they were busier, the opposite of what one would expect if interns provided little advantage to the company and sometimes impeded its work.[82] An internal memo reports that because paid internships were eliminated and overtime pay and temporary employees scaled back, "the size of our [unpaid] intern program more than doubled."[83] Using unpaid interns to fill the interstices created by eliminating paid positions is a clear violation of the NYLL.

The April 2010 release of the DOL Intern Fact Sheet did not represent a change in applicable law. <u>See, e.g.</u>, <u>Reich</u>, 992 F.2d at 1027 (The six DOL criteria "were derived almost directly from [<u>Walling</u>] and have appeared in Wage and Hour Administrator opinions since at

---

[79] <u>See</u> Mem. of Law in Support of Pls.' Mot. for Class Certification and Court-Authorized Notice ("Pls.' Class Cert. Br.") at 22-24 (Docket Entry #104).
[80] <u>See</u> Bien Class Cert. Decl. Ex. 30.
[81] <u>See, e.g.</u>, Bien Class Cert. Decl. Ex. 50.
[82] Hoffman Tr. 31:17-33:3.
[83] Bien Class Cert. Decl. Ex. 38.

least 1967."). But the reactions to the fact sheet indicate FEG's internship overseers believed "the regulations have been changed significantly creating a lot more risk going forward."[84] Antalik's supervisor, John Maybee, asked intern recruiter Aimee Hoffman "[w]hy would an office have an intern that provides no immediate advantage from said intern's activities?"[85] Hoffman responded, "That is the question! . . . If we give them work to benefit the company, we really should pay them . . . these DOL guidelines really make you think about whether it's worth it or not to have [an unpaid intern]."[86]

At least one FEG department bowed out of the internship program, believing it could not comply with the DOL criteria.[87] Hoffman informed internship supervisors that "internships will be changing considerably" and "we are tightening up our guidelines due to the department of labor's definition of a [sic] unpaid intern."[88] An internal memo in August 2008 states that "[s]tarting with the Fall 2010 internship program . . . Fox will only provide paid internships unless a manager can comply with the six criteria provided by the DOL."[89] Ultimately, FEG eliminated unpaid internships altogether because of "the new regulation on [unpaid] interns."[90]

Evidence that interns were recruited to help with busy periods, that they displaced paid employees, and that those who oversaw the internships did not believe they complied with applicable law is evidence capable of generating common answers to questions of liability.

---

[84] Bien Class Cert. Decl. Ex. 46; see also Ex. 21 ("the 'suggested' guidelines and the former reality [sic] differ quite drastically"); Ex. 24 (DOL factors "indicate[] that [interns'] duties and participation here may change substantially").
[85] Bien Class Cert. Decl. Ex. 22.
[86] Bien Class Cert. Decl. Ex. 22.
[87] Bien Class Cert. Decl. Ex. 32.
[88] Bien Class Cert. Decl. Ex. 26.
[89] Bien Class Cert. Decl. Ex. 38.
[90] Bien Class Cert. Decl. Ex. 27.

IV.    Typicality

Typicality "requires that the claims of the class representative[] be typical of those of the class, and 'is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997) (quoting In re Drexel Burnham Lambert Grp., Inc., 960 F.2d 285, 291 (2d Cir. 1992)). "The commonality and typicality requirements tend to merge into one another." Marisol, 126 F.3d at 376. "Since the claims only need to share the same essential characteristics, and need not be identical, the typicality requirement is not highly demanding." Bolanos v. Norwegian Cruise Lines Ltd., 212 F.R.D. 144, 155 (S.D.N.Y. 2002). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." Robidoux, 987 F.2d at 936-37. Antalik participated in the same internship program administered by the same set of recruiters as all class members, was classified as an unpaid intern like all class members, and brings an NYLL wage claim like all class members. She satisfies the typicality requirement.

Defendants argue vigorously that Antalik has not met this requirement because she did not receive academic credit for her internship and Aimee Hoffman did not recruit her.[91] Receipt of academic credit is of little moment. A university's decision to grant academic credit is not a determination that an unpaid internship complies with the NYLL. Universities may add additional requirements or coursework for students receiving internship credit, but the focus of the NYLL is on the requirements and training provided by the alleged employer.

---

[91] Defs.' Class Cert Opp. Br. at 17-21.

That Hoffman did not recruit Antalik does not defeat typicality because Antalik still worked in the same FEG internship program supervised by Hoffman. The potential liability arises from the operation of the program, not recruitment of the interns. And though Hoffman did not hire Antalik, she required Antalik to send her the same paperwork as all other interns.[92]

## V.    Adequacy

Adequacy requires determining whether "1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000). "The fact that plaintiffs' claims are typical of the class is strong evidence that their interests are not antagonistic to those of the class." Damassia v. Duane Reade, Inc., 250 F.R.D. 152, 158 (S.D.N.Y. 2008). Defendants do not dispute either point. Antalik has no known conflicts with the class. Her counsel are experienced in prosecuting employment class actions. See Capsolas v. Pasta Res., Inc., No. 10 Civ. 5595 (RLE), 2012 WL 4760910, at *3 (S.D.N.Y. Oct. 5, 2012).

## VI.    Predominance

"Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." Moore v. PaineWebber, Inc., 306 F.3d 1247, 1252 (2d Cir. 2002).

As discussed above, Antalik submitted generalized proof on the issue of Defendants' liability. In an FLSA class, common questions of liability predominate over

---

[92] Bien SJ Opp. Decl. Ex. 63.

individual calculations of damages. See Torres v. Gristede's Operating Corp., No. 04 Civ. 3316

(PAC), 2006 WL 2819730, at *15 (S.D.N.Y. Sept. 29, 2006); Noble v. 93 Univ. Place Corp., 224

F.R.D. 330, 345 (S.D.N.Y. 2004).

VII.    Superiority

In determining whether "a class action is superior to other available methods for

fairly and efficiently adjudicating the controversy," the Court must consider

> (A) the class members' interests in individually controlling the prosecution or
> defense of separate actions; (B) the extent and nature of any litigation concerning
> the controversy already begun by or against class members; (C) the desirability or
> undesirability of concentrating the litigation of the claims in the particular forum;
> and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). Here, the relatively small recoveries available to individual plaintiffs

make a class action a more efficient mechanism. There are no known litigations raising the same

issues. This Court is a desirable forum because the proposed class worked in New York. And

there is no reason to expect manageability difficulties.

For the foregoing reasons, the Court certifies Antalik's proposed class under Rule

23(b)(3) with Antalik as class representative. The Court appoints Outten & Golden LLP as class

counsel under Rule 23(g).

### Conditional Certification of Antalik's FLSA Claims

The FLSA allows plaintiffs to bring claims on behalf of "other employees

similarly situated." 29 U.S.C. § 216(b). "Although they are not required to do so by [the] FLSA,

district courts 'have discretion, in appropriate cases, to implement [§ 216(b)] . . . by facilitating

notice to potential plaintiffs' of the pendency of the action and of their opportunity to opt-in as

represented plaintiffs." Myers, 624 F.3d at 554 (quoting Hoffmann-La Roche Inc. v. Sperling,

493 U.S. 165, 169 (1989)). To be entitled to notice, Plaintiffs must make a "'modest factual

34

showing' that they and potential opt-in plaintiffs 'together were victims of a common policy or plan that violated the law.'" Myers, 624 F.3d at 555 (quoting Hoffmann v. Sbarro, Inc., 982 F. Supp. 249, 261 (S.D.N.Y. 1997)).

Courts apply "heightened scrutiny" to motions for court-authorized notice made after discovery. Torres, 2006 WL 2819730, at *9. For post-discovery motions, courts consider whether the plaintiff and proposed class members are "similarly situated" by considering "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations." Torres, 2006 WL 2819730, at *9 (internal alteration omitted) (quoting Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1102 (10th Cir. 2001)).

Antalik moves for authorization to send notice of this action to

> all individuals who had unpaid internships between September 28, 2008 and September 1, 2010 with one or more of the following divisions of FEG:  Fox Filmed Entertainment, Fox Group, Fox Networks Group, and Fox Interactive Media (renamed News Corp. Digital Media).

As discussed above, Antalik has put forth generalized proof that interns were victims of a common policy to replace paid workers with unpaid interns.  Though there are disparate factual and employment settings, the common issues of liability predominate over individual issues and defenses.  See Torres, 2006 WL 2819730, at *10.  And the same fairness and procedural considerations that make a class action a superior mechanism for the NYLL claims make a collective action a superior mechanism for the FLSA claims.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment that Gratts's CAUCL claim is time-barred is granted, and the remainder of its summary judgment

motion is denied. Glatt and Footman's motion for summary judgment that they are "employees" covered by the FLSA and NYLL and that Searchlight is their joint employer is granted. Gratts's motion for summary judgment is denied. Antalik's motions for class certification of her NYLL claims and conditional certification of an FLSA collective action are granted and the law firm of Outten & Golden LLP is appointed as class counsel. The Clerk of Court is directed to terminate the motions pending at ECF Nos. 89, 93, and 103.

Dated:   June 11, 2013
         New York, New York

                                      SO ORDERED:

                                      _____
                                      WILLIAM H. PAULEY III
                                      U.S.D.J.

*Counsel of Record:*

Adam T. Klein, Esq.
Rachel M. Bien, Esq.
Jennifer L. Liu, Esq.
Juno E. Turner, Esq.
Sally J. Abrahamson, Esq.
Outten & Golden, LLP
3 Park Avenue, 29th Floor
New York, NY 10016
*Counsel for Plaintiffs*

Elise M. Bloom, Esq.
Amy F. Melican, Esq.
Proskauer Rose LLP
11 Times Square
New York, NY 10036
*Counsel for Defendant*

Sec. 203

## § 203. Definitions

As used in this chapter—

**(a)** "Person" means an individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons.

**(b)** "Commerce" means trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof.

**(c)** "State" means any State of the United States or the District of Columbia or any Territory or possession of the United States.

**(d)** "Employer" includes any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency, but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization.

**(e)**

    **(1)** Except as provided in paragraphs (2), (3), and (4), the term "employee" means any individual employed by an employer.

    **(2)** In the case of an individual employed by a public agency, such term means—

        **(A)** any individual employed by the Government of the United States—

            **(i)** as a civilian in the military departments (as defined in section 102 of Title 5),

            **(ii)** in any executive agency (as defined in section 105 of such title),

            **(iii)** in any unit of the judicial branch of the Government which has positions in the competitive service,

            **(iv)** in a nonappropriated fund instrumentality under the jurisdiction of the Armed Forces,

            **(v)** in the Library of Congress, or

            **(vi)** the Government Printing Office;

        **(B)** any individual employed by the United States Postal Service or the Postal Regulatory Commission; and

        **(C)** any individual employed by a State, political subdivision of a State, or an interstate governmental agency, other than such an individual—

Sec. 203(e)(2)(C)(i)

**(i)** who is not subject to the civil service laws of the State, political subdivision, or agency which employs him; and

**(ii)** who—

**(I)** holds a public elective office of that State, political subdivision, or agency,

**(II)** is selected by the holder of such an office to be a member of his personal staff,

**(III)** is appointed by such an officeholder to serve on a policymaking level,

**(IV)** is an immediate adviser to such an officeholder with respect to the constitutional or legal powers of his office, or

**(V)** is an employee in the legislative branch or legislative body of that State, political subdivision, or agency and is not employed by the legislative library of such State, political subdivision, or agency.

**(3)** For purposes of subsection (u) of this section, such term does not include any individual employed by an employer engaged in agriculture if such individual is the parent, spouse, child, or other member of the employer's immediate family.

**(4)**

**(A)** The term "employee" does not include any individual who volunteers to perform services for a public agency which is a State, a political subdivision of a State, or an interstate governmental agency, if—

**(i)** the individual receives no compensation or is paid expenses, reasonable benefits, or a nominal fee to perform the services for which the individual volunteered; and

**(ii)** such services are not the same type of services which the individual is employed to perform for such public agency.

**(B)** An employee of a public agency which is a State, political subdivision of a State, or an interstate governmental agency may volunteer to perform services for any other State, political subdivision, or interstate governmental agency, including a State, political subdivision or agency with which the employing State, political subdivision, or agency has a mutual aid agreement.

**(5)** The term "employee" does not include individuals who volunteer their services solely for humanitarian purposes to private non-profit food banks and who receive from the food banks groceries.

3

SPA-39

## Sec. 203(f)

**(f)** "Agriculture" includes farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities (including commodities defined as agricultural commodities in section 1141j(g) of Title 12), the raising of livestock, bees, fur-bearing animals, or poultry, and any practices (including any forestry or lumbering operations) performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market.

**(g)** "Employ" includes to suffer or permit to work.

**(h)** "Industry" means a trade, business, industry, or other activity, or branch or group thereof, in which individuals are gainfully employed.

**(i)** "Goods" means goods (including ships and marine equipment), wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof, but does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof.

**(j)** "Produced" means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any closely related process or occupation directly essential to the production thereof, in any State.

**(k)** "Sale" or "sell" includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition.

**(l)** "Oppressive child labor" means a condition of employment under which

**(1)** any employee under the age of sixteen years is employed by an employer (other than a parent or a person standing in place of a parent employing his own child or a child in his custody under the age of sixteen years in an occupation other than manufacturing or mining or an occupation found by the Secretary of Labor to be particularly hazardous for the employment of children between the ages of sixteen and eighteen years or detrimental to their health or well-being) in any occupation, or

**(2)** any employee between the ages of sixteen and eighteen years is employed by an employer in any occupation which the Secretary of Labor shall find and by order declare to be particularly hazardous for the employment of children between such ages or detrimental to their health or well-being; but oppressive child labor shall not be deemed to exist by virtue of the employment in any occupation of any person with respect to whom the employer shall have on file an unexpired certificate issued and held pursuant to regulations of the Secretary of Labor certifying that such person is above the oppressive child-labor age. The Secretary of Labor shall provide by regulation or by order that the employment of employees between the ages of fourteen and sixteen years in occupations other than manufacturing and

## Sec. 203(l)(2)

mining shall not be deemed to constitute oppressive child labor if and to the extent that the Secretary of Labor determines that such employment is confined to periods which will not interfere with their schooling and to conditions which will not interfere with their health and well-being.

**(m)** "Wage" paid to any employee includes the reasonable cost, as determined by the Administrator, to the employer of furnishing such employee with board, lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by such employer to his employees: *Provided*, That the cost of board, lodging, or other facilities shall not be included as a part of the wage paid to any employee to the extent it is excluded therefrom under the terms of a bona fide collective-bargaining agreement applicable to the particular employee: *Provided further*, That the Secretary is authorized to determine the fair value of such board, lodging, or other facilities for defined classes of employees and in defined areas, based on average cost to the employer or to groups of employers similarly situated, or average value to groups of employees, or other appropriate measures of fair value. Such evaluations, where applicable and pertinent, shall be used in lieu of actual measure of cost in determining the wage paid to any employee. In determining the wage an employer is required to pay a tipped employee, the amount paid such employee by the employee's employer shall be an amount equal to—

**(1)** the cash wage paid such employee which for purposes of such determination shall be not less than the cash wage required to be paid such an employee on August 20, 1996; and

**(2)** an additional amount on account of the tips received by such employee which amount is equal to the difference between the wage specified in paragraph (1) and the wage in effect under section 206(a)(1) of this title.

The additional amount on account of tips may not exceed the value of the tips actually received by an employee. The preceding 2 sentences shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subsection, and all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips.

**(n)** "Resale" shall not include the sale of goods to be used in residential or farm building construction, repair, or maintenance: *Provided*, That the sale is recognized as a bona fide retail sale in the industry.

**(o)** Hours Worked.— In determining for the purposes of sections 206 and 207 of this title the hours for which an employee is employed, there shall be excluded any time spent in changing clothes or washing at the beginning or end of each workday which was excluded from measured working time during the week involved by the express terms of or by custom or practice under a bona fide collective-bargaining agreement applicable to the particular employee.

**(p)** "American vessel" includes any vessel which is documented or numbered under the laws of the United States.

**(q)** "Secretary" means the Secretary of Labor.

## Sec. 203(r)

**(r)**

**(1)** "Enterprise" means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including departments of an establishment operated through leasing arrangements, but shall not include the related activities performed for such enterprise by an independent contractor. Within the meaning of this subsection, a retail or service establishment which is under independent ownership shall not be deemed to be so operated or controlled as to be other than a separate and distinct enterprise by reason of any arrangement, which includes, but is not necessarily limited to, an agreement,

> **(A)** that it will sell, or sell only, certain goods specified by a particular manufacturer, distributor, or advertiser, or

> **(B)** that it will join with other such establishments in the same industry for the purpose of collective purchasing, or

> **(C)** that it will have the exclusive right to sell the goods or use the brand name of a manufacturer, distributor, or advertiser within a specified area, or by reason of the fact that it occupies premises leased to it by a person who also leases premises to other retail or service establishments.

**(2)** For purposes of paragraph (1), the activities performed by any person or persons—

> **(A)** in connection with the operation of a hospital, an institution primarily engaged in the care of the sick, the aged, the mentally ill or defective who reside on the premises of such institution, a school for mentally or physically handicapped or gifted children, a preschool, elementary or secondary school, or an institution of higher education (regardless of whether or not such hospital, institution, or school is operated for profit or not for profit), or

> **(B)** in connection with the operation of a street, suburban or interurban electric railway, or local trolley or motorbus carrier, if the rates and services of such railway or carrier are subject to regulation by a State or local agency (regardless of whether or not such railway or carrier is public or private or operated for profit or not for profit), or

> **(C)** in connection with the activities of a public agency,

shall be deemed to be activities performed for a business purpose.

## Sec. 203(s)

**(s)**

    **(1)** "Enterprise engaged in commerce or in the production of goods for commerce" means an enterprise that—

        **(A)**

            **(i)** has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and

            **(ii)** is an enterprise whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated);

        **(B)** is engaged in the operation of a hospital, an institution primarily engaged in the care of the sick, the aged, or the mentally ill or defective who reside on the premises of such institution, a school for mentally or physically handicapped or gifted children, a preschool, elementary or secondary school, or an institution of higher education (regardless of whether or not such hospital, institution, or school is public or private or operated for profit or not for profit); or

        **(C)** is an activity of a public agency.

    **(2)** Any establishment that has as its only regular employees the owner thereof or the parent, spouse, child, or other member of the immediate family of such owner shall not be considered to be an enterprise engaged in commerce or in the production of goods for commerce or a part of such an enterprise. The sales of such an establishment shall not be included for the purpose of determining the annual gross volume of sales of any enterprise for the purpose of this subsection.

**(t)** "Tipped employee" means any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips.

**(u)** "Man-day" means any day during which an employee performs any agricultural labor for not less than one hour.

**(v)** "Elementary school" means a day or residential school which provides elementary education, as determined under State law.

**(w)** "Secondary school" means a day or residential school which provides secondary education, as determined under State law.

**(x)** "Public agency" means the Government of the United States; the government of a State or political subdivision thereof; any agency of the United States (including the United States Postal Service and Postal Regulatory Commission), a State, or a political subdivision of a State; or any interstate governmental agency.

**(y)** "Employee in fire protection activities" means an employee, including a firefighter, paramedic, emergency medical technician, rescue worker, ambulance personnel, or hazardous materials worker, who—

Sec. 203(y)(1)

**(1)** is trained in fire suppression, has the legal authority and responsibility to engage in fire suppression, and is employed by a fire department of a municipality, county, fire district, or State; and

**(2)** is engaged in the prevention, control, and extinguishment of fires or response to emergency situations where life, property, or the environment is at risk.

## § 204. Administration

**(a) Creation of Wage and Hour Division in Department of Labor; Administrator**

There is created in the Department of Labor a Wage and Hour Division which shall be under the direction of an Administrator, to be known as the Administrator of the Wage and Hour Division (in this chapter referred to as the "Administrator"). The Administrator shall be appointed by the President, by and with the advice and consent of the Senate.

**(b) Appointment, selection, classification, and promotion of employees by Administrator**

The Administrator may, subject to the civil-service laws, appoint such employees as he deems necessary to carry out his functions and duties under this chapter and shall fix their compensation in accordance with chapter 51 and subchapter III of chapter 53 of Title 5. The Administrator may establish and utilize such regional, local, or other agencies, and utilize such voluntary and uncompensated services, as may from time to time be needed. Attorneys appointed under this section may appear for and represent the Administrator in any litigation, but all such litigation shall be subject to the direction and control of the Attorney General. In the appointment, selection, classification, and promotion of officers and employees of the Administrator, no political test or qualification shall be permitted or given consideration, but all such appointments and promotions shall be given and made on the basis of merit and efficiency.

**(c) Principal office of Administrator; jurisdiction**

The principal office of the Administrator shall be in the District of Columbia, but he or his duly authorized representative may exercise any or all of his powers in any place.

**(d) Biennial report to Congress; studies of exemptions to hour and wage provisions and means to prevent curtailment of employment opportunities**

**(1)** The Secretary shall submit biennially in January a report to the Congress covering his activities for the preceding two years and including such information, data, and recommendations for further legislation in connection with the matters covered by this chapter as he may find advisable. Such report shall contain an evaluation and appraisal by the Secretary of the minimum wages and overtime coverage established by this chapter, together with his recommendations to the Congress. In making such evaluation and appraisal, the Secretary shall take into consideration any changes which may



UNITED STATES CODE SERVICE
Copyright © 2014 Matthew Bender & Company, Inc.
a member of the LexisNexis Group (TM)
All rights reserved.

*** Current through PL 113-74, with a gap of PL 113-73, approved 1/16/2014 ***

TITLE 29. LABOR
CHAPTER 8. FAIR LABOR STANDARDS

**Go to the United States Code Service Archive Directory**

*29 USCS § 206*

§ 206.  Minimum wage

(a) Employees engaged in commerce; home workers in Puerto Rico and Virgin Islands; employees in American Samoa; seamen on American vessels; agricultural employees.  Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the following rates:

 (1) except as otherwise provided in this section, not less than--

   (A) $ 5.85 an hour, beginning on the 60th day after the date of enactment of the Fair Minimum Wage Act of 2007 [enacted May 25, 2007];

   (B) $ 6.55 an hour, beginning 12 months after that 60th day; and

   (C) $ 7.25 an hour, beginning 24 months after that 60th day;

 (2) if such employee is a home worker in Puerto Rico or the Virgin Islands, not less than the minimum piece rate prescribed by regulation or order; or, if no such minimum piece rate is in effect, any piece rate adopted by such employer which shall yield, to the proportion or class of employees prescribed by regulation or order, not less than the applicable minimum hourly wage rate. Such minimum piece rates or employer piece rates shall be commensurate with, and shall be paid in lieu of, the minimum hourly wage rate applicable under the provisions of this section. The Administrator [Secretary], or his authorized representative, shall have power to make such regulations or orders as are necessary or appropriate to carry out any of the provisions of this paragraph, including the power without limiting the generality of the foregoing, to define any operation or occupation which is performed by such home work employees in Puerto Rico or the Virgin Islands; to establish minimum piece rates for any operation or occupation so defined; to prescribe the method and procedure for ascertaining and promulgating minimum piece rates; to prescribe standards for employer piece rates, including the proportion or class of employees who shall receive not less than the minimum hourly wage rates; to define the term "home worker"; and to prescribe the conditions under which employers, agents, contractors, and subcontractors shall cause goods to be produced by home workers;

 (3) if such employee is employed as a seaman on an American vessel, not less than the rate which will provide to the employee, for the period covered by the wage payment, wages equal to compensation at the hourly rate prescribed by paragraph (1) of this subsection for all hours during such period when he was actually on duty (including periods aboard ship when the employee was on watch or was, at the direction of a superior officer, performing work or standing by, but

not including off-duty periods which are provided pursuant to the employment agreement); or

(4) if such employee is employed in agriculture, not less than the minimum wage rate in effect under paragraph (1) after December 31, 1977.

(b) Additional applicability to employees pursuant to subsequent amendatory provisions. Every employer shall pay to each of his employees (other than an employee to whom subsection (a)(5) applies) who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, and who in such workweek is brought within the purview of this section by the amendments made to this Act by the Fair Labor Standards Amendments of 1966 [*29 USCS §§ 203*, *206*, *207*, *213*, *214*, *216*, *218*, *255*], title IX of the Education Amendments of 1972, or the Fair Labor Standards Amendments of 1974, wages at the following rate: Effective after December 31, 1977, not less than the minimum wage rate in effect under subsection (a)(1).

(c) [Deleted]

(d) Prohibition of sex discrimination.

(1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: Provided, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

(2) No labor organization, or its agents, representing employees of an employer having employees subject to any provisions of this section shall cause or attempt to cause such an employer to discriminate against an employee in violation of paragraph (1) of this subsection.

(3) For purposes of administration and enforcement, any amounts owing to any employee which have been withheld in violation of this subsection shall be deemed to be unpaid minimum wages or unpaid overtime compensation under this Act [*29 USCS §§ 201* et seq., generally; for full classification, consult USCS Tables volumes].

(4) As used in this subsection, the term "labor organization" means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, or dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

(e) Employees of employers providing contract services to United States.

(1) Notwithstanding the provisions of section 13 of this Act [*29 USCS § 213*] (except subsections (a)(1) and (f) thereof), every employer providing any contract services (other than linen supply services) under a contract with the United States or any subcontract thereunder shall pay to each of his employees whose rate of pay is not governed by the Service Contract Act of 1965 *(41 USC 351-*357) [*41 USCS §§ 6701* et seq.] or to whom subsection (a)(1) of this section is not applicable, wages at rates not less than the rates provided for in subsection (b) of this section.

(2) Notwithstanding the provisions of section 13 of this Act [*29 USCS § 213*] (except subsections (a)(1) and (f) thereof) and the provisions of the Service Contract Act of 1965 [*41 USCS §§ 6701* et seq.], every employer in an establishment providing linen supply services to the United States under a contract with the United States or any subcontract thereunder shall pay to each of his employees in such establishment wages at rates not less than those prescribed in subsection (b), except that if more than 50 per centum of the gross annual dollar volume of sales made or business done by such establishment is derived from providing such linen supply services under any such contracts or subcontracts, such employer shall pay to each of his employees in such establishment wages at rates not less than those prescribed in subsection (a)(1) of this section.

(f) Employees in domestic service.  Any employee--

(1) who in any workweek is employed in domestic service in a household shall be paid wages at a rate not less than the wage rate in effect under section 6(b) [subsec. (b) this section] unless such employee's compensation for such service would not because of section 209(a)(6) of the Social Security Act [*42 USCS § 409(a)(6)*] constitute wages for the purposes of title II of such Act [*42 USCS §§ 401* et seq.], or

(2) who in any workweek--

(A) is employed in domestic service in one or more households, and

(B) is so employed for more than 8 hours in the aggregate, shall be paid wages for such employment in such workweek at a rate not less than the wage rate in effect under section 6(b) [subsec. (b) this section].

(g) Newly hired employees who are less than 20 years old.

(1) In lieu of the rate prescribed by subsection (a)(1), any employer may pay any employee of such employer, during the first 90 consecutive calendar days after such employee is initially employed by such employer, a wage which is not less than $ 4.25 an hour.

(2) No employer may take any action to displace employees (including partial displacements such as reduction in hours, wages, or employment benefits) for purposes of hiring individuals at the wage authorized in paragraph (1).

(3) Any employer who violates this subsection shall be considered to have violated section 15(a)(3) [*29 USCS § 215(a)(3)*].

(4) This subsection shall only apply to an employee who has not attained the age of 20 years.

**HISTORY:**

(June 25, 1938, ch 676, § 6, 52 Stat. 1062; June 26, 1940, ch 432, § 3(e), (f), 54 Stat. 616; Oct. 26, 1949, ch 736, § 6, 63 Stat. 912; Aug. 12, 1955, ch 867, § 3, 69 Stat. 711; Aug. 8, 1956, ch 1035, § 2, 70 Stat. 1118; May 5, 1961, P.L. 87-30, § 5, 75 Stat. 67; June 10, 1963, P.L. 88-38, § 3, 77 Stat. 56; Sept. 23, 1966, P.L. 89-601, Title III, §§ 301-305, 80 Stat. 838-841; April 8, 1974, P.L. 93-259, §§ 2-4, 5(b), 7(b)(1), 88 Stat. 55, 56, 62; Nov. 1, 1977, P.L. 95-151, § 2(a)-(c), (d)(1), (2), 91 Stat. 1245; Nov. 17, 1989, P.L. 101-157, §§ 2, 4(b), 103 Stat. 938, 940; Dec. 19, 1989, P.L. 101-239, Title X, Subtitle B, § 10208(d)(2)(B)(i), 103 Stat. 2481; Aug. 20, 1996, P.L. 104-188, Title II, §§ 2104(b), (c), 2105(c), 110 Stat. 1928, 1929; May 25, 2007, P.L. 110-28, Title VIII, Subtitle A, §§ 8102(a), 8103(c)(1)(B), 121 Stat. 188, 189.)

### HISTORY; ANCILLARY LAWS AND DIRECTIVES

References in text:

"Fair Labor Standards Amendments of 1966", referred to in subsec. (b), is Act Sept. 23, 1966, P.L. 89-601, 80 Stat. 830.  For full classification of such Act, consult USCS Tables volumes.

"Title IX of the Education Amendments of 1972", referred to in subsec (b), is Act June 23, 1972, P.L. 92-318, Title IX, §§ 901-907, 86 Stat. 373-375, which appears generally as *20 USCS §§ 1681* et seq.  For full classification of such Title, consult USCS Tables volumes.

"Fair Labor Standards Amendments of 1974," referred to in subsec. (b), is Act April 8, 1974, which appears generally as *29 USCS §§ 202* et seq. For full classification of such Act, consult USCS Tables volumes.

"Fair Labor Standards Amendments of 1985 (Public Law 99-150)" referred to in subsec. (c)(4), is Act Nov. 13, 1985, P.L. 99-150, 99 Stat. 787. For full classification of such Act, consult USCS Tables volumes.

"Social Security Act", referred to in subsec. (f)(1), is Act Aug. 14, 1935, ch 531, 49 Stat. 620, as amended.  Title II of such Act appears generally as *42 USCS §§ 401* et seq.  For full classification of such Act, consult USCS Tables volumes.

## Sec. 215(a)(2)

**(2)** to violate any of the provisions of section 206 or section 207 of this title, or any of the provisions of any regulation or order of the Secretary issued under section 214 of this title;

**(3)** to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee;

**(4)** to violate any of the provisions of section 212 of this title;

**(5)** to violate any of the provisions of section 211(c) of this title, or any regulation or order made or continued in effect under the provisions of section 211(d) of this title, or to make any statement, report, or record filed or kept pursuant to the provisions of such section or of any regulation or order thereunder, knowing such statement, report, or record to be false in a material respect.

**(b)** For the purposes of subsection (a)(1) of this section proof that any employee was employed in any place of employment where goods shipped or sold in commerce were produced, within ninety days prior to the removal of the goods from such place of employment, shall be prima facie evidence that such employee was engaged in the production of such goods.

## § 216. Penalties

### (a) Fines and imprisonment

Any person who willfully violates any of the provisions of section 215 of this title shall upon conviction thereof be subject to a fine of not more than $10,000, or to imprisonment for not more than six months, or both. No person shall be imprisoned under this subsection except for an offense committed after the conviction of such person for a prior offense under this subsection.

### (b) Damages; right of action; attorney's fees and costs; termination of right of action

Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. Any employer who violates the provisions of section 215(a)(3) of this title shall be liable for such legal or equitable relief as may be appropriate to effectuate the purposes of section 215(a)(3) of this title, including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages. An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become

## Sec. 216(b)

such a party and such consent is filed in the court in which such action is brought. The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action. The right provided by this subsection to bring an action by or on behalf of any employee, and the right of any employee to become a party plaintiff to any such action, shall terminate upon the filing of a complaint by the Secretary of Labor in an action under section 217 of this title in which

> **(1)** restraint is sought of any further delay in the payment of unpaid minimum wages, or the amount of unpaid overtime compensation, as the case may be, owing to such employee under section 206 or section 207 of this title by an employer liable therefore under the provisions of this subsection or

> **(2)** legal or equitable relief is sought as a result of alleged violations of section 215(a)(3) of this title.

**(c) Payment of wages and compensation; waiver of claims; actions by the Secretary; limitation of actions**

The Secretary is authorized to supervise the payment of the unpaid minimum wages or the unpaid overtime compensation owing to any employee or employees under section 206 or section 207 of this title, and the agreement of any employee to accept such payment shall upon payment in full constitute a waiver by such employee of any right he may have under subsection (b) of this section to such unpaid minimum wages or unpaid overtime compensation and an additional equal amount as liquidated damages. The Secretary may bring an action in any court of competent jurisdiction to recover the amount of unpaid minimum wages or overtime compensation and an equal amount as liquidated damages. The right provided by subsection (b) of this section to bring an action by or on behalf of any employee to recover the liability specified in the first sentence of such subsection and of any employee to become a party plaintiff to any such action shall terminate upon the filing of a complaint by the Secretary in an action under this subsection in which a recovery is sought of unpaid minimum wages or unpaid overtime compensation under sections 206 and 207 of this title or liquidated or other damages provided by this subsection owing to such employee by an employer liable under the provisions of subsection (b) of this section, unless such action is dismissed without prejudice on motion of the Secretary. Any sums thus recovered by the Secretary of Labor on behalf of an employee pursuant to this subsection shall be held in a special deposit account and shall be paid, on order of the Secretary of Labor, directly to the employee or employees affected. Any such sums not paid to an employee because of inability to do so within a period of three years shall be covered into the Treasury of the United States as miscellaneous receipts. In determining when an action is commenced by the Secretary of Labor under this subsection for the purposes of the statutes of limitations provided in section 255(a) of this title, it shall be considered to be commenced in the case of any individual claimant on the date when the complaint is filed if he is specifically named as a party plaintiff in the complaint, or if his name did not so appear, on the subsequent date on which his name is added as a party plaintiff in such action.

## Sec. 216(d)

**(d) Savings provisions**

In any action or proceeding commenced prior to, on, or after August 8, 1956, no employer shall be subject to any liability or punishment under this chapter or the Portal-to-Portal Act of 1947, 29 U.S.C.A. § 251 et seq.] on account of his failure to comply with any provision or provisions of this chapter or such Act

> **(1)** with respect to work heretofore or hereafter performed in a workplace to which the exemption in section 213(f) of this title is applicable,

> **(2)** with respect to work performed in Guam, the Canal Zone or Wake Island before the effective date of this amendment of subsection (d), or

> **(3)** with respect to work performed in a possession named in section 206(a)(3) of this title at any time prior to the establishment by the Secretary, as provided therein, of a minimum wage rate applicable to such work.

**(e)**

> **(1)**

>> **(A)** Any person who violates the provisions of sections 212 or 213(c) of this title, relating to child labor, or any regulation issued pursuant to such sections, shall be subject to a civil penalty not to exceed—

>>> **(i)** $11,000 for each employee who was the subject of such a violation; or

>>> **(ii)** $50,000 with regard to each such violation that causes the death or serious injury of any employee under the age of 18 years, which penalty may be doubled where the violation is a repeated or willful violation.

>> **(B)** For purposes of subparagraph (A), the term "serious injury" means—

>>> **(i)** permanent loss or substantial impairment of one of the senses (sight, hearing, taste, smell, tactile sensation);

>>> **(ii)** permanent loss or substantial impairment of the function of a bodily member, organ, or mental faculty, including the loss of all or part of an arm, leg, foot, hand or other body part; or

>>> **(iii)** permanent paralysis or substantial impairment that causes loss of movement or mobility of an arm, leg, foot, hand or other body part.

> **(2)** Any person who repeatedly or willfully violates section 206 or 207, relating to wages, shall be subject to a civil penalty not to exceed $1,100 for each such violation.

> **(3)** In determining the amount of any penalty under this subsection, the appropriateness of such penalty to the size of the business of the person charged and the gravity of the violation shall be considered. The amount of any penalty under this subsection, when finally determined, may be—

Sec. 216(e)(3)(A)

(A) deducted from any sums owing by the United States to the person charged;

(B) recovered in a civil action brought by the Secretary in any court of competent jurisdiction, in which litigation the Secretary shall be represented by the Solicitor of Labor; or

(C) ordered by the court, in an action brought for a violation of section 215(a)(4) of this title or a repeated or willful violation of section 215(a)(2) of this title, to be paid to the Secretary.

(4) Any administrative determination by the Secretary of the amount of any penalty under this subsection shall be final, unless within 15 days after receipt of notice thereof by certified mail the person charged with the violation takes exception to the determination that the violations for which the penalty is imposed occurred, in which event final determination of the penalty shall be made in an administrative proceeding after opportunity for hearing in accordance with section 554 of Title 5, and regulations to be promulgated by the Secretary.

(5) Except for civil penalties collected for violations of section 212 of this title, sums collected as penalties pursuant to this section shall be applied toward reimbursement of the costs of determining the violations and assessing and collecting such penalties, in accordance with the provision of section 9a of this title. Civil penalties collected for violations of section 212 of this title shall be deposited in the general fund of the Treasury.

## § 216a. Repealed. Oct. 26, 1949, c. 736, § 16(f), 63 Stat. 920

## § 216b. Liability for overtime work performed prior to July 20, 1949

No employer shall be subject to any liability or punishment under this chapter (in any action or proceeding commenced prior to or on or after January 24, 1950), on account of the failure of said employer to pay an employee compensation for any period of overtime work performed prior to July 20, 1949, if the compensation paid prior to July 20, 1949, for such work was at least equal to the compensation which would have been payable for such work had subsections (d)(6), (7), and (g) of section 207 of this title been in effect at the time of such payment.

## § 217. Injunction proceedings

The district courts, together with the United States District Court for the District of the Canal Zone, the District Court of the Virgin Islands, and the District Court of Guam shall have jurisdiction, for cause shown, to restrain violations of section 215 of this title, including in the case of violations of section 215(a)(2) of this title the restraint of any withholding of payment of minimum wages or overtime compensation found by the court to be due to employees under this chapter (except

SPA-51

New York State Department of Labor

**Part 142**

# Minimum Wage Order for Miscellaneous Industries and Occupations

Part 142 of Title 12 of the Official Compilation of Codes, Rules, and Regulations of the state of New York
(Cited as 12 NYCRR 142)

Promulgated by the Commissioner of Labor Pursuant to the Minimum Wage Act
(Article 19 of the New York State Labor Law)

Statutory authority: Labor Law, Article 2, § 21 (11) and Article 19, § 652



As amended
Effective December 31, 2013

CR 142 (11-13)

# PART 142
# MISCELLANEOUS INDUSTRIES AND OCCUPATIONS

Subpart 142-1     Coverage
Subpart 142-2     Provisions Applicable to All Employees Subject to This Part, Except Employees in
                  Nonprofitmaking Institutions Covered by the Provisions of Subpart 142-3
Subpart 142-3     Provisions Applicable to Employee in Nonprofitmaking Institutions Which Have Not
                  Elected to be Exempt from Coverage Under a Minimum Wage Order

## SUBPART 142-1
## COVERAGE

Sec.
142-1.1     Coverage of Part.

### § 142-1.1 Coverage of Part

This Part shall apply to all employees, as such term is defined in this Part, except:

(a) employees who are covered by minimum wage standards in any other minimum wage order promulgated by the commissioner; and

(b) employees of a nonprofitmaking institution which has elected to be exempt from coverage under a minimum wage order, pursuant to subdivision 3 of section 652 of the Minimum Wage Act.

## SUBPART 142-2
## PROVISIONS APPLICABLE TO ALL EMPLOYEES SUBJECT TO THIS PART, EXCEPT EMPLOYEES IN NONPROFITMAKING INSTITUTIONS COVERED BY THE PROVISIONS OF SUBPART 142-3

Sec.
142-2.1     Basic minimum hourly wage rate and allowances
142-2.2     Overtime rate
142-2.3     Call-in pay
142-2.4     Additional rate for split shift and spread of hours
142-2.5     Allowances
            REGULATIONS
142-2.6     Employer records
142-2.7     Statement to employee
142-2.8     Posting
142-2.9     Basis of wage payment
142-2.10    Deductions and expenses
142-2.11    Student obtaining vocational experience
142-2.12    Learner and apprentice rates
142-2.13    Rehabilitation programs
            DEFINITIONS
142-2.14    Employee
142-2.15    Voluntary absence

142-2

142-2.16   Regular rate
142-2.17   Split shift
142-2.18   Spread of hours
142-2.19   Meal
142-2.20   Lodging
142-2.21   Tips
142-2.22   Required uniform
142-2.23   Student

## § 142-2.1 Basic minimum hourly wage rate and allowances.

(a) The basic minimum hourly wage rate shall be:

(1) $7.15 per hour on and after January 1, 2007;

(2) $7.25 per hour on and after July 24, 2009;

(3) $8.00 per hour on and after December 31, 2013;

(4) $8.75 per hour on and after December 31, 2014;

(5) $9.00 per hour on and after December 31, 2015, or, if greater, such other wage as may be established by Federal law pursuant to 29 U.S.C. section 206 or its successors.

(b) The minimum wage shall be paid for the time an employee is permitted to work, or is required to be available for work at a place prescribed by the employer, and shall include time spent in traveling to the extent that such traveling is part of the duties of the employee. However, a residential employee--one who lives on the premises of the employer--shall not be deemed to be permitted to work or required to be available for work: (1) during his or her normal sleeping hours solely because he is required to be on call during such hours; or (2) at any other time when he or she is free to leave the place of employment.

## § 142-2.2 Overtime rate.

An employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate in the manner and methods provided in and subject to the exemptions of sections 7 and 13 of 29 USC 201 et seq., the Fair Labor Standards Act of 1938, as amended, provided, however, that the exemptions set forth in section 13(a)(2) and (4) shall not apply. In addition, an employer shall pay employees subject to the exemptions of section 13 of the Fair Labor Standards Act, as amended, except employees subject to section 13(a)(2) and (4) of such act, overtime at a wage rate of one and one-half times the basic minimum hourly rate. The Fair Labor Standards Act is published in the United States Code, the official compilation of Federal statutes, by the Government Printing Office, Washington, DC. Copies of the Fair Labor Standards Act are available at the following office:

New York State Department of Labor
Counsel's Office
State Office Building Campus,
Building 12, Room 509
Albany, NY 12240-0005

The applicable overtime rate shall be paid for each workweek:

|  | *Non-residential employees* | *Residential employees* |
|---|---|---|
| For working time over | 40 hours | 44 hours |

### § 142-2.3 Call-in pay.

An employee who by request or permission of the employer reports for work on any day shall be paid for at least four hours, or the number of hours in the regularly scheduled shift, whichever is less, at the basic minimum hourly wage.

### § 142-2.4 Additional rate for split shift and spread of hours.

An employee shall receive one hour's pay at the basic minimum hourly wage rate, in addition to the minimum wage required in this Part for any day in which:

(a) the spread of hours exceeds 10 hours; or

(b) there is a split shift; or

(c) both situations occur.

### § 142-2.5 Allowances.

(a) Allowances for meals, lodging and utilities. (1) Meals and lodging furnished by an employer to an employee may be considered a part of the minimum wage, but shall be valued at not more than:

(i) Meals ............................................................. $2.45 per meal on and after January 1, 2007;
$2.50 per meal on and after July 24, 2009;
$2.75 per meal on and after December 31, 2013;
$3.00 per meal on and after December 31, 2014;
$3.10 per meal on and after December 31, 2015.

(ii) Lodging ................................................................. $3.05 per day on and after January 1, 2007;
$3.10 per day on and after July 24, 2009;
$3.40 per day on and after December 31, 2013;
$3.70 per day on and after December 31, 2014;
$3.80 per day on and after December 31, 2015.

(2) When a house or apartment and utilities are furnished by an employer to an employee, a fair and reasonable amount may be allowed for such facilities, which amount shall not exceed the lesser of either the value of prevailing rentals in the locality for comparable facilities, or  $5.70 per day on and after January 1, 2007; $5.80 per day on and after July 24, 2009; $6.40 per day on and after December 31, 2013; $7.00 per day on and after December 31, 2014; $7.20 per day on and after December 31, 2015.

(b) *Allowances for tips*. (1) Tips, or gratuities, may be considered a part of the minimum wage, subject to the following conditions:

(i) the particular occupation in which the employee is engaged is one in which tips have customarily and usually constituted a part of the employee's remuneration;

(ii) substantial evidence is provided that the employee received in tips at least the amount of the allowance claimed. An example of substantial evidence is a statement signed by the employee that he actually received in tips the amount of the allowance claimed; and

(iii) the allowance claimed by the employer is recorded on a weekly basis as a separate item in the wage record.

(2) *Allowances for tips.*

(i) Allowances for tips shall not exceed:

(*a*) on and after January 1, 2007, $1.10 an hour for an employee whose weekly average of tips received is between $1.10 and $1.75 per hour, and $1.75 per hour for an employee whose weekly average of tips received is $1.75 per hour or more;

(*b*) on and after December 31, 2013, $1.20 an hour for an employee whose weekly average of tips received is between $1.20 and $1.95 per hour, and $1.95 per hour for an employee whose weekly average of tips received is $1.95 per hour or more;

(*c*) on and after December 31, 2014, $1.30 an hour for an employee whose weekly average of tips received is between $1.30 and $2.15 per hour, and $2.15 per hour for an employee whose weekly average of tips received is $2.15 per hour or more;

(*d*) on and after December 31, 2015, $1.35 an hour for an employee whose weekly average of tips received is between $1.35 and $2.20 per hour, and $2.20 per hour for an employee whose weekly average of tips received is $2.20 per hour or more.

(ii)   On and after January 1, 2007, no allowance for tips or gratuities shall be permitted for an employee whose weekly average of tips is less than $1.10 an hour. On and after December 31, 2013, no allowance for tips or gratuities shall be permitted for an employee whose weekly average of tips is less than $1.20 an hour. On and after December 31, 2014, no allowance for tips or gratuities shall be permitted for an employee whose weekly average of tips is less than $1.30 an hour.  On and after December 31, 2015, no allowance for tips or gratuities shall be permitted for an employee whose weekly average of tips is less than $1.35 an hour.

(c) No allowance for the supply, maintenance or laundering of required uniforms shall be permitted as part of the minimum wage. Where an employee purchases a required uniform, he shall be reimbursed by the employer for the cost thereof not later than the time of the next payment of wages. Where an employer fails to launder or maintain required uniforms for any employee, he shall pay such employee in addition to the minimum wage prescribed herein:

(1) $8.90 per week on and after January 1, 2007, if the employee works more than 30 hours weekly; $7.00 per week on and after January 1, 2007, if the employee works more than 20 but not more than 30

hours weekly; and $4.25 per week on and after January 1, 2007, if the employee works 20 hours or less weekly;

(2) $9.00 per week on and after July 24, 2009, if the employee works more than 30 hours weekly; $7.10 per week on and after July 24, 2009, if the employee works more than 20 but not more than 30 hours weekly; and $4.30 per week on and after July 24, 2009, if the employee works 20 hours or less weekly.;

(3) $9.95 per week on and after December 31, 2013, if the employee works over 30 hours weekly; $7.85 per week on and after December 31, 2013, if the employee works more than 20 but not more than 30 hours weekly; and $4.75 per week on and after December 31, 2013, if the employee works 20 hours or less weekly;

(4) $10.90 per week on and after December 31, 2014, if the employee works over 30 hours weekly; $8.60 per week on and after December 31, 2014, if the employee works more than 20 but not more than 30 hours weekly; and $5.20 per week on and after December 31, 2014, if the employee works 20 hours or less weekly;

(5) $11.20 per week on and after December 31, 2015, if the employee works over 30 hours weekly; $8.85 per week on and after December 31, 2015, if the employee works more than 20 but not more than 30 hours weekly; and $5.35 per week on and after December 31, 2015, if the employee works 20 hours or less weekly.

## REGULATIONS

## § 142-2.6 Employer records.

(a) Every employer shall establish, maintain and preserve for not less than six years, weekly payroll records which shall show for each employee:

(1) name and address;

(2) social security number;

(3) wage rate;

(4) the number of hours worked daily and weekly, including the time of arrival and departure of each employee working a split shift or spread of hours exceeding 10;

(5) when a piece-rate method of payment is used, the number of units produced daily and weekly;

(6) the amount of gross wages;

(7) deductions from gross wages;

(8) allowances, if any, claimed as part of the minimum wage;

(9) net wages paid; and

(10) student classification.

(b) In addition, for each individual permitted to work as a staff counselor in a children's camp, or in an executive, administrative or professional capacity, an employer's records shall show:

(1) name and address;

(2) social security number;

(3) description of occupation; and

(4) for individuals working in an executive or administrative capacity, total wages, and the value of allowances, if any, for each payroll period.

(c) For each individual for whom student status is claimed, an employer's records shall contain a statement from the school which the student attends, indicating such student:

(1) is a student whose course of instruction is one leading to a degree, diploma or certificate; or

(2) is required to obtain supervised and directed vocational experience to fulfill curriculum requirements.

(d) Employers, including those who maintain their records containing the information required by this section at a place outside of New York State, shall make such records or sworn certified copies thereof available upon request of the commissioner at the place of employment.

## § 142-2.7 Statement to employee.

Every employer covered by this Part shall furnish to each employee a statement with every payment of wages, listing hours worked, rates paid, gross wages, allowances, if any, claimed as part of the minimum wage, deductions and net wages.

## § 142-2.8 Posting.

Every employer covered by this Part shall post in a conspicuous place in his or her establishment a notice issued by the Department of Labor summarizing minimum wage provisions.

## § 142-2.9 Basis of wage payment.

The minimum and overtime wage provided by this Part shall be required for each week of work, regardless of the frequency of payment, whether the wage is on a commission, bonus, piece rate, or any other basis.

## § 142-2.10 Deductions and expenses.

(a) Wages shall be subject to no deductions, except for allowances authorized in this Part, and except for deductions authorized or required by law, such as for social security and income tax. Some examples of prohibited deductions are:

(1) deductions for spoilage or breakage;

(2) deductions for cash shortages or losses;

(3) fines or penalties for lateness, misconduct or quitting by an employee without notice.

(b) The minimum wage shall not be reduced by expenses incurred by an employee in carrying out duties assigned by an employer.

### § 142-2.11 Student obtaining vocational experience.

A student is not deemed to be working or to be permitted to work if, in order to fulfill the curriculum requirements of the educational institution which such student attends, such student is required to obtain supervised and directed vocational experience in another establishment.

### § 142-2.12 Learner and apprentice rates.

No learner or apprentice shall be paid less than the minimum rate prescribed in this Part.

### § 142-2.13 Rehabilitation programs.

For an individual employed as part of a rehabilitation program approved by the commissioner, the payment of compensation under such program shall be deemed to meet the requirements of this Part.


### DEFINITIONS

### § 142-2.14 Employee.

(a) *Employee* means any individual employed, suffered or permitted to work by an employer, except as provided below.

(b) Employee does not include any individual employed by a Federal, State or municipal government or political subdivision thereof.

(c) Employee also does not include any individual permitted to work in, or as:

(1) Baby-sitter; companion.

(i) The term *baby-sitter* means an individual in service as a part-time baby-sitter in the home of the employer.

(ii) The term *companion* means someone who lives in the home of an employer for the purpose of serving as a companion to a sick, convalescing or elderly person, and whose principal duties do not include housekeeping.

(2) Booth renter. The term *booth renter* means someone who leases or rents space in a beauty establishment or shop and who operates as an owner or an independent contractor.

(3) Labor on a farm. Farm employees are covered under the provisions of the minimum wage order for farm workers, Part 190 of this Title, promulgated by the Commissioner of Labor pursuant to article 19-A of the New York State Labor Law.

(4) Executive, administrative or professional capacity.

(i) Executive. Work in a *bona fide executive… capacity* means work by an individual:

(*a*) whose primary duty consists of the management of the enterprise in which such individual is employed or of a customarily recognized department or subdivision thereof;

(*b*) who customarily and regularly directs the work of two or more other employees therein;

(*c*) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight;

(*d*) who customarily and regularly exercise discretionary powers; and

(*e*) who is paid for his services a salary of not less than:

(*1*) $536.10 per week on and after January 1, 2007, inclusive of board, lodging, other allowances and facilities;

(*2*) $543.75 per week on and after July 24, 2009, inclusive of board, lodging, other allowances and facilities;

(*3*) $600.00 per week on and after December 31, 2013, inclusive of board, lodging, other allowances and facilities;

(*4*) $656.25 per week on and after December 31, 2014, inclusive of board, lodging, other allowances and facilities;

(*5*) $675.00 per week on and after December 31, 2015, inclusive of board, lodging, other allowances and facilities.

(ii) Administrative. Work in a *bona fide… administrative… capacity* means work by an individual:

(*a*) whose primary duty consists of the performance of office or nonmanual field work directly related to management policies or general operations of such individual's employer;

(*b*) who customarily and regularly exercises discretion and independent judgment;

(*c*) who regularly and directly assists an employer, or an employee employed in a bona fide executive or administrative capacity (e.g., employment as an administrative assistant); or who performs, under only general supervision, work along specialized or technical lines requiring special training, experience or knowledge; and

(*d*) who is paid for his services a salary of not less than:

142-9

(*1*) $536.10 per week on and after January 1, 2007, inclusive of board, lodging, other allowances and facilities;

(2) $543.75 per week on and after July 24, 2009, inclusive of board, lodging, other allowances and facilities;

(*3*) $600.00 per week on and after December 31, 2013, inclusive of board, lodging, other allowances and facilities;

(*4*) $656.25 per week on and after December 31, 2014, inclusive of board, lodging, other allowances and facilities;

(*5*) $675.00 per week on and after December 31, 2015, inclusive of board, lodging, other allowances and facilities.

(iii) Professional. Work in a *bona fide... professional capacity* means work by an individual:

(*a*) whose primary duty consists of the performance of work: requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual or physical processes; or original and creative in character in a recognized field of artistic endeavor (as opposed to work which can be produced by a person endowed with general manual or intellectual ability and training), and the result of which depends primarily on the invention, imagination or talent of the employee; and

(*b*) whose work requires the consistent exercise of discretion and judgment in its performance; or

(*c*) whose work is predominantly intellectual and varied in character (as opposed to routine mental, manual, mechanical or physical work) and is of such a character that the output produced or the result accomplished cannot be standardized in relation to a given period of time.

(5) Outside salesperson. The term *outside salesperson* means an individual who is customarily and predominantly engaged away from the premises of the employer and not at any fixed site and location for the purpose of:

(i) making sales;

(ii) selling and delivering articles or goods; or

(iii) obtaining orders or contracts for service or for the use of facilities.

(6) Taxicab driver. The term *driver engaged in operating a taxicab* means an individual employed to drive an automobile equipped to carry no more than seven passengers, which is used in the business of carrying or transporting passengers for hire on a zone or meter fare basis, and the use of which is generally limited to a community's local transportation needs and which is not operated over fixed routes, or between fixed terminals, or under contract.


(7) Student in or for a college or university fraternity, sorority, student association or faculty association. A student is not deemed to be an employee if he or she is permitted to work in or for a college or university fraternity, sorority, student association or faculty association, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and which is recognized by such college or university.

(8) Staff counselor in a children's camp. (i) A *staff counselor* is a person whose duties primarily relate to the guidance, instruction, supervision and care of campers in a children's camp, whether such work involves direct charge of, or responsibility for, such activities, or merely assistance to persons in charge. The term *staff counselor* includes, but is not limited to: head counselor, assistant head counselor, specialist counselor instructor (such as swimming counselor, arts and crafts counselor, etc.), group or division leader, camp mother, supervising counselor, senior counselor, counselor, general counselor, bunk counselor, assistant counselor, co-counselor, junior counselor, and counselor aide.

   (ii) *Children's camp* means any establishment which, as a whole or part of its activities, is engaged in offering for children, on a resident or nonresident basis, recreational programs of supervised play or organized activity in such fields as sports, nature lore, and arts and crafts, whether known as camps, play groups, play schools, or by any other name. The term children's camp does not include an establishment which is open for a period exceeding 17 consecutive weeks during the year.

## § 142-2.15 Voluntary absence.

*Voluntary absence* includes any absence from work not directed by the employer or the employer's agent and not designed or planned by the employer or the employee to evade minimum wage standards. Voluntary absence does not include any absence contemplated in the employment contract or incurred as a condition of continued employment; or at the direction or suggestion of the employer or his agent; or recurrent or periodic absence, except such absence for medical treatment under a doctor's care.

## § 142-2.16 Regular rate.

The term *regular rate* shall mean the amount that the employee is regularly paid for each hour of work. When an employee is paid on a piece work basis, salary, or any basis other than hourly rate, the regular hourly wage rate shall be determined by dividing the total hours worked during the week into the employee's total earnings.

## § 142-2.17 Split shift.

A *split shift* is a schedule of daily hours in which the working hours required or permitted are not consecutive. No meal period of one hour or less shall be considered an interruption of consecutive hours.

## § 142-2.18 Spread of hours.

The *spread of hours* is the interval between the beginning and end of an employee's workday. The spread of hours for any day includes working time plus time off for meals plus intervals off duty.

## § 142-2.19 Meal.

A *meal* shall provide adequate portions of a variety of wholesome, nutritious foods, and shall include at least one of the types of foods from all four of the following groups:

(a) fruits or vegetables;

(b) cereals, bread or potatoes;

(c) eggs, meat, fish or poultry;

(d) milk, tea or coffee; except that for breakfast, group (c) may be omitted if both cereal and bread are offered in group (b).

## § 142-2.20 Lodging.

*Lodging* includes room, house or apartment, and means living accommodations which meet generally accepted standards for protection against fire, and all structural, sanitation and similar standards in State and local laws, codes, regulations and ordinances applicable to the premises.

## § 142-2.21 Tips.

*Tips*, or *gratuities*, shall mean voluntary contributions received by the employee from a guest, patron, customer or other person for services rendered. No gratuities or tips shall be deemed received for the purpose of this Part if their acceptance is prohibited by the employer or prohibited by law.

## § 142-2.22 Required uniform.

A *required uniform* shall be that clothing worn by an employee, at the request of the employer, while performing job-related duties or to comply with any State, city or local law, rule or regulation. It does not, however, include clothing that may be worn as part of an employee's ordinary wardrobe.

## § 142-2.23 Student.

A *student* means an individual who is enrolled in and regularly attends a course of instruction at a state-licensed educational institution of learning leading to a degree, certificate or diploma, or who is completing residence requirements for a degree.

## SUBPART 142-3
## PROVISIONS APPLICABLE TO EMPLOYEES IN NONPROFITMAKING INSTITUTIONS WHICH HAVE NOT ELECTED TO BE EXEMPT FROM COVERAGE UNDER A MINIMUM WAGE ORDER

Sec.

MINIMUM WAGE AND REGULATIONS
142-3.1   Basic minimum hourly wage rate
142-3.2   Overtime rate
142-3.3   Call-in pay
142-3.4   Additional rate for split and spread of hours
142-3.5   Allowances
142-3.6   Employer payroll records requirements for nonprofitmaking institutions
142-3.7   Required personnel records for nonprofitmaking institutions
142-3.8   Statement to employee
142-3.9   Posting
142-3.10  Basis of wage payment

142-12





**Effective: November 29, 2010**

McKinney's Consolidated Laws of New York Annotated Currentness
  Labor Law (Refs & Annos)
    Chapter 31. Of the Consolidated Laws (Refs & Annos)
      Article 19. Minimum Wage Act (Refs & Annos)
        ➡➡ **§ 651. Definitions**

As used in this article:

1. "Commissioner" means the industrial commissioner [FN1].

2. "Department" means the labor department.

3. "Board" or "wage board" means a board created as provided in this article.

4. "Occupation" means an industry, trade, business or class of work in which employees are gainfully employed.

5. "Employee" includes any individual employed or permitted to work by an employer in any occupation, but shall not include any individual who is employed or permitted to work: (a) on a casual basis in service as a part time baby sitter in the home of the employer; (b) in labor on a farm; (c) in a bona fide executive, administrative, or professional capacity; (d) as an outside salesman; (e) as a driver engaged in operating a taxicab; (f) as a volunteer, learner or apprentice by a corporation, unincorporated association, community chest, fund or foundation organized and operated exclusively for religious, charitable or educational purposes, no part of the net earnings of which inures to the benefit of any private shareholder or individual; (g) as a member of a religious order, or as a duly ordained, commissioned or licensed minister, priest or rabbi, or as a sexton, or as a christian science reader; (h) in or for such a religious or charitable institution, which work is incidental to or in return for charitable aid conferred upon such individual and not under any express contract of hire; (i) in or for such a religious, educational or charitable institution if such individual is a student; (j) in or for such a religious, educational or charitable institution if the earning capacity of such individual is impaired by age or by physical or mental deficiency or injury; (k) in or for a summer camp or conference of such a religious, educational or charitable institution for not more than three months annually; (l) as a staff counselor in a children's camp; (m) in or for a college or university fraternity, sorority, student association or faculty association, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and which is recognized by such college or university, if such individual is a student; (n) by a federal, state or municipal government or political subdivision thereof. The exclusions from the term "employee" contained in this subdivision shall be as defined by

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

regulations of the commissioner; or (o) as a volunteer at a recreational or amusement event run by a business that operates such events, provided that no single such event lasts longer than eight consecutive days and no more than one such event concerning substantially the same subject matter occurs in any calendar year. Any such volunteer shall be at least eighteen years of age. A business seeking coverage under this paragraph shall notify every volunteer in writing, in language acceptable to the commissioner, that by volunteering his or her services, such volunteer is waiving his or her right to receive the minimum wage pursuant to this article. Such notice shall be signed and dated by a representative of the business and the volunteer and kept on file by the business for thirty-six months.

"Employee" also includes any individual employed or permitted to work in any non-teaching capacity by a school district or board of cooperative educational services except that the provisions of sections six hundred fifty-three through six hundred fifty-nine of this article shall not be applicable in any such case.

6. "Employer" includes any individual, partnership, association, corporation, limited liability company, business trust, legal representative, or any organized group of persons acting as employer.

7. "Wage" includes allowances, in the amount determined in accordance with the provisions of this article, for gratuities and, when furnished by the employer to employees, for meals, lodging, apparel, and other such items, services and facilities.

8. "Non-profitmaking institution" means any corporation, unincorporated association, community chest, fund or foundation organized and operated exclusively for religious, charitable or educational purposes, no part of the net earnings of which inure to the benefit of any private shareholder or individual.

9. "Food service worker" means any employee primarily engaged in the serving of food or beverages to guests, patrons or customers in the hotel or restaurant industries, including, but not limited to, wait staff, bartenders, captains and bussing personnel; and who regularly receive tips from such guests, patrons or customers.

CREDIT(S)

(Added L.1960, c. 619, § 2. Amended L.1961, c. 440, § 1; L.1962, c. 439, §§ 2, 3; L.1962, c. 440, §§ 1, 3; L.1966, c. 649, § 1; L.1968, c. 889, § 1; L.1971, c. 1165, § 1; L.1980, c. 726, § 1; L.2000, c. 14, §§ 2, 3, eff. March 31, 2000; L.2002, c. 281, § 2, eff. Aug. 6, 2002; L.2005, c. 640, § 1, eff. Aug. 30, 2005; L.2010, c. 481, § 8, eff. Nov. 29, 2010.)

     [FN1] Now Commissioner of Labor.

HISTORICAL AND STATUTORY NOTES

L.2010, c. 481 legislation

Subd. 5. L.2010, c. 481, § 8, substituted "(a) on a casual basis in service as a part time baby sitter in the home of the employer;" for "(a) in service as a part time baby sitter in the home of the employer; or someone who lives in the home

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

SPA-65

of an employer for the purpose of serving as a companion to a sick, convalescing or elderly person, and whose principal duties do not include housekeeping;".

L.2010, c, 481, § 1, provides:

"Legislative findings and intent. Many thousands of domestic workers are employed in New York state as housekeepers, nannies, and companions to the elderly. The labor of domestic workers is central to the ongoing prosperity that the state enjoys, and yet, despite the value of their work, domestic workers do not receive the same protection of many state laws as do workers in other industries. Domestic workers often labor under harsh conditions, work long hours for low wages without benefits or job security, are isolated in their workplaces, and are endangered by sexual harassment and assault, as well as verbal, emotional and psychological abuse. Moreover, many domestic workers in the state of New York are women of color who, because of race and sex discrimination, are particularly vulnerable to unfair labor practices. Additionally, domestic workers are not afforded by law the right to organize labor unions for the purpose of collective bargaining.

"The legislature finds that because domestic workers care for the most important elements of their employers' lives, their families and homes, it is in the interest of employees, employers, and the people of the state of New York to ensure that the rights of domestic workers are respected, protected, and enforced."

L.2005, c. 640 legislation

Subd. 5. L.2005, c. 640, § 1, deleted "or" at the end of cl. (m); inserted "; or" at the end of cl. (n); and added cl. (o).

L.2002, c. 281 legislation

Subd. 6. L.2002, c. 281, § 2, inserted "limited liability company,".

L.2000, c. 14 legislation

Subd. 7. L.2000, c. 14, § 2, deleted "his" before "employees".

Subd. 9. L.2000, c. 14, § 3, added subd. 9.

L.1921, c. 50 legislation

Section, L. 1921 c. 50, related to statement of policy, was repealed by L.1960, c. 619, § 1, and is now covered by § 650.

Derivation

Former § 652, added as section 552, L.1937, c. 276; renumbered 652, L.1944, c. 705, and repealed by L.1960, c. 619,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

§ 1. Section 552 was from a prior § 552, added L.1933, c. 584, and repealed by L.1937, c. 276.

CROSS REFERENCES

    Commissioner of labor, powers of, see Labor Law § 10.
    Definitions--
      Generally, see Labor Law § 2.
      Unemployment insurance, see Labor Law § 510 et seq.
    Department of labor, duties, etc., see Labor Law § 10.
    Employee, defined, see Labor Law § 2.
    Employer, defined, see Labor Law § 2.
    Non-profitmaking institution, see N-PCL § 101 et seq.

RULES OF THE CITY OF NEW YORK

Summer and children's overnight camps, compliance with other laws, see 24 RCNY § 48.17.

LAW REVIEW AND JOURNAL COMMENTARIES

    Avoiding double recovery: Assessing liquidated damages in private wage and hour actions under the Fair Labor Standards Act and the New York Labor Law. Alexander J. Callen, 81 Fordham L. Rev. 1881 (March 2013).

    Avoiding double recovery: Assessing liquidated damages in private wage and hour actions under the Fair Labor Standards Act and the New York Labor Law. Alexander J. Callen, 81 Fordham L. Rev. 1881 (March 2013).

RESEARCH REFERENCES

Treatises and Practice Aids

Employment Coordinator Compensation § 13:4, Government Employees.

Employment Coordinator Compensation § 13:6, Volunteers for Nonprofit Groups.

Employment Coordinator Compensation § 13:7, Employees of Nonprofit Groups.

Employment Coordinator Compensation § 6:39, Minimum Wage Exemption Under State Law.

Employment Coordinator Compensation § 9:18, Combined Minimum Wage and Overtime Pay Exemption Under State Law.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

McKinney's Labor Law § 651                                    Page 5

Employment Coordinator Compensation § 9:19, Minimum Wage Exemption Under State Law.

Employment Coordinator Compensation § 13:12, Elderly Persons.

Employment Coordinator Compensation § 13:14, Students.

Employment Coordinator Compensation § 13:15, Learners, Apprentices, or Trainees.

Employment Coordinator Compensation § 13:16, Religious Officers.

Employment Coordinator Compensation § 3:133, Combined Minimum Wage and Overtime Pay Exemption.

Employment Coordinator Compensation § 18:165, Credits for Most Employees.

Guide to Employment Law and Regulation 2d § 53:7, Minimum Wage Law.

NOTES OF DECISIONS

Aliens 2
College students 5
Construction with federal laws 1.5
Delivery persons 9
Employees 13
Employers, generally 10
Executive, administrative or professional employees 12
Federal, state or municipal workers 6
Food service workers 8
Hotel industry 3
Housekeepers 4
Joint employers 11
Non-profit organizations 7
Validity 1

1. Validity

Subdivision 5 of this section does not, with regard to exclusions of benefits and protection from agricultural workers, individually or cumulatively with other legislation accomplish invidious discrimination between classes of laborers on racial grounds, render migrant agricultural labor system imposed peonage or effect arbitrary and unreasonable discriminations denying due process and equal protection. Doe v. Hodgson, 1972, 344 F.Supp. 964, affirmed 478 F.2d 537, certiorari denied 94 S.Ct. 732, 414 U.S. 1096, 38 L.Ed.2d 555. Constitutional Law ⟺3268; Constitutional Law ⟺4129; Social Security ⟺5(1)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

1.5. Construction with federal laws

Both federal and New York overtime wage laws are remedial in nature, and thus, their relevant exemptions are construed narrowly against the employer. Clougher v. Home Depot U.S.A., Inc., 2010, 696 F.Supp.2d 285, reconsideration denied 2010 WL 4568984. Labor and Employment ⚷2251

Corporate officer who is directly responsible for failure to pay statutorily required wages is subject to liability for corporation's failure to fulfill its minimum wage obligations under Fair Labor Standards Act (FLSA) and New York Minimum Wage Act. Hernandez v. La Cazuela de Mari Restaurant, Inc., 2007, 538 F.Supp.2d 528. Labor And Employment ⚷2227

2. Aliens

Alien's status as illegal alien for part of the period of his employment did not preclude him from recovery of wages under this article; since alien was a protected person, once he established the fact of his employment and the failure to pay wages, he was entitled to recover. Nizamuddowlah v. Bengal Cabaret, Inc. (2 Dept. 1979) 69 A.D.2d 875, 415 N.Y.S.2d 685, appeal dismissed 48 N.Y.2d 609, 424 N.Y.S.2d 1026, 400 N.E.2d 372. Labor And Employment ⚷2233

3. Hotel industry

A rooming house comes within the definition of "hotel industry" contained in order fixing minimum wages for women and minors in the hotel industry so as to authorize conviction of rooming house proprietor of failure to pay minimum wages required in the hotel industry. People v. Manning (2 Dept. 1947) 272 A.D. 1022, 73 N.Y.S.2d 517. Labor And Employment ⚷2526

Order of Commissioner which defines the "hotel" industry in such manner as to include every establishment where lodging accommodations are offered to public, thereby including Bowery lodging houses in the hotel industry, is not invalid as being result of arbitrariness or capriciousness on part of Commissioner or as being in excess of jurisdiction of Commissioner. N.H. Lyons & Co. v. Corsi, 1952, 203 Misc. 160, 116 N.Y.S.2d 520, affirmed 286 A.D. 1065, 146 N.Y.S.2d 663, motion denied 1 N.Y.2d 855, 153 N.Y.S.2d 230, 135 N.E.2d 732, affirmed 3 N.Y.2d 60, 163 N.Y.S.2d 677, 143 N.E.2d 392, reargument denied 3 N.Y.2d 928, 167 N.Y.S.2d 945, 145 N.E.2d 885, appeal dismissed 78 S.Ct. 342, 355 U.S. 284, 2 L.Ed.2d 271. Labor And Employment ⚷2350(2)

4. Housekeepers

Sleep-in home attendants employed by home care service providers were not within home care exemption to Minimum Wage Act, in that clients with whom attendants resided were not employers, attendants were not employed for purpose of serving as "companion," and attendants' principal duties included housekeeping. Settlement Home Care, Inc. v. Industrial Bd. of Appeals of Dept. of Labor (2 Dept. 1989) 151 A.D.2d 580, 542 N.Y.S.2d 346. Labor And

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Employment 🔑2284

Individuals who perform housekeeping services are not exempt from the operation of this article. Perez v. Lavine, 1974, 79 Misc.2d 179, 359 N.Y.S.2d 942. Labor And Employment 🔑2284

### 5. College students

This article did not apply to undergraduates of college of pharmacy placed under tutelage of licensed pharmacists in pharmacy college's professional practice program. Albany College of Pharmacy v. Ross, 1978, 94 Misc.2d 389, 404 N.Y.S.2d 779. Labor And Employment 🔑2246

### 6. Federal, state or municipal workers

Faculty-student association at state university college was not the state government or a political subdivision thereof and, therefore, its nonstudent employees did not come within the Minimum Wage Act, section 650 et seq., exception to the definition of "employees" in this section for individuals employed or permitted to work "by a federal, state or municipal government or political subdivision thereof," and such employees were entitled to the minimum wage. Faculty Student Ass'n of State University of Oneonta, Inc. v. Ross, 1981, 54 N.Y.2d 460, 446 N.Y.S.2d 205, 430 N.E.2d 1258. Labor And Employment 🔑2240; Labor And Employment 🔑2241

### 7. Non-profit organizations

Related non-profit entities exercised control over participants in an employment program, selecting which persons participated in the program and stating that anyone found under the influence of drugs and/or alcohol would be dismissed automatically from the program, and thus, the entities were "employers" for purposes of the New York State Minimum Wage Act. Archie v. Grand Cent. Partnership, Inc., 1998, 997 F.Supp. 504. Labor And Employment 🔑2227

### 8. Food service workers

Unemployment Insurance Appeal Board could not be collaterally estopped from determining whether workers were independent contractors for provider of bartenders, wait staff, and other food service personnel, rather than employees, in provider's action appealing assessment of unemployment tax, although Industrial Board of Appeals had determined that the workers were independent contractors; employment was not defined identically under the statutes relevant to each agency and the Legislature created different bodies to exercise the adjudicatory authority. In re Bartenders Unlimited Inc. (3 Dept. 2001) 289 A.D.2d 785, 736 N.Y.S.2d 119, leave to appeal denied 98 N.Y.2d 601, 744 N.Y.S.2d 761, 771 N.E.2d 834. Administrative Law And Procedure 🔑501; Taxation 🔑3291(9)

### 9. Delivery persons

Workers hired by contractor of drugstore corporation to work as on-foot delivery personnel in corporation's stores

were "employees" of contractor for purposes of FLSA and state statutory minimum wage and overtime provisions, rather than merely being "placed" by contractor, even though workers were relatively transient; contractor paid workers and controlled their hiring, firing, transfer and pay, contractor was not licensed as employment agency, workers had negligible investment in business, little skill or initiative was required for work in question, and workers' services constituted integral part of contractor's business. Ansoumana v. Gristede's Operating Corp., 2003, 255 F.Supp.2d 184, reconsideration denied 255 F.Supp.2d 197. Labor And Employment ⟨☞⟩2225

10. Employers, generally

Restaurant's owners and operators were "employers," and thus were jointly and severally liable under Fair Labor Standards Act (FLSA) and New York Minimum Wage Act for restaurant's failure to fulfill its minimum wage obligations, even if they did not personally employ workers, where they were restaurant's sole owners, corporate officers, and managers. Hernandez v. La Cazuela de Mari Restaurant, Inc., 2007, 538 F.Supp.2d 528. Labor And Employment ⟨☞⟩2228

Individual owners/operators of corporate contractor that hired on-foot delivery personnel to work in drugstore corporation's stores qualified as "employers" for purposes of minimum wage and overtime provisions of FLSA and state statute, just as did contractor, even though owners did not directly control workers; owners exercised operational management of contractor. Ansoumana v. Gristede's Operating Corp., 2003, 255 F.Supp.2d 184, reconsideration denied 255 F.Supp.2d 197. Labor And Employment ⟨☞⟩2227

Former employees adequately alleged that former employer's corporate officer was also their "employer," as required to state cause of action against officer for violation of New York Minimum Wage Act and its implementing regulations; officer allegedly exercised control of former employer's day-to-day operations, including hiring and firing employees, supervising and controlling employees' work schedules, determining the method and rate of pay, keeping employment records, and approving vacations. Bonito v. Avalon Partners, Inc. (1 Dept. 2013) 106 A.D.3d 625, 967 N.Y.S.2d 19. Labor and Employment ⟨☞⟩2199

11. Joint employers

Genuine issues of material fact existed as to whether garment manufacturer, in outsourcing sewing to contractors, was joint employer liable for minimum wage and overtime payments to contractors' employees, precluding summary judgment in action under FLSA and New York minimum wage and overtime statutes. Chen v. Street Beat Sportswear, Inc., 2005, 364 F.Supp.2d 269. Federal Civil Procedure ⟨☞⟩2498

Evidence concerning presence of manufacturer's quality control personnel at contractors' factories to monitor quality of work had no bearing on fifth factor for determining whether company, in outsourcing to contractors, was joint employer liable, under FLSA and New York law, for minimum wage payments to contractors' employees. Chen v. Street Beat Sportswear, Inc., 2005, 364 F.Supp.2d 269. Labor And Employment ⟨☞⟩2228

The fourth factor for determining whether a company that outsources to contractors is a joint employer liable, under

the FLSA and New York law, for minimum wage payments to the contractors' employees, namely whether responsibility under the contracts could pass from one subcontractor to another without material changes, relates to the interchangeability of contractors. Chen v. Street Beat Sportswear, Inc., 2005, 364 F.Supp.2d 269. Labor And Employment ☞2228

Work of sewing contractors' employees was integral to garment manufacturer's process of production, and such factor thus weighed in favor of determining that manufacturer was joint employer of its contractors' employees, and thus liable for minimum wage payments under FLSA and New York statutes, even though employees did not work on manufacturers' premises, where employees performed piece work, rather than work depending on their initiative, judgment, or foresight. Chen v. Street Beat Sportswear, Inc., 2005, 364 F.Supp.2d 269. Labor And Employment ☞2228

Under the test for determining whether a company that outsources to contractors is a joint employer, so as to be liable under the FLSA and New York law for minimum wage payments to the contractors' employees, there is substantial overlap between the second factor, i.e., whether the contractors shifted as a unit, and the sixth factor, concerning whether the employees performed all or almost all of their work for the company; where the evidence establishes factor two, the company is less likely to be a joint employer, but where the evidence shows that the employees worked predominantly for the company, factor six is satisfied, but not factor two. Chen v. Street Beat Sportswear, Inc., 2005, 364 F.Supp.2d 269. Labor And Employment ☞2228

Factor of whether workers used putative joint employer's premises and equipment weighed against determining that garment manufacturer was joint employer of its sewing contractors' employees, so as to be liable for minimum wage payments under FLSA and New York statutes, where employees used manufacturers' premises only on rare occasions, and, although manufacturer supplied cut garments, trimming, hanger, bag, labels, and assembly instructions, contractors used their own equipment. Chen v. Street Beat Sportswear, Inc., 2005, 364 F.Supp.2d 269. Labor And Employment ☞2228

In determining whether a company that outsources to contractors is a joint employer liable, under the FLSA and New York law, for minimum wage payments to the contractors' employees, the District Court considers: (1) whether the company's premises and equipment were used for the employees' work; (2) whether the contractors had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which the employees performed a discrete line-job that was integral to the company's process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the company or its agents supervised the employees' work; and (6) whether the employees worked exclusively or predominantly for the company. Chen v. Street Beat Sportswear, Inc., 2005, 364 F.Supp.2d 269. Labor And Employment ☞2228

Economic reality test applied to garment manufacturers' liability as joint employers, with respect to payment of minimum wage, under both FLSA and New York law. Chen v. Street Beat Sportswear, Inc., 2005, 364 F.Supp.2d 269. Labor And Employment ☞2228

Fourth factor for determining whether company that outsources to contractors is joint employer liable, under the FLSA

and New York law, for minimum wage payments to contractors' employees, namely whether responsibility under contracts could pass from one subcontractor to another without material changes, weighed in favor of finding garment manufacturer jointly liable, where employees asserted they moved from one contractor to another to work on manufacturer's orders, contractors occasionally changed their names, and it generally was difficult to determine their ownership. Chen v. Street Beat Sportswear, Inc., 2005, 364 F.Supp.2d 269. Labor And Employment ⚷2228

Drugstore corporation in whose stores workers hired by corporate contractor were placed as on-foot delivery personnel was joint employer, jointly liable with contractor for violations of FLSA and state statutory minimum wage and overtime provisions; corporation and contractor had extensive and regular relationship approaching agency, workers performed integral service for stores in which they worked, deliveries were not made via central facility but directly from stores, and corporation exercised control over workers, who worked as individuals rather than as a group, throughout. Ansoumana v. Gristede's Operating Corp., 2003, 255 F.Supp.2d 184, reconsideration denied 255 F.Supp.2d 197. Labor And Employment ⚷2228

12. Executive, administrative or professional employees

Employee's equitable claims for quantum meruit and unjust enrichment would be dismissed as duplicative of his New York Labor Law claim, which provided an adequate legal remedy for the conduct alleged. Clougher v. Home Depot U.S.A., Inc., 2010, 696 F.Supp.2d 285, reconsideration denied 2010 WL 4568984. Implied and Constructive Contracts ⚷3; Implied and Constructive Contracts ⚷30

Employer's 55-hour per week policy for Merchandising Assistant Store Managers (MASM) did not render employee's salary improperly contingent upon the satisfaction of hourly targets, so as to warrant classifying him as a nonexempt, hourly-wage worker for purposes of the New York Labor Law section prescribing overtime pay requirements. Clougher v. Home Depot U.S.A., Inc., 2010, 696 F.Supp.2d 285, reconsideration denied 2010 WL 4568984. Labor and Employment ⚷2262

Genuine issues of material fact as to whether management constituted an employee's primary duty precluded summary judgment for employer on its claim that the employee was a "bona fide executive" falling within a statutory exemption from the overtime pay requirements of the New York Labor Law. Clougher v. Home Depot U.S.A., Inc., 2010, 696 F.Supp.2d 285, reconsideration denied 2010 WL 4568984. Federal Civil Procedure ⚷2498

Consideration of factors for determining whether management constitutes an employee's primary duty, for purposes of an exemption from overtime pay requirements of the FLSA and New York law, is a highly fact-intensive inquiry to be made on a case-by-case basis in light of the totality of the circumstances. Clougher v. Home Depot U.S.A., Inc., 2010, 696 F.Supp.2d 285, reconsideration denied 2010 WL 4568984. Labor and Employment ⚷2262; Labor and Employment ⚷2397(2)

In the context of overtime wage claims, application of the "executive exemption" is an affirmative defense, which any defendant employer bears the burden of proving by a preponderance of the evidence. Clougher v. Home Depot U.S.A., Inc., 2010, 696 F.Supp.2d 285, reconsideration denied 2010 WL 4568984. Labor and Employment ⚷2365; Labor

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

and Employment 🗝2385(7)

Balance of hardships did not favor a preliminary injunction barring plaintiff employee's attorney from representing those putative plaintiffs who had executed consent forms based upon an allegedly deficient letter notice sent by employee's attorney brought under Fair Labor Standards Act (FLSA) and New York Minimum Wage Act; imposition of such a sanction would have worked a substantial hardship on the putative plaintiff while doing nothing to alleviate litigation burden on employer, and any inaccuracies in the notice could have been remedied by the issuance of a corrective notice in the event class certification was granted. Rubery v. Buth-Na-Bodhaige, Inc., 2007, 514 F.Supp.2d 431. Labor And Employment 🗝2418

Defendant employer was not likely to suffer irreparable harm in absence of a preliminary injunction barring plaintiff employee's attorney from representing those putative plaintiffs who had executed consent forms based upon an allegedly deficient letter notice sent by employee's attorney in action against employer brought under Fair Labor Standards Act (FLSA) and New York Minimum Wage Act, notwithstanding concerns about the letter's potential to confuse or mislead putative class members. Rubery v. Buth-Na-Bodhaige, Inc., 2007, 514 F.Supp.2d 431. Labor And Employment 🗝2418

Regardless of whether shop manager list provided by plaintiff employee, which was used by employee's attorneys to compile list of potential class members in employee's action against employer under Fair Labor Standards Act (FLSA) and New York Minimum Wage Act, was covered by confidentiality agreement between employer and employee, plaintiff's attorney's use of the document to compile letter notice to class members was not violative of said agreement; attorneys were not parties to the agreement, and it was plaintiff's attorneys that had made exclusive use of the allegedly misappropriated document. Rubery v. Buth-Na-Bodhaige, Inc., 2007, 514 F.Supp.2d 431. Labor And Employment 🗝2377.5

Restaurant employee satisfied duties prong of short test for overtime exemption for executive or administrative employees, despite his claim he was only cashier; employee applied for managerial position and had prior managerial work experience with other restaurants, worked night shift during which there was no other on-site manager on duty, was called manager and represented himself as such to Health and Fire Departments at his employer's request, wore same color shirt as other managers, and had key to restaurant, and day shift manager testified that subject employee's duties were similar to hers and included opening and closing store, taking inventory, supervising staff, and handling cash drop in safe, and that she and subject employee would cover for each other at times. Kahn v. Superior Chicken & Ribs, Inc., 2004, 331 F.Supp.2d 115. Labor And Employment 🗝2262

Restaurant employee satisfied salary basis prong of short test for overtime exemption for executive or administrative employees, even though he claimed he was paid on hourly basis; employee always received $250 each week by check that was never subject to deductions and additional cash payments for total compensation of $600 per week and was not required to punch time card, and restaurant's day shift manager and owner testified they did not keep track of employee's hours. Kahn v. Superior Chicken & Ribs, Inc., 2004, 331 F.Supp.2d 115. Labor And Employment 🗝2264(1)

To satisfy short test for determining whether employee qualifies for overtime exemptions for executive and admin-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

istrative employees, employer must satisfy "salary basis" requirement and "duties" requirement; to satisfy "salary basis" requirement, employee must regularly receive each pay period on weekly, or less frequent basis, predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in quality or quantity of work performed. Kahn v. Superior Chicken & Ribs, Inc., 2004, 331 F.Supp.2d 115. Labor And Employment ☞2264(1)

**13. Employees**

Subsidiary of city Health and Hospitals Corporation (HHC) that was public benefit corporation created pursuant to HHC Act for the same public purposes as HHC, i.e., to further provision and delivery of comprehensive medical care and treatment to all New York City residents, was a "political subdivision" within meaning of New York Labor Law (NYLL) exemption from "employee" definition. Drayton v. MetroPlus Health Plan, Inc., 2011, 791 F.Supp.2d 343. Labor and Employment ☞2240

Genuine issues of material fact existed as to the totality of the circumstances of the training program for unpaid interns at magazine, regarding who was the primary recipient of the benefits from the intern relationship, and whether the interns were employees under the FLSA, precluding summary judgment on interns claims against magazine owner alleging violations of the minimum wage requirements, overtime provisions, and recordkeeping requirements of the FLSA and New York Labor Law. Xuedan Wang v. Hearst Corp., 2013, 2013 WL 1903787, motion to certify appeal granted 2013 WL 3326650. Federal Civil Procedure ☞2498

State's interception and retention of one-half of former public assistance benefits recipient's $10,000 lottery prize winnings in satisfaction of his obligation to reimburse state for public assistance benefits he received did not violate New York State Minimum Wage Act; recipient, who was employed or permitted to work by the City of New York in exchange for public benefits, was not an "employee" within the meaning of the New York State Minimum Wage Law. Carver v. State (2 Dept. 2011) 87 A.D.3d 25, 926 N.Y.S.2d 559. Labor and Employment ☞2233

McKinney's Labor Law § 651, NY LABOR § 651

Current through L.2014, chapters 1 to 2.

© 2014 Thomson Reuters

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

SPA-75



NEW YORK CONSOLIDATED LAW SERVICE
Copyright © 2014 Matthew Bender, Inc.
a member of the LexisNexis (TM) Group
All rights reserved

*** This section is current through 2014 released chapters 1-17 ***

LABOR LAW
ARTICLE 19.  MINIMUM WAGE ACT

**Go to the New York Code Archive Directory**

*NY CLS Labor § 652 (2014)*

§ 652.  Minimum wage

  1. Statutory. Every employer shall pay to each of its employees for each hour worked a wage of not less than:

    $ 4.25 on and after April 1, 1991

    $ 5.15 on and after March 31, 2000,

    $ 6.00 on and after January 1, 2005,

    $ 6.75 on and after January 1, 2006,

    $ 7.15 on and after January 1, 2007,

    *[Added, L 2013]* $ 8.00 on and after December 31, 2013,

    *[Added, L 2013]* $ 8.75 on and after December 31, 2014,

    *$ 9.00 on and after December 31, 2015,* or, if greater, such other wage as may be established by federal law pursuant to *29 U.S.C. section 206* or its successors or such other wage as may be established in accordance with the provisions of this article.

2. Existing wage orders. The minimum wage orders in effect on the effective date of this act shall remain in full force and effect, except as modified in accordance with the provisions of this article.

Such minimum wage orders shall be modified by the commissioner to increase all monetary amounts specified therein in the same proportion as the increase in the hourly minimum wage [fig 1] as provided in subdivision one of this section, [fig 2] including the amounts specified in such minimum wage orders as allowances for gratuities, and when furnished by the employer to [fig 3] *its* employees, for meals, lodging, apparel and other such items, services and facilities. All amounts so modified shall be rounded off to the nearest five cents. [fig 4] The modified orders shall be

promulgated by the commissioner without a public hearing, and without reference to a wage board, and shall become effective on the effective date of such increases in the minimum wage except as otherwise provided in this subdivision, notwithstanding any other provision of this article.

3. Non-profitmaking institutions.

   (a) Application of article. This article shall apply to non-profitmaking institutions.

   (b) Option available to non-profitmaking institutions. The provisions of any wage order issued under this article shall not apply, however, to any non-profitmaking institution which pays and continues to pay to each of its employees in every occupation a wage, exclusive of allowances, of not less than the minimum wage provided in subdivision one of this section provided that such institution had certified under oath to the commissioner, on or before September first, nineteen hundred sixty, that on or before October first, nineteen hundred sixty it would pay and thereafter intended to pay such wage to each of its employees in every occupation and provided further that all the provisions of this article have not become applicable to such institution by operation of paragraph (c) of this subdivision. If such institution was not organized or did not hire any employees as defined in subdivision five of section six hundred fifty-one of this chapter before September first, nineteen hundred sixty, such provisions shall not apply so long as, commencing six months after it was organized, or first employed such employees it paid and continues to pay such wage to each of its employees in every occupation, provided that such institution certified under oath within six months after it was organized or first employed such employees that it would pay and thereafter intended to pay such wage to each of its employees in every occupation and provided further that all the provisions of this article have not become applicable to such institution by operation of paragraph (c) of this subdivision.

   (c) Termination of option. All the provisions of this article, including all of the provisions of any wage order issued thereunder which, but for the operation of paragraph (b) of this subdivision, would apply to any non-profitmaking institution, shall become fully applicable to such institution sixty days after such institution files a notice with the commissioner requesting that the provisions of such wage order apply to it, or immediately upon the issuance of an order by the commissioner finding that such institution has failed to pay the wages provided in paragraph (b) of this subdivision, but in no event shall any such order discharge the obligation of such institution to pay the wages provided by paragraph (b) of this subdivision for any period prior to the issuance of such order.

4. Notwithstanding subdivisions one and two of this section, the wage for an employee who is a food service worker receiving tips shall be a cash wage of at least three dollars and thirty cents per hour on or after March thirty-first, two thousand*; three dollars and eighty-five cents on or after January first, two thousand five; at least four dollars and thirty-five cents on or after January first, two thousand six; and at least four dollars and sixty cents on or after January first, two thousand seven,* provided that the tips of such an employee, when added to such cash wage, are equal to or exceed the minimum wage in effect [fig 1] *pursuant to subdivision one of this section* and provided further that no other cash wage is established pursuant to section six hundred fifty-three of this article. In the event the cash wage payable under the Fair Labor Standards Act (29 United States Code Sec. 203 (m), as amended), is increased after enactment of this subdivision, the cash wage payable under this subdivision shall automatically be increased by the proportionate increase in the cash wage payable under such federal law, and will be immediately enforceable as the cash wage payable to food service workers under this article.

5. Notwithstanding subdivisions one and two of this section, meal and lodging allowances for a food service worker receiving a cash wage amounting to three dollars and thirty cents per hour *on or after March thirty-first, two thousand; three dollars and eighty-five cents on or after January first, two thousand five; four dollars and thirty-five cents on or after January first, two thousand six; and four dollars and sixty cents on or after January first, two thousand seven ,* shall not increase more than two-thirds of the increase required by subdivision two of this section as applied to state wage orders in effect [fig 1] *pursuant to subdivision one of this section .*

NY CLS Labor § 652

6. *[Added, L 2013]* Notwithstanding subdivision two of this section and subdivision two of section six hundred fifty-three of this article, a modification in the hourly cash wage or meal and lodging credits as applied to food service workers and service employees paid in accordance with Part 146 of Title 12 of the New York state compilation of codes, rules and regulations that would otherwise be based on the increases in the hourly minimum wage that will become effective on December thirty-first, two thousand thirteen, December thirty-first, two thousand fourteen and December thirty-first, two thousand fifteen shall be made by a wage order promulgated by the commissioner pursuant to section six hundred fifty-six of this article and provided further that, for the purposes of the modifications based on such increases provided for in subdivision two of this section only, the maximum credit for tips in such wage order shall be modified so that such credit, when combined with the cash wage, is equal to the minimum wage. Any time after the effective date of the chapter of the laws of two thousand thirteen which added this subdivision, the commissioner shall appoint a wage board pursuant to the provision of subdivision one of section six hundred fifty-five of this article to inquire and report and recommend any changes to the wage order governing wages payable to such food service workers and service employees sufficient to provide adequate maintenance and to protect the health and livelihood of employees subject to such a wage order. Such wage board shall make such report and recommendations to the commissioner within six months of its establishment. The commissioner shall act upon such report and recommendations pursuant to the provisions of section six hundred fifty-six of this article.

**HISTORY:**

Add, L 1960, ch 619; amd, L 1962, ch 439, , eff May 1, 1962, L 1962, ch 440, L 1966, ch 649, eff June 21, 1966, L 1970, ch 280, L 1970, ch 282, eff April 30, 1970, L 1974, ch 280, , eff May 1, 1974, L 1978, ch 747, §§ 1, 2, eff Aug 7, 1978, L 1979, ch 668, § 1, eff July 11, 1979, L 1990, ch 38, §§ 1, 2, eff March 30, 1990, L 1999, ch 3, § 3, eff Dec 29, 1999, L 2000, ch 14, § 4, eff March 31, 2000 (see 2000 note below), L 2004, ch 747, § 2, eff Dec 6, 2004, L 2013, ch 57, § 1 (Part P), eff March 29, 2013.

**NOTES:**

Prior Law

Former § 652, formerly § 552; renumbered, L 1944, ch 705, repealed, L 1960, ch 691, eff April 18, 1960, with substance transferred to § 651.

Editor's Notes

See 1960 note under Article 19.

Laws 1999, ch 3, §§ 1, 2, eff Dec 29, 1999, provide as follows:

Section 1. Short title. This act shall be known and may be cited as the "farm worker equity and wage reform act".

§ 2. Legislative findings. The legislature finds and declares that as the state enters a new millennium, the time has come to reform the state's minimum wage laws in order to end the distinction between agricultural workers and all other classes of workers, and provide a more equitable method for providing adequate maintenance of wages for persons employed in some occupations in the state and their families, without substantially curtailing opportunities for employment or earning power. The legislature further recognizes that the need to ensure adequate funding for the farmworker housing project loan program is an essential component of ensuring a safe and healthy work environment for farmworkers and their families throughout New York state.

Laws 2000, ch 14, § 1, eff March 31, 2000, provides as follows:

Section 1. Legislative intent. The legislature having recently increased the minimum wage payable within this state to

the sum of $ 5.15 per hour, and being aware that existing wage orders in this state permit payment to certain tipped employees working in certain industries of an amount that is less than the minimum wage by their employers, hereby adjusts the effect of such wage orders for food service workers. It is acknowledged that the food and beverage service industry is highly competitive and that tipping employees who serve customers in food and beverage establishments is a common practice. It is also common that the hourly income earned by employees in this industry in the aggregate, when tips are combined with the wages required under existing wage orders of the department of labor, frequently exceed the mandated minimum wage. The existing state wage order for the food service industry requires a cash wage in excess of the wage required under the federal Fair Labor Standards Act.

The legislature hereby modifies the impact of the existing state wage order for food service workers in order to obtain a balance between the need to protect the rights and income of workers against the prices payable by consumers for food and beverage in restaurants, grills, diners and other establishments. In doing so the legislature promotes and enhances the quality of life for worker and public alike.

Laws 2004, ch 747, § 1, eff Dec 6, 2004, provides as follows:

Section 1. Short title. This act shall be known and may be cited as the "empire state wage act of 2004".

Amendment Notes
   **2013.** Chapter 57, § 1 (Part P) amended:
   By adding sub 1, sixth undesignated par.
   By redesignating former sub 1, seventh undesignated par as sub 1, eighth undesignated par.
   By adding sub 1, seventh undesignated par.
   Sub 1, eighth undesignated par by adding the matter in italics.
   **2013.** Chapter 57, § 2 (Part P) amended:
   By adding sub 6.
   **2004.** Chapter 747, § 2 amended:
   Sub 4 by deleting at fig 1 "on March thirty-first, two thousand,"
   Sub 5 by deleting at fig 1 "on January first, two thousand".
   **1990.** Chapter 38, § 2 amended:
   Sub 2, second undesignated par by deleting at fig 1 "from two dollars thirty cents to two dollars sixty-five cents, from two dollars sixty-five cents to two dollars ninety cents, from two dollars ninety cents to three dollars ten cents, and from three dollars ten cents to three dollars thirty-five cents", at fig 2 "as the case may be,", at fig 3 "his" and at fig 4 "In addition, the minimum wage order for the building service industry shall be modified by the commissioner to change from June first, nineteen hundred seventy-one to June first, nineteen hundred seventy-five the date specified in such order relating to the allowance for the apartment furnished by an employer to an employee, effective on the sixtieth day after this subdivision shall have become a law. Notwithstanding any other provisions of this section, the commissioner shall modify the minimum wage order for the hotel industry by enacting a regulation applicable to service employees and to chambermaids in resort hotels, as such terms are defined in such orders, whose weekly average of tips received exceeds one dollar ninety cents an hour. Such regulation shall provide that the allowance for gratuities for such service employee shall be one dollar twenty-four cents on the day this subdivision shall have become a law and one dollar thirty-four cents on January first, nineteen hundred eighty-one; and the allowance for gratuities for such chambermaids shall be ninety-five cents on the day this subdivision shall have become a law and one dollar five cents on January first, nineteen hundred eighty-one. In addition, the modified order for resort hotels shall provide that the allowance for lodging and three meals per workday shall be six dollars ninety-five cents per workday on January first, nineteen hundred eighty and seven dollars fifty-five cents per workday on January first, nineteen hundred eighty-one; and the allowance for meals furnished to a non-residential employee shall be one dollar fifteen cents per meal on a workday on the day this subdivision shall have become a law, one dollar thirty cents per meal on a workday on January first, nineteen hundred eighty and one dollar fifty cents per meal on a workday on January first, nineteen hundred

NY CLS Labor § 652

eighty-one." and adding the matter in italics.


New York References:
    This section referred to in §§ 655, 657
    Minimum rate of wage and supplement for public work, § 220-d
    Rate of wages for grade crossing elimination work, § 226
    Prevailing wage for building service employees, §§ 230 et seq


Federal References:
    Minimum wages under Fair Labor Standards Act, *29 USCS § 206*


Research References & Practice Aids:


Annotations:
    Tips as wages for purposes of state wage laws. *61 ALR6th 61*
    Who is employed in "professional capacity," within exemption, under *29 USCS § 213*(a)(1), from minimum wage and maximum hours provisions of Fair Labor Standards Act. *77 ALR Fed 681*
    Employee training time as exempt from minimum wage and overtime requirements of Fair Labor Standards Act. *80 ALR Fed 246*


Texts:
    Liddle & Marino, Labor and Employment in New York (Michie) pp 12-2
    New York Insurance Law (Matthew Bender's New York Practice Series) § 6.05[1b]


**LexisNexis 50 State Surveys, Legislation & Regulations**

    Minimum Wage


Case Notes:


    A rooming house comes within the definition of hotel industry as contained in an order setting minimum wages in the hotel industry so as to authorize conviction of a rooming house operator for a violation of the order. *People v Manning (1947) 272 AD 1022, 73 NYS2d 517, 13 CCH LC P 64059.*

    At hearings conducted by the Industrial Commissioner to modify existing minimum wage orders and raise minimum wage to one dollar per hour, there was no predetermination by the Commissioner merely because a "proposed" order was submitted to interested parties as a basis for discussion, it was not necessary that witnesses be sworn or that opportunity be afforded for their cross-examination, and his factual determination supported by adequate

NY CLS Labor § 652

evidence must be sustained. *Kiamesha Concord, Inc. v Lewis (1962, 3d Dept) 15 AD2d 702, 223 NYS2d 602, 44 CCH LC P 50439.*

The State Minimum Wage Law is designed to occupy the entire field of minimum wage legislation for the state, and a local New York City Minimum Wage Law attempting to increase, locally, the required minimum is invalid under §§ 11 and 21 of the City Home Rule Law. *Wholesale Laundry Board of Trade, Inc. v New York (1962, 1st Dept) 17 AD2d 327, 234 NYS2d 862, 46 CCH LC P 50684,* affd *12 NY2d 998, 239 NYS2d 128, 189 NE2d 623, 47 CCH LC P 50789.*

In view of subd. 2 of this section, there is no basis for a contention that the 1960 repeal and re-enactment of the Minimum Wage Law nullified effectiveness of existing wage orders issued prior to effective date of the new article, merely because their enforcement had been temporarily stayed in connection with proceedings for review. *Emerson v Board of Standards & Appeals (1962, 3d Dept) 17 AD2d 1014, 234 NYS2d 57, 46 CCH LC P 50676.*

Fact that an employer is solely in the amusement and recreation industry does not preclude the classification of its employees within another industry and the consequent inclusion in another minimum wage order; therefore, the employees of an operator of a chain of drive-in and indoor motion picture theaters, who worked at candy counters, concession stands and snack bars, were properly ordered to be paid in accordance with a minimum wage order pertaining to retail and wholesale trade industry and restaurant industry. *Carrols Development Corp. v Ross (1982, 4th Dept) 85 App Div 2d 104, 447.*

Order requiring employer to comply with New York Minimum Wage Law and to pay employee $ 1,522.92 in wages, interest and penalty upon determination that employer violated statute would be reversed as arbitrary and capricious since there was no evidence indicating exactly how many hours employee actually worked during period in question; in view of fact that no time records were kept and employee worked unspecified number of flexible hours, it would be necessary to remand proceeding for new hearing and direct employee to appear as witness to determine exact number of hours she worked. *Kronin v State, Dept. of Labor, Industrial Bd. of Appeals (1987, 1st Dept) 127 App Div 2d 479, 511 NYS2d 625, 27 BNA WH Cas 1687.*

Substantial evidence supported state labor commissioner's assessment of unpaid minimum wages, interest, and penalties against hotel owner where testimony of claimant employees, labor department investigators, and other witnesses proved 2 classic examples of "off the books" employment, and credibility of those witnesses would not be weighed in Article 78 proceeding. *Alphonse Hotel Corp. v Sweeney (1998, 1st Dept) 251 AD2d 169, 674 NYS2d 351, 136 CCH LC P 58451.*

Determination that an employer violated N.Y. *Lab. Law § 652(1)* by underpaying wages was proper because the employer failed to tender documentary evidence to substantiate his assertion that one claimant spent significant time driving between jobs and failed to tender documentary evidence to contradict the claimants' testimony as to the hours they worked and their daily routines; the employer failed to maintain records of the hours the claimants worked and/or provide them with wage stubs, thus compelling Department of Labor (DOL) to employ an alternate analysis to ascertain the number of hours that the claimants worked and, in turn, imposing on the employer the burden of demonstrating the unreasonableness of DOL's calculations. *Matter of Garcia v Heady (2007, 3d Dept) 46 App Div 3d 1088, 847 NYS2d 303.*

State Minimum Wage Act, authorizing the Industrial Commissioner to establish different minimum wage rates for different localities in respect to particular industries, is a "general law" within constitutional provision prohibiting local laws inconsistent with general laws, making the local law fixing higher minimum wage rate unconstitutional. *Wholesale Laundry Board of Trade, Inc. v New York (1964) 43 Misc 2d 816, 252 NYS2d 502, 50 CCH LC P 51160,* affd *22 AD2d 762, 252 NYS2d 955,* affd *15 NY2d 604, 255 NYS2d 265, 203 NE2d 652* and affd *22 AD2d 765, 252 NYS2d 956.*

NY CLS Labor § 652

Individuals who perform housekeeping services are not exempt from the operation of the Minimum Wage Act. *Perez v Lavine (1974) 79 Misc 2d 179, 359 NYS2d 942.*

As the recipient of public assistance benefits was employed or permitted to work by a municipal government, he clearly was not an "employee" within the meaning of the state Minimum Wage Law; thus, the trial court properly dismissed the recipient's N.Y. C.P.L.R. art. 78 proceeding challenging a determination to withhold his lottery winnings. *Matter of Carver v State of New York (2011, App Div, 2d Dept) 926 NYS2d 559.*

Summary judgment in favor of defendants against plaintiffs' Fair Labor Standards Act (FLSA), *29 U.S.C.S. § 201* et seq., N.Y. *Lab. Law § 652(1)*, and *N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2* claims was vacated as the district court erred when it concluded, based exclusively on the four factors identified in Carter, that defendants were not joint employers within the FLSA or within the meaning of New York's statutory analogues to the FLSA. A district court must look beyond traditional agency principles before declaring that the entity is not an employer under the FLSA or New York state laws; accordingly, although an entity's exercise of an employer's formal prerogatives--hiring and firing, supervising schedules, determining rate and method of payment, and maintaining records--may be sufficient to establish joint employment under the FLSA or state laws, it was not necessary to establish joint employment. *Ling Nan Zheng v Liberty Apparel Co. (2003, CA2 NY) 355 F3d 61, 9 BNA WH Cas 2d 336.*

Employee sufficiently alleged state minimum wage violations; he identified himself as an employee and defendant as an employer, he also listed the relevant statutory wage requirements and averred that the employer willfully refused to pay him at that wage. *Jian Zhong v August August Corp. (2007, SD NY) 498 F Supp 2d 625.*

Half of the Zheng II factors weighed in favor of a finding that the corporation was a joint employer, so summary judgment on the ultimate issue of Fair Labor Standards Act coverage was inappropriate; this conclusion similarly required the denial of defendants' motion against the workers' claims under N.Y. *Lab. Law § 652(1)* and N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2. There was a genuine issue of material fact as to whether the workers performed a discrete line-job that was integral to the corporation's process of production; there was a genuine issue as to whether defendants' engaged in extensive supervision of the workers' work, thereby exercising effective control of the terms and conditions of the workers' employment; and there was a genuine issue of material fact regarding the portion of the workers' work that was performed for the corporation. *Ling Nan Zheng v Liberty Apparel Co. (2008, SD NY) 556 F Supp 2d 284.*

Employer was not entitled to credits for a portion of an employee's tips and the costs of meals and allowances, when the employee made a claim for payment of minimum wages from the employer, because the employer did not furnish the employee with a statement listing the allowances and the employee did not maintain payroll records for six years, as required by N.Y. Comp Codes. R. & Regs. tit. 12, §§ 137-1.5, 1.9, and 2.2. *Padilla v Manlapaz (2009, ED NY) 643 F Supp 2d 302.*

Employer was not entitled to credits for a portion of an employee's tips and the costs of meals and allowances, when the employee made a claim for payment of minimum wages from the employer, because the employer did not furnish the employee with a statement listing the allowances and the employee did not maintain payroll records for six years, as required by N.Y. Comp Codes. R. & Regs. tit. 12, §§ 137-1.5, 1.9, and 2.2. *Padilla v Manlapaz (2009, ED NY) 643 F Supp 2d 302.*

Employer was liable to its employee for unpaid wages with regard to her work as a waitress at its restaurant because they violated the Fair Labor Standards Act and New York State law by failing to pay her a minimum wage, any overtime, as well as by retaining portions of her weekly tips plus, it failed to keep records of the wages paid and produced a sham record of check paying reports. *Lanzetta v Florio's Enters. (2011, SD NY) 763 F Supp 2d 615.*

Employer's motion to dismiss the employees' claims under N.Y. *Lab. Law § 652* and other sections for a minimum wage and overtime pay was denied because the employees' claims under state law were not preempted by the Labor

NY CLS Labor § 652

Management Relations Act, *29 U.S.C.S. § 185*(a), as regardless of whether the facts alleged by them constituted a violation of the collective bargaining agreement, they also made out an independent claim under N.Y. Lab. Law art. 19. *Polanco v Brookdale Hosp. Med. Ctr. (2011, ED NY) 819 F Supp 2d 129,* application den (2012, ED NY) *2012 US Dist LEXIS 21535.*

Provisions of Art. 19 unlike those of Art. 18 and Art. 20 do not specifically exempt the operations of governmental agencies.  1941 NY Ops Atty Gen Mar. 10.

Minimum wage law is applicable to operations of Bear Mountain Inn conducted by Palisades interstate park commission.  1941 NY Ops Atty Gen Mar. 10.

Because plaintiff was recovering unpaid wages pursuant to the frequency of payments provision, and because the court had determined the recovery under that provision would be greater than recovery under the minimum wage provision, plaintiff was not entitled to recover additional damages for minimum wage violations. *Ho v Target Constr. of NY, Corp. (2011, ED NY) 2011 US Dist LEXIS 33365* (UNPUBLISHED).

Plaintiff established that, with the exception of the first weeks of his employment with the employer, he regularly worked for more than ten hours in a single day without any additional compensation, so he was entitled to an additional hour of pay at the minimum hourly rate in effect during the time he was employed by defendants for each day he worked more than ten hours. *Ho v Target Constr. of NY, Corp. (2011, ED NY) 2011 US Dist LEXIS 33365* (UNPUBLISHED).

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of March 2014, I caused the foregoing to be filed through this Court's CM/ECF appellate filer system, which will send a notice of electronic filing to the following:

RACHEL M. BIEN
ADAM T. KLEIN
JUNO TURNER
OUTTEN & GOLDEN LLP
3 Park Avenue, 29th Floor
New York, New York 10016
(212) 245-1000
RMB@outtengolden.com
atk@outtengolden.com
jturner@outtengolden.com

*Counsel for Plaintiffs-Appellees*

  /s/ Elise M. Bloom
Elise M. Bloom