# 13-4478-cv(L), 13-4481-cv(CON)

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

ERIC GLATT, on behalf of himself and all others similarly situated,
ALEXANDER FOOTMAN, on behalf of himself and all others similarly situated,
EDEN M. ANTALIK, DAVID B. STEVENSON, KANENE GRATTS, on behalf
of themselves and all others similarly situated, BRIAN NICHOLS,

*Plaintiffs-Appellees*,

v.

FOX SEARCHLIGHT PICTURES, INC.,
FOX ENTERTAINMENT GROUP, INC.,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the Southern District of New York, Case No. 1:11-CV-6784 (WHP)

## BRIEF OF THE CHAMBER OF COMMERCE OF
## THE UNITED STATES OF AMERICA AND CALIFORNIA
## EMPLOYMENT LAW COUNCIL AS *AMICI CURIAE*
## IN SUPPORT OF DEFENDANTS-APPELLANTS

Kate Comerford Todd
Steven P. Lehotsky
NATIONAL CHAMBER LITIGATION
CENTER, INC.
1615 H Street NW
Washington, DC  20062
(202) 463-5337
ktodd@uschamber.com
slehotsky@uschamber.com

*Counsel for* Amicus Curiae *Chamber
of Commerce of the United States*

Matthew S. Hellman
Jessie K. Liu
Lindsay C. Harrison
JENNER & BLOCK LLP
1099 New York Ave. NW, Suite 900
Washington, DC  20001
(202) 639-6000
mhellman@jenner.com
jliu@jenner.com
lharrison@jenner.com

*Counsel for* Amici Curiae

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1, the Chamber of Commerce of the United States of America and the California Employment Law Council certify that they are nonprofit organizations with no parent corporations, and no publicly held company owns 10% or more of their stock, respectively.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ................................................................... iii

INTEREST OF *AMICI CURIAE* ...........................................................1

SUMMARY OF ARGUMENT ................................................................2

ARGUMENT ....................................................................................5

I.    UNPAID INTERNSHIPS CAN BE MUTUALLY BENEFICIAL FOR
      BUSINESSES, INTERNS AND EDUCATIONAL INSTITUTIONS...........5

      A.    The Use of Interns, Including Unpaid Interns, Is Widespread. ............5

      B.    Internships Are A Win-Win-Win for Businesses, Interns and
            Educators. ................................................................6

            1.    Businesses ........................................................7

            2.    Interns............................................................9

            3.    Educators.........................................................12

II.   PLAINTIFFS' CONTRARY POLICY ARGUMENTS ARE
      UNPERSUASIVE. ..................................................................13

      A.    There Is No Proof That Internships Are Replacing Paid Positions. ...13

      B.    Available Data Does Not Support Plaintiffs' Claim That Unpaid
            Internships Disproportionately Privilege Wealthy Students...............16

III.  THE PRIMARY BENEFIT TEST BEST REFLECTS AND
      ENCOURAGES MUTUALLY ADVANTAGEOUS INTERNSHIPS........18

CONCLUSION ..................................................................................24

# TABLE OF AUTHORITIES

**CASES**

*Reich v. Fire Protection District*, 99 F.2d 1023 (10th Cir. 1993) ..........................16

*Solis v. Laurelbrook Sanitarium & School, Inc.*, 642 F.3d 518 (6th Cir. 2011) ...................................................................................... 9-10, 18, 22

*Tony & Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290 (1985) ......................................................................................................22

*Walling v. Portland Terminal Co.*, 330 U.S. 148 (1947).......................................18

**OTHER AUTHORITIES**

Briana Alterman, *Unpaid Internships Aren't So Black and White*, Progressive Policy Institute Blog (Aug. 8, 2013), http://www.progressivepolicy.org/2013/08/unpaid-internships-arent-so-black-and-white/ ...............................................................................11

Joseph E. Aoun, *Protect Unpaid Internships*, Inside Higher Ed., July 13, 2010, http://www.insidehighered.com/views/2010/07/13/aoun.........6, 13, 19, 21

Georgia T. Chao & Philip D. Gardner, *Young Adults at Work:  What They Want, What They Get, and How to Keep Them* (MonsterTRAK White Paper, 2008), http://www.wwu.edu/careers/docs/Resource_YoungAdultsatWork.pdf.......................................................................8

Malcolm Coco, *Internships:  A Try Before You Buy Arrangement*, 65 SAM Advanced Mgmt. J. 41 (2000) ..............................................................5, 10, 12

Richard L. Divine et al., *Required Internship Programs in Marketing: Benefits, Challenges and Determinants of Fit*, 17 Marketing Educ. Rev. 45 (2007) ...............................................................................................6, 17

Lynn Everett, *Unpaid Internships Can Have Long Lasting Benefits*, Wall St. J., Apr. 16, 2010, at A18 ..................................................................10

Phil Gardner, CERI Research Brief 6-2013:  *Framing Internships from an Employers' Perspective*, http://www.ceri.msu.edu/wp-content/uploads/2010/01/internshipCERI-Research-Brief-XX.pdf .....7, 8, 14, 15

Phil Gardner, *The Debate Over Unpaid College Internships* (2010),
http://www.internbridge.com/Unpaid-College-Internship-Report.pdf.......5, 6, 16

Phil Gardner, *Reaction on Campus to the Unpaid Internship Controversy*
(2012), http://www.ceri.msu.edu/wp-content/uploads/2009/10/Reaction-
on-Campus-to-the-Unpaid-Internship-Controversy-Whitepaper.pdf.............5, 11

Philip D. Gardner, *CERI Thought Piece:  Internships as High-Stakes Events*
(Jan. 1, 2011), http://www.ceri.msu.edu/wp-content/uploads/2010/01/
High-Stakes-Internships.pdf .........................................................................7, 20

Phillip D. Gardner, Georgia T. Chao & Jessica Hurst, *Ready for Prime
Time?  How Internships and Co-ops Affect Decisions on Full-Time Job
Offers* (MonsterTRAK White Paper, 2008), http://ceri.msu.edu/
publications/pdf/internwhitep.pdf............................................................8, 10, 11

Jack Gault, John Redington, & Tammy Schlager, *Undergraduate Business
Internships and Career Success:  Are They Related?*, 22 J. Marketing
Educ. 45 (2000)..............................................................................................10, 12

Edward L. Glaeser, *High Value in Unpaid Internships*, Boston Globe, Oct.
31, 2013, at A-15 ...............................................................................................5, 16

Leslie Hook & Joseph Sternberg, *Confessions of Two Unpaid Interns*, Wall
St. J., Apr. 8, 2010 at A19...............................................................................10, 17

Intern Bridge, Inc., *Intern Bridge 2012 Internship Salary Report* (2013),
http://www.internbridge.com/salaryreport2012 ...................................................6

Eliza Jacobs, Society for Human Resources Management, *Executive Brief:
Tracking Trends in Employee Turnover*, https://www.shrm.org/Research/
benchmarks/Documents/Trends%20in%20Turnover_FINAL.pdf ......................9

David Lat, *Why mess with a win-win situation?*, N.Y. Times (July 18, 2013,
11:41 AM).........................................................................................................10, 23

Letter from 13 University Presidents to the Hon. Hilda Solis (Apr. 28, 2010),
http://chronicle.com/items/biz/pdf/FINAL_US%20Department%20of
%20Labor%20letter.pdf....................................................................................13

Letter from Sen. John F. Kerry to the Hon. Hilda L. Solis (May 11, 2010),
http://www.jenner.com/system/assets/assets/7890/original/Kerry_20Lette
r.pdf. ......................................................................................................................7

iv

Susan McDonald, *Planting a Future Workforce*, Business First, Mar. 5, 2001.................................................................................................8

Dori Meinert, *Fresh Faces, A well-planned internship program can energize your enterprise*, HR Magazine, Nov. 1, 2013, http://www.shrm.org/Publications/hrmagazine/EditorialContent/2013/1113/Pages/1113-internships.aspx.................................................................................9

NACE, *Class of 2013:  Majority of Graduating Seniors Took Internship or Co-op During College Career* (June 26, 2013), http://www.naceweb.org/s06262013/internship-co-op-during-college.aspx ...............................................5

NACE, *2013 Internship & Co-op Survey:  Executive Summary* (2013), https://www.naceweb.org/uploadedFiles/Content/static-assets/downloads/executive-summary/2013-internship-co-op-survey-executive-summary.pdf.................................................................9

NACE, *Unpaid Internships:  A Survey of the NACE Membership – Executive Summary* (2010), http://www.utexas.edu/cola/orgs/lacs/_files/pdf/Employers/Unpaid%20Internships-%20A%20Survey%20of%20the%20NACE%20Membership.pdf...............................................19, 20, 21

On Point With Tom Ashbrook, *The Internship Economy* (June 11, 2013), http://onpoint.wbur.org/2013/06/11/internship-economy ...............................11

PwC, *Driving the bottom line:  Improving retention* (PricewaterhouseCoopers Saratoga Institute White Paper, 2006), http://www.pwc.com/en_US/us/hr-saratoga/assets/saratoga-improving-retention.pdf.................................................................9

PwC, *State of the Workforce, Results from PwC Saratoga's 2013/2014 U.S. Human Capital Effectiveness Report* (2013), http://www.pwc.com/en_US/us/hr-management/publications/assets/pwc-saratoga-human-capital-effectiveness-report.pdf .......................................................8

Philip S. Rose, *Recruiting and Selecting Graduate Employees Via Internships*, 4 Asia Pac. J. Bus. & Mgmt. 39 (2013)...........................................7

David R. Sands, *Rules push on interns worries college chiefs; 'Chilling effects' seen in reform*, Wash. Times, May 30, 2010, at A1. ......................13, 20

J. Robert Shindell, The Value of Credit Bearing Internships for Students, Employers, and Institutions of Higher Education (May 2013) (Ph.D. dissertation, Texas Tech Univ.), http://repositories.tdl.org/ttuir/bitstream/handle/2346/50640/SHINDELL_Robert_Diss.pdf?sequence ........................6, 20

Society for Human Resource Management, SHRM Survey Findings: Internships (Nov. 6, 2013), http://www.shrm.org/research/surveyfindings/articles/documents/internships.pptx...........................................15

Society of Human Resource Management, *2012 Employee Job Satisfaction and Engagement* (Oct. 2012), http://www.shrm.org/legalissues/stateandlocalresources/stateandlocalstatutesandregulations/documents/12-0537%202012_jobsatisfaction_fnl_online.pdf ..................................11

Alanna Stage, *Internships Lead to Jobs At Higher Rate Than Ever, Survey Says*, Online Colleges, May 2, 2012, http://www.onlinecolleges.net/2012/05/02/internships-lead-to-jobs-at-higher-rate-than-ever-survey-says/........9

John Stossel, *Pro-choice on Internships*, foxbusiness.com (May 10, 2013), http://www.foxbusiness.com/on-air/stossel/blog/2010/05/10/pro-choice-on-internships.....................................................................................17

John Stossel, *Unpaid Interns Are Exploited?*, reason.com, May 6, 2010, http://reason.com/archives/2010/05/06/unpaid-interns-are-exploited/1.............20

Glenn R. Thiel & Neil T. Hartley, *Cooperative education:  A natural synergy between business and academia*, 62 Advanced Mgmt. J. 19 (1997)..........................................................................................6, 10

Derek Thompson, *In Defense of Unpaid Internships*, The Atlantic (May 10, 2012, 1:45 PM), http://www.theatlantic.com/business/archive/2012/05/in-defense-of-unpaid-internships/257000/ ...........................10

Wage and Hour Division, U.S. Dep't of Labor, Fact Sheet No. 71: Internship Programs Under the Fair Labor Standards Act (Apr. 2010), http://www.dol.gov/whd/regs/compliance/whdfs71.htm ...............................4, 19

Lauren Weber, *Condé Nast To Cease Its Internship Program*, Wall St. J., Oct. 23, 2013, at B3 .........................................................................20

Rick Weible, *Are Universities Reaping the Available Benefits Internship Programs Offer?*, 85 J. Educ. for Bus. 59 (2010)...............................12

vi

# INTEREST OF *AMICI CURIAE*[1]

The Chamber of Commerce of the United States of America (the "Chamber") is the world's largest business federation.  It represents 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country.  More than 96% of the Chamber's members are small businesses with 100 or fewer employees.  An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts.  To that end, the Chamber regularly files *amicus curiae* briefs in cases that raise issues of concern to the nation's business community, including cases involving labor and employment matters.

The Chamber has a substantial interest in the Court's interpretation of the Fair Labor Standards Act ("FLSA"), the New York Labor Law ("NYLL"), and other laws that may be applicable to interns.  Many of the Chamber's members hire, train, promote, and utilize interns.  They have an interest in clarifying employers' obligations under federal law and building a workforce that can best advance their businesses' prosperity, innovation, and growth.

---

[1]    No party's counsel authored this brief in whole or in part.  No person, aside from *Amici Curiae*, their members, and their counsel, made any monetary contribution intended to fund the preparation or submission of this brief.  Counsel of record for all parties have consented to the filing of this brief.

The California Employment Law Council ("CELC") is a multi-employer organization that promotes the common interests of employers and the general public in fostering the development of reasonable, equitable and progressive rules of employment law. CELC's membership includes about 70 private sector employers in the State of California who collectively employ hundreds of thousands of Californians. Many CELC members offer unpaid internships, generally to students, and frequently for academic credit. It is doubtful that many of these internships will continue to be offered if the interns must be treated as paid employees.

## SUMMARY OF ARGUMENT

Nationwide, students and businesses increasingly turned to internships as a way to transition young people from school to the working world. These internships—both paid and unpaid—confer a multitude of benefits to all parties involved: interns, businesses, and institutions of higher education. Internships allow students to gain tangible and intangible skills that bridge the gap between education and employment, they allow businesses to try out prospective employees in real-world settings, and they provide institutional and reputational benefits for colleges and universities with internship programs. The data convincingly show that individuals who have had internships fare better in the job market and are more valuable to future employers. Conversely, Plaintiffs offer no evidence for

their assertion that regulation of unpaid internships should be increased, and in particular their contention that interns are being used to displace paid workers. Nor do Plaintiffs offer any evidence that unpaid internships operate to exclude and disadvantage less wealthy students and jobseekers.  In fact, the available data indicate just the opposite.

In order to preserve the opportunities that internships provide, *Amici* urge the Court to apply the primary benefit test in determining whether interns are employees under the FLSA and the NYLL.  This test best encourages the continued development of mutually beneficial internship opportunities.  The primary benefit test bars exploitative internships while ensuring that the many businesses offering constructive, well-designed unpaid opportunities may continue to do so.

By contrast, the six-factor test that Plaintiffs advocate and that the District Court below adopted would mark a drastic shift that would harm all stakeholders. The District Court held, as a matter of first impression in this Circuit, that six criteria listed in a Department of Labor fact sheet provide the applicable standard.[2] This test, which would prohibit businesses from deriving any "immediate

---

[2]     SPA-22 (*Glatt v. Fox Searchlight Pictures Inc.*, 1:11-cv-06784-WHP, slip op. 22 (S.D.N.Y. June 11, 2013), ECF No. 163).

advantage" from the work of unpaid interns, should be rejected.[3]  Prohibiting

interns from performing any productive work is antithetical to a meaningful

internship.  If unpaid interns are confined solely to unproductive tasks such as

shadowing senior employees and participating in training, the benefits of the

internship may be significantly diminished.  In addition, the six-factor test

Plaintiffs urge would have a chilling effect, reducing the number of internship

opportunities available.  There is no need to speculate on this point.  Several major

employers have already eliminated or reduced the size of their internship programs

in light of the decision below, and other businesses are closely watching legal

developments to determine whether they should follow.

---

[3]    Department of Labor's Fact Sheet No. 71 enumerates the following criteria for determining whether an internship may be unpaid:

1. The internship, even though it includes actual operation of the facilities of the employer, is similar to training which would be given in an educational environment;
2. The internship experience is for the benefit of the intern;
3. The intern does not displace regular employees, but works under close supervision of existing staff;
4. The employer that provides the training derives no immediate advantage from the activities of the intern; and on occasion its operations may actually be impeded;
5. The intern is not necessarily entitled to a job at the conclusion of the internship; and
6. The employer and the intern understand that the intern is not entitled to wages for the time spent in the internship.

Wage and Hour Division, U.S. Dep't of Labor, Fact Sheet No. 71:  Internship Programs Under the Fair Labor Standards Act 1 (Apr. 2010).

Accordingly, *Amici* urge this Court to reverse the judgment below.

## ARGUMENT

## I.   UNPAID INTERNSHIPS CAN BE MUTUALLY BENEFICIAL FOR BUSINESSES, INTERNS, AND EDUCATIONAL INSTITUTIONS.

### A.   The Use of Interns, Including Unpaid Interns, Is Widespread.

Internships bridge the gap between education and employment.[4]  They allow young people to build essential skills, particularly during the current period of exceptionally high employment for individuals in their early 20s.[5]  Internship opportunities have been prevalent for decades, but they have steadily increased as job growth has slowed since the financial crisis.[6]  Today, over half of graduating college seniors have participated in at least one internship, and an estimated one-quarter to one-half of these experiences are unpaid.[7]

---

[4]    *See, e.g.*, Malcolm Coco, *Internships:  A Try Before You Buy Arrangement*, 65 SAM Advanced Mgmt. J. 41, 41-44 (2000).

[5]    *See* Edward L. Glaeser, *High Value in Unpaid Internships*, Boston Globe, Oct. 31, 2013, at A-15.

[6]    Phil Gardner, *The Debate Over Unpaid College Internships* 4 (2010).

[7]    The Bureau of Labor Statistics does not track internships, but researchers, such as Intern Bridge, the National Association of Colleges and Employers ("NACE"), and the College Employment Research Institute ("CERI") at Michigan State University, conduct surveys of students and employers.  *See, e.g.*, NACE, *Class of 2013:  Majority of Graduating Seniors Took Internship or Co-op During College Career* (June 26, 2013); Phil Gardner, *Reaction on Campus to the Unpaid Internship Controversy* 2 (2012) (estimating, based on 2009 data, that approximately 43% of internships were unpaid).  Each of these organizations works directly with students and educators, in order to build knowledge about young adults' transition from school to work and improve the quality of internship programs.

Internships and other experiential-education programs are increasingly becoming prerequisites for skilled jobs.  College students see internship participation as key to securing a first job and 75% of employers prefer to hire entry-level employees who enter the workforce with real-world experience.[8]

Although unpaid internship opportunities are offered at some large corporations, unpaid internships are significantly more common within small businesses and the non-profit sector.[9]  Undeniably, internships—both paid and unpaid—have become an "important and widespread national convention."[10]

## B.     Internships Are A Win-Win-Win for Businesses, Interns, And Educators.

An effective internship program is a "collaborative effort that balances the needs of the three key actors:  the student, the university, and the business."[11]  By conferring significant benefits on all stakeholders, these "symbiotic relationship[s]

---

[8]      *See* Intern Bridge Inc., *Intern Bridge 2012 Internship Salary Report* at 9 (2013); Joseph E. Aoun, *Protect Unpaid Internships*, Inside Higher Ed., July 13, 2010.

[9]      *See The Debate Over Unpaid College Internships*, *supra* note 6, at 6-7.

[10]     *Id*. at 2.

[11]     J. Robert Shindell, The Value of Credit Bearing Internships for Students, Employers, and Institutions of Higher Education 6 (May 2013) (Ph.D. dissertation, Texas Tech Univ.); *see also* Glenn R. Thiel & Neil T. Hartley, *Cooperative education:  A natural synergy between business and academia*, 62 Advanced Mgmt. J. 19-24 (1997); Richard L. Divine et al., *Required Internship Programs in Marketing:  Benefits, Challenges and Determinants of Fit*, 17 Marketing Educ. Rev. 45, 45 (2007) ("The primary reason for the popularity of internships is that they offer win-win-win opportunities for students, employers, and schools.").

help[] foster economic development and a competitive workforce."[12]

### 1.    Businesses

The benefits for employers include exposure to fresh ideas, creation of partnerships with educational institutions and communities, fulfillment of social responsibilities, development of a more highly skilled workforce, and the creation of a pipeline of the most talented prospective employees.[13]  By providing inexperienced students and job seekers with real-world training, they also mitigate the risks that businesses face when they hire new college graduates.[14]

Internship programs are particularly beneficial to employers as tools to recruit and screen talent.[15]  They allow businesses to try out and train the next generation of workers, and to hire new employees who are a proven fit with their

---

[12]    Letter from Sen. John F. Kerry to the Hon. Hilda L. Solis (May 11, 2010) (urging Department of Labor to "consider any potential chilling effects on college internship programs before any regulatory steps are taken").

[13]    *See supra* note 11.

[14]    Philip D. Gardner, *CERI Thought Piece:  Internships as High-Stakes Events* 1 (Jan. 1, 2011).

[15]    Phil Gardner, CERI Research Brief 6-2013:  *Framing Internships from an Employers' Perspective* 1 ("[I]nternships have become an essential talent management strategy for organizations big and small."); Philip S. Rose, *Recruiting and Selecting Graduate Employees Via Internships*, 4 Asia Pac. J. Bus. & Mgmt. 39, 42 (2013) ("Arguably, the primary benefit from internships from an organizational perspective is their ability to attract, recruit and screen potential future employees." (citations omitted)).

companies.[16]  Indeed, one survey of human resources managers found that

"[c]ompanies spend approximately 20%, on average, of their human resources

recruitment budgets towards recruiting college talent . . . . Nearly 80% of these

managers indicated that the return of investment for internships and co-ops was

'good to excellent.'  This was the highest rated recruiting strategy."[17]  This is

particularly important as businesses face challenges related to workforce

retention.[18]  A survey by PricewaterhouseCoopers' Saratoga Institute estimated

that 22% of new hires voluntarily quit their jobs within the first year of

employment,[19] and voluntary turnover increases as the health of the economy

---

[16]    CERI Research Brief 6-2013, *supra* note 15, at 2; *see also* Susan McDonald, *Planting a Future Workforce*, Business First, Mar. 5, 2001 ("While students are exploring career options and getting experience that may help them land a job, employers are getting an invaluable preview of potential recruits . . . Internships give you an opportunity to really evaluate someone." (internal quotation marks omitted)).

[17]    Phillip D. Gardner, Georgia T. Chao & Jessica Hurst, *Ready for Prime Time? How Internships and Co-ops Affect Decisions on Full-Time Job Offers* 4 (MonsterTRAK White Paper, 2008).

[18]    PwC, *State of the Workforce, Results from PwC Saratoga's 2013/2014 U.S. Human Capital Effectiveness Report* 2-3, 7 (2013) (finding that voluntary turnover, especially among top performing employees, is increasing and that employee retention is a key challenge for businesses); Georgia T. Chao & Philip D. Gardner, *Young Adults at Work:  What They Want, What They Get, and How to Keep Them* 3, 7 (MonsterTRAK White Paper, 2008) (64% of manager respondents say that retaining young adults has become increasingly difficult in recent years).

[19]    Chao & Gardner, *Young Adults at Work*, *supra* note 18, at 7 (citing Saratoga Institute survey data).

improves.[20]  Turnover costs for businesses include diminished productivity,

increased hiring and on-boarding costs, and loss of institutional knowledge.[21]  The

data show, however, that new hires with previous intern experience are more likely

to stay with the company for longer periods than other new recruits.[22]  When

businesses hire interns *from their own internship programs*, the odds that new hires

will stay with the company increase even more significantly.[23]  Accordingly, "HR

professionals commonly measure the success of their internship programs by

determining how many former interns they convert to full time employees."[24]

### 2.    Interns

Internship opportunities enable students to try out career paths and potential

employers, obtain hands-on experience, develop professional skills, and make

interpersonal connections that traditional education cannot provide.  *See, e.g.*, *Solis*

---

[20]     Eliza Jacobs, Society for Human Resources Management, *Executive Brief: Tracking Trends in Employee Turnover* (2011).

[21]     PwC, *Driving the bottom line:  Improving retention* (PricewaterhouseCoopers Saratoga Institute White Paper, 2006).

[22]     Alanna Stage, *Internships Lead to Jobs At Higher Rate Than Ever, Survey Says*, Online Colleges, May 2, 2012 ("After five years, 62.4% of former interns were still with companies, where only 48.1% of other hires were still employed with the same company" (discussing Intern Bridge and NACE data)).

[23]     NACE, *2013 Internship & Co-op Survey:  Executive Summary* 3 (2013) ("[R]etention rates of full-time hires who came from an employers' own internship/co-op program are higher than the rate of those hires that either completed an internship/co-op with another employer or completed no internship/co-op at all.").

[24]     Dori Meinert, *Fresh Faces, A well-planned internship program can energize your enterprise*, HR Magazine, Nov. 1, 2013.

*v. Laurelbrook Sanitarium & Sch., Inc.*, 642 F.3d 518, 531 (6th Cir. 2011) (unpaid

trainees derive tangible and intangible benefits, including gaining hands-on

training, learning practical skills, developing leadership capabilities, and building

character traits like work ethic and responsibility).  The completion of one or more

internships is correlated with higher starting salaries, higher job satisfaction,

quicker job offers, more job offers, development of communication skills, better

career preparation, improved job-related skills, and improved creative thinking.[25]

As criticisms of unpaid internships have surfaced, students have defended

their experiences and stressed the positive effect that their internships have had on

their lives and careers.[26]  The data show that the overwhelming majority of interns

have found their internships beneficial.  In a leading survey of interns, 65% of

respondents reported being "very satisfied" with their internship experiences.[27]  At

---

[25]    Coco, *supra* note 4; Shindell, *supra* note 11, at 4; Thiel & Hartley, *supra*
note 11; Jack Gault, John Redington, & Tammy Schlager, *Undergraduate Business
Internships and Career Success:  Are They Related?*, 22 J. Marketing Educ. 45, 50-
51 (2000).

[26]    *See, e.g.*, Leslie Hook & Joseph Sternberg, *Confessions of Two Unpaid
Interns*, Wall St. J., Apr. 8, 2010 at A19; Derek Thompson, *In Defense of Unpaid
Internships*, The Atlantic (May 10, 2012, 1:45 PM); Lynn Everett, *Unpaid
Internships Can Have Long Lasting Benefits*, Wall St. J., Apr. 16, 2010, at A18 ("I
am the first in my family to graduate from college, and lacking any family
connections, [my two] internships gave me access to companies I could only dream
about"); David Lat, *Why mess with a win-win situation?*, N.Y. Times (July 18,
2013, 11:41 AM) ("Two of the best work experiences I have ever had were
unpaid.").

[27]    Gardner, Chao & Hurst, *Ready for Prime Time?*, *supra* note 17, at 3.

least one study has found that unpaid interns report even greater satisfaction than paid interns; and both groups far outpace regular, paid employees in terms of workplace satisfaction.[28] Whereas 65% of interns report being "very satisfied," only 38% of regular employees report being "very satisfied" with their jobs.[29]

Finally, while critics of unpaid internships argue that students who participate in paid internships garner better employment prospects than those who perform unpaid internships, those differences are attributable to other factors, including the relevant industries and relative qualifications of students who secure paid versus unpaid opportunities in the first place.[30]

Students and jobseekers participate in internship programs for a variety of reasons—some with the aim of exploring options that they may not further pursue, some in order to contribute to businesses and organizations that interest them, and some with the goal of gaining immediate full-time employment or higher starting

---

[28]     *Reaction on Campus*, *supra* note 7, at 5.

[29]     *Compare* Gardner, Chao & Hurst, *Ready for Prime Time?*, *supra* note 17, at 3, *with* Society of Human Resource Management, *2012 Employee Job Satisfaction and Engagement* 3 (Oct. 2012).

[30]     *See, e.g.*, On Point With Tom Ashbrook, *The Internship Economy* (June 11, 2013) (explaining that rates of compensation vary by sector); Briana Alterman, *Unpaid Internships Aren't So Black and White*, Progressive Policy Institute Blog (Aug. 8, 2013) (data demonstrating differences between paid and unpaid internships do not account for differences among major and field or report the percentage of college students who go directly to graduate school rather than entering the workforce).

salaries in their chosen fields.  As interns themselves widely recognize, an

internship, paid or unpaid, can be a critical tool in achieving any of these goals.

### 3.  Educators

Internships also benefit colleges and universities as institutions.  Internships

can improve a school's reputation and image, aid in student recruiting, foster closer

ties with the business community, encourage positive town-gown relations, yield

additional scholarships and funding sources, and ensure consistency between

academic curricula and real-world needs.[31]

Perhaps most importantly, colleges and universities benefit from the

educational experience that internships provide to their students.  A significant

body of research shows that experiential learning is an invaluable component of

educating students and preparing them for successful careers.[32]  When students

participate in internship programs, they emerge as more highly skilled and highly

employable graduates who excel in the transition from school to work—a key

metric by which colleges and universities are evaluated.[33]  As Joseph E. Auon, the

President of Northeastern University, has stated:  "[T]he real benefits of

experiential learning go far beyond the practical advantage it affords students

---

[31]    *See supra* note 11; Gault, et al., *supra* note 25, at 51-52; Rick Weible, *Are Universities Reaping the Available Benefits Internship Programs Offer?*, 85 J. Educ. for Bus. 59, 59-60, 62 (2010).

[32]    *See, e.g.*, Coco, *supra* note 4.

[33]    *See supra* note 25 (discussing benefits to students).

entering the workforce. Educators are increasingly realizing that the integration of study and practice is a more powerful way to learn."[34]

Accordingly, a group of university presidents, including the presidents of New York University, the University of California, and the University of Wisconsin, have asked the Department of Labor not to expand its regulation of unpaid internships.[35] Cautioning the DOL against the approach that Plaintiffs advocate, the presidents' letter acknowledges the significant advantages that these opportunities provide to their students and their institutions, and it "urge[s] great caution in changing an approach to learning that is viewed as a huge success by educators, employers, and students alike."[36]

## II.   PLAINTIFFS' CONTRARY POLICY ARGUMENTS ARE UNPERSUASIVE.

### A.   There Is No Proof That Internships Are Replacing Paid Positions.

Against all these benefits, Plaintiffs' contention that unpaid internships displace paid workers is unpersuasive. Plaintiffs' only support for their argument below that "as companies hire more interns for free, they hire fewer paid workers" comes from a student note and 16-year old law review article, neither of which

---

[34]   Aoun, *supra* note 8.

[35]   Letter from 13 University Presidents to the Hon. Hilda Solis (Apr. 28, 2010).

[36]   *Id.*; *see also* David R. Sands, *Rules push on interns worries college chiefs; 'Chilling effects' seen in reform*, Wash. Times, May 30, 2010, at A1.

identifies any evidence in support of this bold assertion.[37]  And although Plaintiffs

imply that the prevalence of internships is somehow to blame for unemployment

and underemployment, this suggestion is overly simplistic and unsupported.  *Amici*

are not aware of any data that shows that unpaid internships *cause* greater

unemployment.  A more obvious explanation for any correlation between these

trends is that jobseekers who are unable to find work during a period of stifled

economic growth are doing exactly what they should:  looking to internships and

other educational opportunities to develop skills and relationships that will allow

them to be more competitive in the job market.

    Both the available data and an understanding of the structure of many

internship opportunities indicate that there is not a direct trade-off between interns

and paid entry-level employees.  For instance, a recent study by the Collegiate

Employment Research Institute at Michigan State University found that most

"employers promote internships as a strategy for developing full-time talent," *not*

as a substitute for full-time employees.[38]  In fact, 57% of employers identified

---

[37]     Pls.' Mem. Supp. Summ. J., at 22, *Glatt v. Fox Searchlight Pictures Inc.*,
1:11-cv-06784-WHP (S.D.N.Y. Feb. 15, 2013), ECF No. 90 (internal quotation
marks omitted; citing Jessica L. Curiale, Note, *America's New Glass Ceiling:
Unpaid Internships, the Fair Labor Standards Act, and the Urgent Need for
Change*, 61 Hastings L.J. 1531, 1537 (2010); David L. Gregory, *The Problematic
Employment Dynamics of Student Internships*, 12 Notre Dame J.L. Ethics & Pub.
Pol'y 227, 242 (1998)).
[38]     CERI Research Brief 6-2013, *supra* note 15, at 2.

"developing talent for full-time employment and workforce succession planning"
as the primary purpose of their internship programs, whereas, by contrast, only 1%
reported relying on interns to cover assignments of regular staff who were on
vacation or leave.[39]

Many of the tasks interns perform—shadowing senior employees,
participating in trainings, observing meetings, and attending intern programming—
are *not* tasks that businesses would normally hire employees to do.[40]  These tasks
may be useful to businesses (and interns) because they introduce interns to the
work of an organization and integrate them into its business culture.  But, in many
cases, if an intern were not performing these tasks, no one in the organization
would.

Furthermore, many internships last for only a matter of weeks or months,
and many are concentrated during the summer, when students are not in school.
But businesses operate year-round, including during the academic year, and thus
their interns are not simply subbing-in for long-term, paid workers.

---

[39]    *Id.*

[40]    A recent study by the Society for Human Resources Management found that,
among surveyed employers, 68% arranged intern-specific activities for their
interns, such as mentoring meetings, speakers, resume workshops and social
events.  Society for Human Resource Management, SHRM Survey Findings:
Internships 19 (Nov. 6, 2013).

15

**B.    Available Data Does Not Support Plaintiffs' Claim that Unpaid Internships Disproportionately Privilege Wealthy Students.**

Similarly, Plaintiffs have not offered—and cannot offer—data to support their argument that unpaid internships serve to exclude and disadvantage less-wealthy students and jobseekers.[41]  The view that unpaid internships favor the wealthy is "primarily based on anecdotal stories" and not on quantified research.[42]

A recent survey of 27,335 undergraduates from 234 colleges and universities nationwide does not show that under-privileged students are excluded from unpaid internships.[43]  This study concluded:  "*Our findings do not support the common contention that students from the wealthiest families have greater access to unpaid internships*, even among most for-profit companies."[44]

In short, Plaintiffs' argument is not supported by available data:  less-wealthy students *are* taking advantage of unpaid internship opportunities in large numbers.[45]  These opportunities allow lower income students a means of

---

[41]    Even if that was the case (and it is not), the fact that undertaking unpaid internships entails financial sacrifice, is not determinative of interns' status.  *See Reich v. Fire Protection Dist.*, 99 F.2d 1023, 1028 (10th Cir. 1993) (noting that although training program required participants to make "financial sacrifices," a "vocational or associate degree program . . . would have entailed similar burdens").

[42]    *The Debate Over Unpaid College Internships*, *supra* note 6, at 5.

[43]    *Id.* at 10-13.

[44]    *Id.* at 12 (emphasis added).

[45]    Even when interns are unpaid by the organizations at which they work, funding may be available from outside sources, such as school stipends and scholarships.  *See* Glaeser, *supra* note 5 (discussing alternate funding sources).

16

developing skills and relationships with potential employers; and, they expose businesses to a larger, more diverse group of candidates.  Contrary to popular perception, these unpaid internships may actually help "convince employers to take a risk on very green but potentially promising students they'[ve] never heard of," who are less connected through family and other social networks.[46]  Conversely, advocates of stricter regulation of unpaid internships may be harming the very people they seek to protect; as Richard D. Richards, CEO of internships.com, averred:

> The way many of the students from the 3,900+ colleges and universities not considered elite compete with students from the elite institutions is not on paper but in the actual working environment. They show their value live.  We as a country do not need to constrain ingenuity and hard work and free choice with legal roadblocks.  The approach of reducing options and choice will hurt the very group this well intended position is trying to protect.[47]

Indeed, young people who are less connected and less experienced are the persons most likely to suffer from a smaller pool of available internships.  This is the inevitable consequence of the test Plaintiffs advocate.

---

[46]     Hook & Sternberg, *supra* note 26.

[47]     John Stossel, *Pro-choice on Internships*, foxbusiness.com (May 10, 2013); *see also* Divine, *supra* note 11.

## III.   THE PRIMARY BENEFIT TEST BEST REFLECTS AND ENCOURAGES MUTUALLY ADVANTAGEOUS INTERNSHIPS.

In determining whether an unpaid intern should be considered an employee under the FLSA and the NYLL, the Court should ask whether the intern or the employer is the primary beneficiary of the relationship.  The primary benefit test best reflects and encourages mutually advantageous internship programs, which have long been considered both constructive and legally permissible.  This approach is consistent with the Supreme Court's decision in *Walling v. Portland Terminal Co.*, which focused principally on the relative benefits of the work performed.  *See Walling v. Portland Terminal Co.*, 330 U.S. 148 (1947); *see also Laurelbrook*, 642 F.3d at 526 (discussing *Portland Terminal*'s focus on relative benefits and collecting cases that do the same).  Moreover, "[b]y focusing on the benefits flowing to each party, the [primary benefit] test readily captures the distinction the FLSA attempts to make between trainees and employees." *Laurelbrook*, 642 F.3d at 529; *see id.* at 525 (finding, by contrast, that application of the "overly rigid" six-factor DOL test is "a poor method for determining employee status in a training or educational setting").

By contrast, the test that Plaintiffs advocate would prohibit unpaid internships unless *all six* factors set forth in the Department of Labor's Fact Sheet

No. 71 are satisfied.[48]  Most important, this would mean that businesses could no longer derive *any* "immediate advantage" from the activities of their unpaid interns.  That would mark a seismic change in internship opportunities—one that would radically undermine current economic conditions and harm all stakeholders.

First, a rule that requires "student interns to perform 'no or minimal work' [is] antithetical to the premise of experiential learning."[49]  If interns are not permitted to do work that is meaningful to their employers in real-world terms, their ability to develop tangible and intangible skills will be limited, and neither interns nor businesses will be as capable of assessing the prospective fit with regard to full-time work.  In short, if the rigid test Plaintiffs urge were adopted, internship opportunities would "deteriorate into job shadowing, a pale imitation of true experiential learning."[50]  Accordingly, educators and employers widely oppose application of this change.[51]  For instance, in a recent survey of NACE member organizations, over two-thirds of colleges and universities and over half of

---

[48]    U.S. Dep't of Labor, Fact Sheet No. 71, *supra* note 3 (requiring that "[t]he employer that provides the training derives no immediate advantage from the activities of the intern; and on occasion its operations may actually be impeded").

[49]    Aoun, *supra* note 8.

[50]    *Id.*

[51]    *See supra* note 36; NACE, *Unpaid Internships:  A Survey of the NACE Membership – Executive Summary* 3 (2010).

employers said that they disagreed or strongly disagreed with the criterion "that an employer receive no immediate advantage from an internship."[52]

Second, rigid application of the DOL factors would have a chilling effect and reduce the number of internship opportunities available. Many businesses will not be able to maintain their internship programs at current rates if they must pay all interns, purge all immediate benefits they receive from interns, or risk being sued.[53] Already, at least one major internship sponsor, Condé Nast, has discontinued its internship program as a direct result of FLSA litigation.[54] ABC has responded to the threat of increased regulation and litigation by paying its interns; but, according to one report, this change led the company to "cut the number of interns [it hires] by more than half."[55] Other businesses are watching

---

[52]     *Unpaid Internships:  A Survey of the NACE Membership* (2010), *supra* note 51, at 5 (noting comments from multiple members that this criterion "was, in the words of one respondent, 'ludicrous.' These respondents felt that this regulation needed immediate revision to recognize the reality of what makes the internship experience valuable for both the student and the employer."); *see also* Sands, *supra* note 36.

[53]     Gardner, CERI Thought Piece, *supra* note 14, at 10 ("It is rather cavalier to state that all internships should be paid.  While we might want that to happen, the reality is that non-profit organizations, small for-profit businesses, and some government agencies . . . can only offer internships if unpaid.").

[54]     Lauren Weber, *Condé Nast To Cease Its Internship Program*, Wall St. J., Oct. 23, 2013, at B3.

[55]     John Stossel, *Unpaid Interns Are Exploited?*, reason.com, May 6, 2010 (noting that when "ABC[] started paying [its] interns," it "was good for well-connected students who got internships, but bad for those who were turned down.").

legal developments closely to determine whether they, too, should scale back or eliminate their internship programs.[56]  As these examples make clear, "just the threat of increased regulation" has had "a chilling effect on the willingness of employers to offer internships—paid or unpaid.  With experiential learning on the rise, through co-ops, internships and other approaches, the country cannot afford to create disincentives for employers to play a valuable role in the educational enterprise."[57]

Small businesses and non-profit organizations—the employers that currently provide the highest numbers of unpaid opportunities—would be most at risk from the position that Plaintiffs urge this Court to adopt.[58]  Although the FLSA does contain a narrow exception for certain types of volunteerism, many internships at non-profits fall outside of this exception.  For instance, if interns are engaged in commercial activities of non-profit organizations, their activities are governed by

---

[56]    *See, e.g.*, *Unpaid Internships:  A Survey of the NACE Membership* (2010), *supra* note 51, at 5 (noting comments by colleges that the "'new' DOL regulations or scrutiny had a chilling effect on all internships because employers were frightened by the increased scrutiny").

[57]    Aoun, *supra* note 8.

[58]    *Id.*; *see also supra* note 9.  For many small businesses and non-profits, limited resources are already stretched thin; sorting through opaque legal standards, often without the benefit of in-house counsel, would be particularly burdensome.

the same standards applicable to for-profit businesses.[59]  That Plaintiffs so strongly suggest that non-profits would be exempt reveals just how devastating their proposed test would be for internships in that sector.

Furthermore, even those employers that might choose to maintain unpaid internships programs without garnering any immediate benefit would have to police interns constantly to ensure that they were not taking on productive work. Because entrepreneurial students often see internships as opportunities to take initiative and impress their supervisors, providing sufficient oversight could be onerous.

Finally, any concern about exploitative internships can be addressed by faithful application of the primary benefit test.  This rule would weed out poorly designed internship opportunities because, in these circumstances, the businesses—not the interns engaged in these activities—derive the primary benefit. Unlike the test that Plaintiffs propose, the primary benefit test would effectively

---

[59]     *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 296 (1985) (finding religious foundation in violation of the FLSA, and holding that the statute "contains no express or implied exception for commercial activities conducted by religious or other nonprofit organizations"); *see also Laurelbrook*, 642 F.3d at 524 (rejecting argument that non-profit school was categorically excluded from FLSA).

"deter . . . the worst abuses while preserving the educational, mutually beneficial unpaid internships" that thousands of students and jobseekers currently enjoy.[60]

---

[60]     Lat, *supra* note 26 (arguing for maintaining "the status quo" in order to preserve the benefits of  "unpaid internships that I and so many others have experienced").

## CONCLUSION

For the foregoing reasons, the District Court's judgment should be reversed.

Respectfully submitted,

April 4, 2014

/s/ Matthew S. Hellman
Matthew S. Hellman
Jessie K. Liu
Lindsay C. Harrison
JENNER & BLOCK LLP
1099 New York Ave., NW, Suite 900
Washington, DC  20001
(202) 639-6000
mhellman@jenner.com
jliu@jenner.com
lharrison@jenner.com

*Counsel for* Amici Curiae

Kate Comerford Todd
Steven P. Lehotsky
NATIONAL CHAMBER LITIGATION
CENTER, INC.
1615 H Street, NW
Washington, DC  20062
(202) 463-5337
ktodd@uschamber.com
slehotsky@uschamber.com

*Counsel for* Amicus Curiae *Chamber of Commerce of the United States of America*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 5,368 words, excluding parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and 32(a)(6), respectively, because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 2007 in Times New Roman 14-point font.

/s/ Matthew S. Hellman
Matthew S. Hellman

## CERTIFICATE OF SERVICE

I certify that on April 4, 2014, I caused the foregoing **Brief of the Chamber of Commerce of the United States and California Employment Law Council as *Amici Curiae*** to be electronically filed via the Court's CM/ECF System.  All of the parties listed on the attorney service preference report have been served via the Court's CM/ECF system.

I further certify that I caused six (6) copies of the foregoing **Brief of the Chamber of Commerce of the United States and California Employment Law Council as *Amici Curiae*** to be delivered via overnight mail to the Clerk of the United States Court of Appeals for the Second Circuit.


/s/ Matthew S. Hellman
Matthew S. Hellman

26