# 13-4478-cv(L)

## United States Court of Appeals
## for the Second Circuit

ERIC GLATT, ALEXANDER FOOTMAN, EDEN ANTALIK, and
KANENE GRATTS, on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellees,*

v.

FOX SEARCHLIGHT PICTURES, INC., and
FOX ENTERTAINMENT GROUP, INC.,

*Defendants-Appellants.*

---

**BRIEF FOR *AMICI CURIAE* AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO,
COMMUNICATIONS WORKERS OF AMERICA, AFL-CIO, SERVICE
EMPLOYEES INTERNATIONAL UNION, AND UNITED FOOD AND
COMMERCIAL WORKERS INTERNATIONAL UNION, AFL-CIO,**

**IN SUPPORT OF PLAINTIFFS-APPELLEES' PETITION FOR
REHEARING AND REHEARING *EN BANC***

---

Matthew Stark Blumin
American Federation of State, County
and Municipal Employees, AFL-CIO
1101 17th Street NW, Suite 900
Washington, DC 20036
(202) 775 5900
Attorney for *Amici Curiae*

## <u>RULE 26.1 CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 29(c), *Amici Curiae* hereby provide the following disclosure statements:

**American Federation of State, County, and Municipal Employees, AFL-CIO ("AFSCME"),** is a non-profit labor union.

**Communications Workers of America, AFL-CIO ("CWA"),** is a non-profit labor union.

**Service Employees International Union ("SEIU")** is a non-profit labor union.

**United Food and Commercial Workers International Union, AFL-CIO ("UFCW"),** is a non-profit labor union.

*Amici* have no parent corporations, and no publicly-held corporation owns 10% or more of any *amici* organization's stock.

# **TABLE OF CONTENTS**

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ................................... i

TABLE OF CONTENTS ................................................................. ii

TABLE OF AUTHORITIES .............................................................. iii

STATEMENTS OF INTEREST OF *AMICI CURIAE* ........................................... 1

ARGUMENT ............................................................................ 2

I.   THE PRIMARY BENEFICIARY TEST FAILS TO ACCOUNT FOR THE BROAD DEFINITION OF "EMPLOYEE" UNDER THE FLSA, WHICH WAS DESIGNED TO BUTTRESS BARGAINING POWER AND SET A PRICE FLOOR FOR LABOR ………………………... 4

    A. Lack of Bargaining Power ………………………………………… 6

    B. Downward Pressure on Wages ……………………………………... 6

    C. *Portland Terminal* ………………………………………………... 7

II.  THE PRIMARY BENEFICIARY TEST WOULD SWELL THE RANKS OF AN UNDERCLASS OF WORKERS WHO LACK FEDERAL STATUTORY PROTECTIONS ………………………… 10

    A. Expanding the Number of Unpaid Workers Robs Workers of Other Federal Statutory Protections ……………………………………… 10

        1. Federal Antidiscrimination Statutes ………………… 10
        2. National Labor Relations Act ………………………... 11
        3. Occupational Health and Safety Act ………………… 12

    B. Denying These Federal Workplace Rights to More Unpaid Workers Would Strip Protection from Those Who Need It Most ………….. 13

CONCLUSION …………………………………………………………… 15

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Brooklyn Sav. Bank v. O'Neill*, 324 U.S. 697 (1945) ............................................. 6

*Brown v. Nationscredit Commercial Corp.*, 2000 WL 887593 (D. Conn. June 26, 2000) ............................................................................................................... 11

*Carter v. Duchess Cmty. Coll.*, 735 F.2d 8 (2d Cir. 1984) .................................. 5, 9

*Glatt v. Fox Searchlight Pictures, Inc.,* 791 F.3d 376 (2d Cir. 2015) ……… *passim*

*Gulino v. N.Y. State Educ. Dep't.*, 460 F.3d 361 (2d Cir. 2006) .......................... 11

*Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132 (2d. Cir. 1999) .............................. 5

*Irizarry v. Castimatidis,* 722 F.3d 99 (2d Cir. 2013) …………………………... 4

*Jones v. McKitterick*, 215 F.3d 1337 (10th Cir. 2000) (Unpublished) ................. 13

*Ling Nan Zheng v. Liberty Apparel Co.,* 355 F.3d 61 (2d. Cir. 2003) .............. 9-10

*O'Connor v. Davis*, 126 F.3d 112 (2d. Cir. 1997) .................................... 10-11, 14

*Pastor v. P'ship for Children's Rights,* 2012 WL 4503415 (E.D.N.Y. Sept. 28, 2012) ............................................................................................................... 11

*Tony and Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290 (1985) ................ 7

*United States v. Rosenwasser*, 323 U.S. 360 (1945) ........................................... 4-5

*Walling v. Portland Terminal*, 330 U.S. 148 (1947) ...................................... *passim*

*WBAI Pacifica Found.*, 328 NLRB No. 179 (1999) ............................................ 11

**Statutes**

29 U.S.C. § 151 ............................................................................................. 11-12

29 U.S.C. § 201 *et seq.* .................................................................. *passim*

29 U.S.C. § 174(1) ...................................................................... 11

29 U.S.C. § 621 *et seq.* ............................................................... 11

29 U.S.C. § 651 .......................................................................... 12

42 U.S.C. § 2000e *et seq.* ........................................................... 10

42 U.S.C. § 12101 *et seq.* .......................................................... 11

**Other Authorities**

81 Cong. Rec. 7657 ...................................................................... 5

*Amici Curiae* Economic Policy Institute Br., ECF No. 128 ……………………… 7

David C. Yamada, *The Employment Rights of Student Interns,* 35 CONN. L. REV. 215 (2002) ............................................................................... 14

DOL, Wage & Hour Div., Fact Sheet # 71, Internship Programs Under The Fair Labor Standards Act (April 2010), available at http://www.dol. gov/whd/regs/compliance/whdfs71.pdf ……............................................... 8

elaws-OSHA Recordkeeping Advisor, U.S. Dept. of Labor, available at http://webapps.dol.gov/elaws/osha/recordkeeping/05.aspx .................................. 13

Fed. R. App. P. 35 ………………………………………………………………... 2

Heidi Sherholz, *Six Years from Its Beginning, the Great Recession's Shadow Looms over the Labor Market*, ECONOMIC POLICY INSTITUTE, Jan. 9, 2014, available at http://www.epi.org/publication/years-beginning-great-recessionsshadow/ ............................................................................. 14

James Brudney, *Reflections on Group Action and the Law of the Workplace,* 74 TEX. L. REV. 1563 (1996) ........................................................... 14-15

## STATEMENTS OF INTEREST OF *AMICI CURIAE*[1]

*Amici* are labor unions dedicated to ensuring that all people who work receive the rewards they deserve for their work—decent paychecks and benefits, safe jobs, respect and fair treatment. As part of this mission, *amici* regularly advocate that the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA" or "the Act"), is interpreted and enforced consistent with its broad remedial nature.

*Amici* respectfully submit this brief pursuant to Rule of Appellate Procedure 29 and Local Rule 29.1. All parties have consented to participation by *amici*, who have nevertheless filed a motion for leave of court out of an abundance of caution.

*Amicus* the American Federation of State, County and Municipal Employees ("AFSCME") is a union of 1.6 million members in the United States and Puerto Rico, both in the public and private sectors, who share a commitment to service. AFSCME advocates for prosperity and opportunity for all working families.

*Amicus* the Communications Workers of America, AFL-CIO ("CWA"), is an international labor union representing more than 700,000 workers in the telecommunications, media, manufacturing, airlines and health care industries and in a wide variety of public sector positions in the United States, Canada and Puerto

---

[1] Neither party's counsel authored this brief, in whole or in part, nor did either party or party's counsel contribute money intended to fund the preparation or submission of the brief. No person, including *amici curiae,* their members, or their counsel contributed money that was intended to fund the preparation or submission of the brief.

Rico.  CWA is actively involved in representing, organizing, educating and mobilizing workers throughout the United States and abroad on issues of public concern, including workplace rights and other civil and human rights issues.

*Amicus* the Service Employees International Union ("SEIU") is an international labor union representing more than 2.2 million men and women in healthcare, property services, and public service employment in the United States, Canada and Puerto Rico.  SEIU advocates for workers on a diverse range of matters of concern in the workplace.

A*micus* the United Food and Commercial Workers International Union ("UFCW") is a labor organization of 1.3 million members representing workers across the United States in industries including poultry, meat packing and other food processing, retail food and non-food retail, hospitals, nursing homes, other healthcare, and the chemical industry.  UFCW organizes and represents workers and fights to broaden civil, labor, and human rights for all workers in the U.S.

## **ARGUMENT**

The panel opinion in this case strays far from clear Supreme Court guidance. In the process, it fundamentally undermines the important protections not only of the FLSA, but also of other federal statutes governing the workplace.  For these reasons, this case involves a question of exceptional importance that merits rehearing *en banc* under Federal Rule of Appellate Procedure 35(a)(2).

The FLSA is a remedial statute targeting the unlivable wages that can result from workers' lack of bargaining power vis-à-vis employers. It does so by establishing a wage floor in order to prevent competition-driven inhumane wages. Unlike many labor statutes, the FLSA explicitly defines the term "employee" to reach beyond the common law definition, in order to capture a large enough swath of the labor market to make the Act's remedy effective for society-at-large.

Unpaid internships like those at issue in this case – in which workers provide productive labor free-of-charge for the benefit of a for-profit corporation – provide a case-in-point of the mischief targeted by the FLSA. These workers have so little bargaining power that they are willing to accept so-called "internships" in which they perform the same work as regular employees, but for no pay. The FLSA's wage floor was designed to prevent this race to the bottom.

Nothing in the text or legislative history of the FLSA justifies this exploitation of labor. The Supreme Court's decision in *Walling v. Portland Terminal,* 330 U.S. 148 (1947), recognized as much when it created an exceedingly narrow exemption from FLSA coverage for trainees "whose work serves *only* [their] own interest" and provides no "immediate advantage" to the company providing their training. 330 U.S. at 153 (emphasis added).

Bending *Portland Terminal* unrecognizably out of shape, the panel opinion fashions out of whole cloth a "primary beneficiary" test to determine whether an

"intern" – a term that appears nowhere in the FLSA – is an employee under the Act based on who – the intern or the company – receives more "tangible and intangible benefits" from the internship. 791 F.3d at 383. This test has no basis in the FLSA, or in any Supreme Court or Second Circuit case law; is inherently subjective, so much so that it could be manipulated to exclude common-law employees; and does not even include among its "non-exhaustive set of considerations," *see id.* at 384, a *Portland Terminal* analysis of whether the employer received value from the work.

Furthermore, the primary beneficiary test adopted by the panel effectively denies a host of other federal statutory protections to struggling workers who desperately need them. This is because working for no pay – which the panel's employer-friendly test encourages – denies productive workers not only the wages they legally deserve, but also a slew of other federal statutory workplace rights – concerning sexual harassment, discrimination on the basis of race or gender, workplace safety, and collective bargaining – that apply only to wage earners.

I. **The Primary Beneficiary Test Fails to Account for the Broad Definition of "Employee" under the FLSA, Which Was Designed to Buttress Bargaining Power and Set a Price Floor for Labor**

The panel opinion neglects to mention even once that the definition of "employee" under the FLSA is – as this Court has consistently recognized in its decisions construing the Act – strikingly broad. *See, e.g., Irizarry v. Castimatidis,* 722 F.3d 99, 103 (2d Cir. 2013) (Wesley, J.). *See also United States v.*

*Rosenwasser,* 323 U.S. 360, 363 n.3 (1945) (FLSA definition of employee is "'the broadest definition that has ever been included in any one act.'" (quoting 81 Cong. Rec. 7657)). In determining whether workers are employees under this "expansive" definition, "the overarching concern is whether the alleged employer possessed the power to control the workers in question." *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) (citation omitted). Yet the panel opinion nowhere states that defendants lacked control over the Plaintiff interns, nor that employers tend to lack control over unpaid interns generally. To the contrary, the opinion makes clear that the Defendants exercised extensive control over the Plaintiff interns, extracting menial labor from them. 791 F.3d at 379-80.

"Above and beyond the plain language . . . the remedial nature of the statute further warrants an expansive interpretation of its provisions so that they will have 'the widest possible impact in the national economy.'" *Herman,* 172 F.3d at 139 (quoting *Carter v. Duchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984)). This "remedial purpose" includes improving workers' "bargaining strength vis-à-vis employers" as well as "the establishment of minimum standards in the workplace" in order to eliminate "unfair competition, not only among employers, but also among workers looking for jobs." *Carter,* 735 F.2d at 12-13 (citation omitted).

The need for FLSA coverage is thus at its apex where, as here, employers' superior bargaining power exerts downward pressure on wages all the way to zero.

For this reason, the Supreme Court in *Portland Terminal* fashioned a narrow exception to FLSA coverage only for cases where the employer receives no value for training a new worker. The primary beneficiary test ignores these teachings.

## A. Lack of Bargaining Power

Unpaid workers like the Plaintiffs in this case are not outside the broad coverage of the FLSA – they are its central target. The "prime purpose of the [FLSA] was to aid the unprotected, unorganized and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum subsistence wage*." Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 n.18 (1945) (summarizing legislative history).

It is undisputed that Plaintiffs, like millions of unpaid interns nationwide, undertook productive work for a corporation. That they lacked the bargaining power to secure a wage in exchange for their labor is self-evident. The "prime purpose" of the FLSA is to rectify that lack of bargaining power by maintaining a wage floor, not to sanction the power imbalance. But that is precisely the effect of the primary beneficiary test, which allows employers to profit from free labor so long as a judge finds that the intern got "intangible" value out of the relationship.

## B. Downward Pressure on Wages

Unpaid internships are a hallmark example of the race to the bottom in wages that results when, in the perceived absence of FLSA coverage, workers at

the lowest rungs of the labor market are forced to compete against one another to offer their services at the cheapest possible rate. As the District Court correctly held, the Plaintiff interns in this case performed work "that otherwise would have been done by a paid employee." SPA24-25. Had the Defendants hired paid employees for that work, the FLSA would have set a minimum wage for their labor. Instead, Defendants circumvented that wage floor by hiring Plaintiffs.

Such evasion – which the primary beneficiary test countenances – frustrates the purpose of the FLSA. Plagued by the Great Recession, young workers have rushed to accept unpaid work and displace paid employees, thus driving down wages for employees willing to do that work.[2] But as the Supreme Court has held, "the purposes of the Act require that it be applied even to those who would decline its protections" because making "exceptions to coverage" for them privileges employers' "superior bargaining power to coerce employees" to volunteer their labor for free and thereby "exert[s] a general downward pressure on wages." *Tony and Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 302 (1985).

### C. *Portland Terminal*

As demonstrated by the foregoing, there is nothing about the FLSA that suggests that a company should be allowed not to pay "interns" like the Plaintiffs for their productive work. The Supreme Court so recognized in *Portland Terminal*

---

[2]     See *Amici Curiae* Economic Policy Institute Br. 5-7, 12-17, ECF No. 128.

*v. Walling,* 330 U.S. 148 (1947), which held that a trainee who provides no "immediate advantage" to a company – there, a railroad that provided trainees "the same kind of instruction" as "courses in railroading" at a vocational school, which "actually impede[d] and retard[ed]" the company's business without displacing "any of the regular employees" – is not an employee under the FLSA because his "work serves *only* his own interest." 330 U.S. at 150, 152-53 (emphasis added).

The panel opinion pays lip service to *Portland Terminal,* but the test the panel promulgates empowers employers to withhold wages under precisely the circumstances that *Portland Terminal* sought to distinguish. Contrary to the panel's view that no "particular fact was essential to [*Portland Terminal's*] conclusion," 791 F.3d at 384, it is plain from the text of *Portland Terminal* that its holding hinged on the "finding" that the company there "receive[d] no 'immediate advantage' from any work done by the trainees." 330 U.S. at 642. Yet the panel's primary beneficiary test does not even include among its "set of considerations" an inquiry into the advantage received by the company. 791 F.3d at 384.

The panel's primary beneficiary test thereby eschews the outcome-determinative factors relied upon by the Supreme Court in *Portland Terminal* and enforced by DOL,[3] substituting an *ad hoc* analysis that asks whether an unpaid

---

[3]     *See* DOL, Wage & Hour Div., Fact Sheet # 71, Internship Programs Under The Fair Labor Standards Act (April 2010), available at http://www.dol.gov/whd/regs/compliance/whdfs71.pdf

worker matches the contemporary notion of an intern—a term nowhere mentioned in the FLSA, its legislative history, or *Portland Terminal*.  It thus runs directly counter to this Court's admonition in *Carter* that "courts should refrain from exempting a whole class of workers, based on technical labels, from coverage of the FLSA, because such action would have the potential for upsetting the desired equilibrium in the work force."  735 F.2d at 13 (FLSA can cover prisoners).

Worse, the panel's primary beneficiary test is not confineable to interns. The non-exhaustive factors set forth by the panel reference "training" (factor 2), "learning" (factor 5), and "educational benefits" (factor 6) received by the intern. 791 F.3d at 384.  Yet typical entry-level workers also derive training, learning, and educational benefits from their work.  In fact, many may value those benefits more than their employers value their services.  But that comparison is entirely subjective.  As the District Court recognized, these so-called "benefits" are "the results of simply having worked as any other employee works."  SPA26.  If these factors count, an internship may just be a run-of-the-mill job that doesn't pay.

As a result, the subjective "primary beneficiary test" could exclude from the FLSA workers who would otherwise meet the common-law test for employment, which focuses on "the formal right to control the physical performance of another's work."  *Ling Nan Zheng v. Liberty Apparel Co.,* 355 F.3d 61, 69 (2d Cir.

---

9

2003). But that result would conflict with this Court's conclusion in *Zheng* that courts should not apply a "narrow approach" to employee status that is "*more* rigid than the common-law approach." *Id.* at 69-70 (emphasis in original). To the contrary, the FLSA's definition of employee "encompasses 'working relationships which, prior to the FLSA, were not deemed to fall within an employer-employee category.'" *Id.* at 69 (quoting *Portland Terminal,* 330 U.S. at 150-51).

## II.    The Primary Beneficiary Test Would Swell the Ranks of an Underclass of Workers Who Lack Federal Statutory Protections

It should be beyond dispute that displacing the DOL's six-factor *Portland Terminal* test with the panel's primary beneficiary test will lead to a greater number of unpaid workers. As we now explain, increasing the number of unpaid workers also does violence to the broader scheme of federal workplace statutes.

### A. Expanding the Number of Unpaid Workers Robs Workers of Other Federal Statutory Protections

#### 1.  *Federal Antidiscrimination Statutes*

This Court has held that uncompensated workers are not employees under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* and therefore cannot bring suit for violations of their federal civil rights to be free from sexual harassment or discrimination on the basis of race or gender. The Court made this rule crystal clear in *O'Connor v. Davis,* holding that "economic remuneration or the promise thereof" is required for an employee to be covered by Title VII.

10

*O'Connor v. Davis*, 126 F.3d 112, 116 (2d Cir. 1997). "'Where no *financial benefit* is obtained by the purported employee from the employer, no plausible employment relationship of any sort can be said to exist'" for the purposes of Title VII. *Gulino v. N.Y. State Educ. Dep't,* 460 F.3d 361, 372 (2d Cir. 2006) (emphasis added) (quoting *O'Connor*, 126 F.3d at 115–16).

Courts in this Circuit have also applied the *O'Connor* rule to other federal antidiscrimination statutes, such as the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, and the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq. See, e.g., Pastor v. P'Ship for Children's Rights,* 2012 WL 4503415 (E.D.N.Y. Sept. 28, 2012) (ADA); *Brown v. Nationscredit Commercial Corp.,* 2000 WL 887593 (D. Conn. June 26, 2000) (ADEA).

2. *National Labor Relations Act*

The National Labor Relations Act ("NLRA") grants employees the right "to organize and bargain collectively" in order to ameliorate the "inequality of bargaining power between employees . . . and employers." 29 U.S.C. § 151.

The NLRA does not, however, cover "unpaid staff." *WBAI Pacifica Found.,* 328 NLRB No. 179 (1999). Denying productive workers like the Plaintiffs the right to a wage under the FLSA thus has the corollary effect of eliminating their right to collectively bargain *any* terms and conditions of employment, not just wages—including "hours and working conditions." *See* 29 U.S.C. § 174(1).

11

Furthermore, as the District Court held, the Plaintiffs performed "essential" work "that would have required paid employees." SPA25. By increasing the number of workers that for-profit employers can use cost-free, the primary beneficiary test will lead to more competition between paid staff and unpaid staff for the same work. This weakens the bargaining power of paid staff, forcing them to cede ground to employers in order to stave off the threat that they will be replaced with interns, especially during the "recurrent business depressions" whose effect on wages the NLRA was designed to mitigate. *See* 29 U.S.C. § 151.

In sum, more unpaid interns means more of the inequality in bargaining power that the NLRA targets—not just for interns, but for all workers.

### 3. *Occupational Health and Safety Act*

The Occupational Health and Safety Act ("OSHA") fosters "safe and healthful working conditions" by requiring that employers report workplace injuries and satisfy occupational safety and health standards. 29 U.S.C. § 651.

The Department of Labor, however, interprets OSHA as excluding unpaid interns. DOL has stated unequivocally that "an uncompensated intern or volunteer is NOT considered to be an employee under the OSH Act. Therefore, OSHA

Recordkeeping rules do NOT apply to unpaid interns or volunteers."[4]  *See also*

*Jones v. McKitterick*, 215 F.3d 1337 (10th Cir. 2000) (collecting cases).

By increasing the scope of unpaid jobs permitted under the FLSA, the primary beneficiary test would also decrease the number of workers whose injuries are reported or punished under OSHA.  This would make all employees less safe by failing to identify and mandate correction of dangerous workplace conditions. And the increased ranks of unpaid interns would not be protected from retaliation for complaining about unsafe conditions, which would discourage them from reporting problems at their worksites that affect everyone, including the public.

## B. Denying These Federal Workplace Rights to More Unpaid Workers Would Strip Protection from Those Who Need It Most

The increased number of workers who would lose FLSA coverage under the primary beneficiary test, and thereby lose the workplace protections described above, are precisely the vulnerable people those statutes were designed to protect.

The same biases that make antidiscrimination statutes necessary for ensuring equal employment rights also make minorities more likely to be forced to consider unpaid work.  Unsurprisingly, racial and ethnic minorities protected by Title VII

---

[4]     *See* elaws-OSHA Recordkeeping Advisor, U.S. Dept. of Labor, available at http://webapps.dol.gov/elaws/osha/recordkeeping/05.aspx

have suffered significantly more joblessness since the Great Recession.[5]

Unfortunately, the efforts of unemployed minority workers to reenter the labor

market via internships will be impeded by their lack of statutory protection against

unlawful bias in hiring. And, if hired, they will be vulnerable to discrimination

during their internships without protection by federal antidiscrimination statutes,

reproducing the unequal employment opportunities targeted by those statutes.

This problem is acute in the context of sexual harassment. Studies suggest

that interns are particularly vulnerable to sexual harassment. *See, e.g.,* David C.

Yamada, *The Employment Rights of Student Interns,* 35 Conn. L. Rev. 215, 219-20

(2002). Yet young women interns like the plaintiff in *O'Connor* – who was asked

by a male supervisor to "participate in an 'orgy'" on one occasion, and told to

"remove her clothing for preparation for a meeting with him" on another, 126 F.3d

at 114 – have no recourse under federal law. Quite the opposite, they are easy

targets for harassers looking for victims. The permissive primary beneficiary test

will only add to the number of women (and men) in this precarious position.

This workplace disenfranchisement will be accentuated by a lack of

collective bargaining rights. The FLSA and the NLRA were passed within three

years of one another, at the height of the New Deal, with the goal of leveling the

---

[5]    Heidi Sherholz, *Six Years from Its Beginning, the Great Recession's Shadow Looms over the Labor Market*, Economic Policy Institute, Jan. 9, 2014, available at http://www.epi.org/publication/years-beginning-great-recessions-shadow/

playing field between workers and employers by empowering workers to bargain under the NLRA while ensuring minimum wages under the FLSA to build upon through bargaining. *See* James Brudney, *Reflections on Group Action and the Law of the Workplace,* 74 Tex. L. Rev. 1563, 1569 n.27 (1996). Unpaid internships eliminate this tandem protection wholesale, leaving only self-help as an option.

The loss of each of the aforementioned federal rights – the right to equal employment opportunity, to be free from sexual harassment, to work in a safe environment, and to bargain collectively – is damaging enough, but the compound harm of removing all of them together is potentially devastating to those who most need legal protection. So many of the unpaid workers who would be swept into this underclass by the adoption of the primary beneficiary test are already struggling. Because "internships are widely supported by . . . employers looking to hire well-trained recent graduates," 791 F.3d at 382, college graduates are faced with a Hobson's choice: donate your productive labor to a for-profit company (and, for those of lesser means, work a second job on the side to make ends meet) and leave your other federal workplace rights at the door, or be left behind. The FLSA was designed to prevent employers from asking workers to make such choices, not to empower them to do so.

## **CONCLUSION**

For the foregoing reasons, the petition for rehearing should be granted.

Dated: August 21, 2015

Respectfully submitted,

/s/ Matthew Stark Blumin

Attorney for *Amici Curiae*

Matthew Stark Blumin
Associate General Counsel
American Federation of State, County
and Municipal Employees, AFL-CIO
1101 17th Street NW, Suite 900
Washington, DC 20036
(202) 775 5900

William Lurye
Judith Rivlin
American Federation of State, County
and Municipal Employees, AFL-CIO
1101 17th Street NW, Suite 900
Washington, DC 20036
(202) 775 5900

Jody Calemine
Communications Workers of
America, AFL-CIO
501 3rd Street NW, Suite 800
Washington, DC 20001
(202) 434 1213

Judith A. Scott
Nicole G. Berner
Service Employees International
Union
1800 Massachusetts Ave. NW
Washington, DC 20036
(202) 730 7455

Nicholas Clark
Renee L. Bowser
United Food and Commercial
Workers International Union, AFL-
CIO
1775 K Street NW
Washington, DC 20006
(202) 466 1593

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that pending this Court's permission to file a 15-page brief, this brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(d) and 32(a)(7)(B) because this brief contains 15 pages, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

I hereby certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in size 14 Times New Roman font.

DATED: August 21, 2015

<u>/s/ Matthew Stark Blumin</u>

Matthew Stark Blumin
Associate General Counsel
American Federation of State, County
and Municipal Employees, AFL-CIO
1101 17th Street NW, Suite 900
Washington, DC 20036
(202) 775 5900

Attorney for *Amici Curiae*

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 21, 2015, I electronically filed the foregoing *amicus* brief with the Clerk of the Court of the U.S. Court of Appeals for the Second Circuit by using the Appellate CM/ECF system. All participants are registered CM/ECF users and will be served by the Appellate CM/ECF system.

/s/ Matthew Stark Blumin

Matthew Stark Blumin
Associate General Counsel
American Federation of State, County
and Municipal Employees, AFL-CIO
1101 17th Street NW, Suite 900
Washington, DC 20036
(202) 775 5900

Attorney for *Amici Curiae*

## <u>RULE 32.1(b) ADDENDUM</u>

Pursuant to Fed. R. App. P. 32.1(b), appended hereto is a copy of the

decision in *Jones v. McKitterick*, 215 F.3d 1337 (10th Cir. 2000) (Unpublished).



215 F.3d 1337, 2000 WL 668061 (C.A.10 (Colo.)), 2000 CJ C.A.R. 2849
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 215 F.3d 1337, 2000 WL 668061 (C.A.10 (Colo.)))**

C

NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. See CTA 10 Rule 32.1 before citing.)

United States Court of Appeals, Tenth Circuit.
Daniel K. **JONES** and Tracy L. **Jones**, Plaintiffs-Appellants,
v.
Monte McKITTERICK, Defendant-Appellee.

No. 99-1043.
May 23, 2000.

Before MURPHY and McWILLIAMS, Circuit Judges, and ROGERS, Senior District Judge.[FN**]

> FN** The Honorable Richard D. Rogers, Senior United States District Judge for the District of Kansas, sitting by designation.

ORDER AND JUDGMENT [FN*]

> FN* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir.R. 36.3.

ROGERS.

**\*1** This is a personal injury action where there is diversity jurisdiction. This appeal was filed following a jury verdict for the defendant. Plaintiffs, Daniel **Jones** and his wife Tracy **Jones**, present five issues for review. Upon due consideration, the court shall affirm the judgment of the district court.

Daniel **Jones** was injured while hammering a nail into a joist hanger at defendant's home addition construction site. A nail he struck ricocheted and damaged **Jones**' left eye. **Jones** was not wearing eye protection at the time. **Jones** had not worked on a construction site before. He was in the military but scheduled to get out in some months. He asked to work on the home addition project to get some experience or training in the construction trade. He was not paid.

When he was injured **Jones** was above an open garage door on the joist hangers he was nailing. Beforehand, defendant had tacked nails into the joist hangers. **Jones**' job was to "nail off" the joist hangers. In other words, he finished hammering the nails into the hangers.

Plaintiffs alleged negligence on the grounds that defendant did not provide **Jones** eye protection or warn him of the dangers of hammering nails without eye protection. However, prior to trial, the district court granted a motion in limine which excluded any testimony about OSHA eye protection regulations from a witness plaintiffs had endorsed as an expert. Plaintiffs also alleged that defendant negligently failed to instruct **Jones** regarding how to safely position himself to drive a nail.

At trial, plaintiffs argued that the injury occurred because, unbeknownst to **Jones**, defendant had broken a nail in the joist hanger and, when **Jones** tried to hammer a new nail into the hole, it struck the broken nail and ricocheted into his eye. Defendant asserted that the injury occurred because **Jones** mishit and bent back a nail which caused it to weaken and break when **Jones** tried to hammer the nail again.

Add-1

215 F.3d 1337, 2000 WL 668061 (C.A.10 (Colo.)), 2000 CJ C.A.R. 2849
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 215 F.3d 1337, 2000 WL 668061 (C.A.10 (Colo.)))**

*Voir dire*

The first two issues raised by plaintiffs on appeal concern voir dire. First, plaintiffs contend that a new trial should be ordered because the trial judge told the jury during voir dire that the State Farm Insurance Company was "not a party to this case." The comment was made in the following context:

THE COURT: Okay. Do any of you have any interests, stock, shareholder, or other interest in State Farm Insurance Company? Okay.

PROSPECTIVE JUROR DEWIRE: Excuse me.

THE COURT: Yes, ma'am.

PROSPECTIVE JUROR DEWIRE: My parents are in a lawsuit right now with State Farm. I don't know whether that will affect anything. It was an accident case.

THE COURT: How does that make you feel sitting here today in view of the spirit in which these questions are asked of you?

PROSPECTIVE JUROR DEWIRE: I would try to be as truthful as I could be, but I can't help but see what they have gone through and the feeling that they've had. That's something I cannot help.

THE COURT: Do you feel that this really-well, you know, we can't look into your mind. And I've tried to set the spirit of what we're after here, and I appreciate your bringing this to our attention. So I guess we're going to kind of need to trust you on this as to whether you would be comfortable serving as a judge of the facts in this particular case.

**\*2** PROSPECTIVE JUROR DEWIRE: It honestly just depends on how much the insurance company is involved.

THE COURT: Well, they're not-you know they're not a party to this case.

PROSPECTIVE JUROR DEWIRE: They are not?

THE COURT: No.

PROSPECTIVE JUROR DEWIRE: Okay. Then that would make a difference.

THE COURT: Okay. I mean the parties are Daniel K. **Jones** and Tracy L. **Jones**, Plaintiffs, versus Monte McKitterick, Defendant. Okay?

PROSPECTIVE JUROR DEWIRE: Okay.

App. at 220-222.

The question regarding State Farm was made at plaintiffs' request presumably because State Farm *was* involved in the defense of this case, although it was not a party. The prospective juror who responded to the question was not selected to hear the case.

Plaintiffs assert that the comment of the court violates the rule in Colorado that "during the actual trial of a case, it is improper to mention insurance in either a positive or negative manner." *Liber v. Flor,* 415 P.2d 332, 339 (Colo.1966). See also, *Bonser v. Shainholtz,* 983 P.2d 162 (Colo.App.1999) (error to admit evidence of commonality of liability insurance to show bias of a witness).

In this instance, the trial court's statement did not admit or deny the presence of insurance in the case. The statement only denied the presence of *one* insurance company as a party in the case. Contrary to plaintiffs' claim, the trial court did not say there was no insurance. Moreover, plaintiffs engage in sheer speculation when they assert that the trial court's statement

215 F.3d 1337, 2000 WL 668061 (C.A.10 (Colo.)), 2000 CJ C.A.R. 2849
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 215 F.3d 1337, 2000 WL 668061 (C.A.10 (Colo.)))**

limited the jury from responding to the question regarding "interests" in State Farm. Therefore, the trial court's statement regarding State Farm does not provide grounds for ordering a new trial.

Plaintiffs' second issue related to voir dire also concerns the question asking whether the prospective jurors were stockholders or had "any interest" in the State Farm Insurance Company. Plaintiffs assert that two jurors gave false answers to this question because they failed to state that they were State Farm policyholders. Plaintiffs further assert that as policyholders these jurors were entitled to rebates from the company and that both jurors had been involved in automobile accidents while insured with State Farm.

Whether these allegations warrant a new trial is governed by the standard set forth in *McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548, 556 (1984): "To obtain a new trial ... a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." Neither part of the standard has been satisfied in this case. The jurors could have honestly believed that holding a State Farm policy was not the same as having an "interest" in the company. In addition, this information by itself would not have provided a sufficient basis to excuse a juror for cause. See *Oglesby v. Conger,* 507 P.2d 883, 885 (Colo.App.1972); see also, *Nathan v. Boeing Co.,* 116 F.3d 422, 425 (9th Cir.1997) (employee of defendant may serve on employment discrimination jury); *Vasey v. Martin-Marietta Corp.,* 29 F.3d 1460, 1466-68 (10th Cir.1994) (employee of consultant for defendant may serve on jury); *Ramirez v. IBP, Inc.,* 938 F.Supp. 735 (D.Kan .1996) *aff'd,* 131 F.3d 152 (10th Cir.1997) (table) (employee of company that did business with defendant may serve on jury). For these reasons, plaintiffs' second grounds on appeal must be rejected.

*Surprise exhibits*
**\*3** Plaintiffs' third contention on appeal is that

they were unfairly prejudiced by defendant's use of undisclosed "exhibits" during the trial. The only exhibits to which plaintiffs make specific reference are a joist hanger and a bag of nails. The hanger was admitted only as a demonstrative exhibit.

The trial record contains no objection to these exhibits from plaintiffs. Rule 103 of the Federal Rules of Evidence provides that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected" and "[i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears on record, stating the specific ground of the objection if the ground was not apparent from the context." In light of plaintiffs' failure to make a proper and timely objection at trial and the substantial discretion afforded trial judges in making evidentiary decisions, the court shall reject plaintiffs' third argument on appeal. See *Sorensen v. City of Aurora,* 984 F.2d 349, 355 (10th Cir.1993).

*OSHA regulations*
Plaintiffs next challenge the decision of the trial court to exclude expert testimony on OSHA eye protection regulations. The trial court, in an oral ruling, found that the regulations were not applicable because: there was no employer/employee relationship between defendant and Daniel **Jones**; application would affect or enlarge the common law duties of employers contrary to 29 U.S.C. § 653(b)(4); and their own definition excluded their application. App. at 111.

We find no error in the analysis of the trial court. Because there was no employer/employee relationship between Daniel **Jones** and defendant, OSHA regulations do not directly apply and should not be considered under Colorado law. *Auxier v. Auxier,* 843 P.2d 93, 95-96 (Colo.App.1992); see also, *Lynch v. Reed,* 944 P.2d 218, 223-24 (Mont.1997); *Kerker v. Elbert,* 634 N.E.2d 482, 486 (Ill.App.1994) (no duty owed under OSHA to volunteer laborers). In addition, if an employer/employee relationship did exist, defendant

215 F.3d 1337, 2000 WL 668061 (C.A.10 (Colo.)), 2000 CJ C.A.R. 2849

**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 215 F.3d 1337, 2000 WL 668061 (C.A.10 (Colo.)))**

does not qualify as an "employer" under OSHA, i.e., a person "engaged in a business affecting commerce." 29 U.S.C. § 652(5); see *Dekle v. Todd,* 207 S.E.2d 654, 656 (Ga.App.1974) (repairing roof on employer's farm was not being "engaged in a business affecting commerce").

    Accordingly, we reject plaintiffs' fourth argument on appeal.

*Weight of the evidence*

    Finally, plaintiffs contend that the jury verdict was against the weight of the evidence. "A motion for a new trial made on the ground that the verdict of the jury is against the weight of the evidence normally presents a question of fact and not of law and is addressed to the discretion of the trial court." *Richardson v. City of Albuquerque,* 857 F.2d 727, 730 (10th Cir.1988). Our standard of review on such matters is whether the denial of the motion for new trial was "a manifest abuse of discretion." *Id.* We must determine "whether the verdict is clearly, decidedly or overwhelmingly against the weight of the evidence." *Getter v. Wal-Mart Stores, Inc.,* 66 F.3d 1119, 1125 (10th Cir.1995) *cert. denied,* 516 U.S. 1146 (1996). Here, our review of the trial record reveals substantial evidence to support the jury's verdict. The record indicates uncertainty by Daniel **Jones** as to the cause of his injury. Moreover, the jury was entitled to credit the testimony of defendant's expert over the evidence and testimony presented by plaintiffs. The verdict was not clearly, decidedly, or overwhelmingly against the evidence. We therefore find no abuse of discretion in the district court's denial of plaintiffs' motion for a new trial.

    **\*4** In conclusion, we find that a new trial is not warranted by the arguments presented on appeal and that the jury verdict is not contrary to the clear weight of the evidence.

    Therefore, we affirm the judgment of the trial court.

C.A.10 (Colo.),2000.
Jones v. McKitterick
215 F.3d 1337, 2000 WL 668061 (C.A.10 (Colo.), 2000 CJ C.A.R. 2849

END OF DOCUMENT

Add-4