# 13-4478-cv

IN THE

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

ERIC GLATT, ALEXANDER FOOTMAN, EDEN ANTALIK, and
KANENE GRATTS, on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellees,*

-against-

FOX SEARCHLIGHT PICTURES, INC., and
FOX ENTERTAINMENT GROUP, INC.,

*Defendants-Appellants.*

**BRIEF *AMICUS CURIAE* BY PROFESSORS AND EDUCATORS SCOTT MOSS, DAVID C. YAMADA, JEFF YATES, GREG RIESTENBERG, ANTONIO C. CUYLER, KERRI STONE, AND VICTORIA PYNCHON**

**IN SUPPORT OF PLAINTIFFS—APPELLEES' PETITION FOR REHEARING**

Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue, 10th Floor
New York, NY 10020
(212) 763-5000

*Attorneys for* Amici Curiae *Professors and Educators*

# **TABLE OF CONTENTS**

STATEMENT OF INTEREST OF AMICI.................................................................1

STATEMENTS OF AMICI.....................................................................................2

    A.    Scott Moss, Professor of Law, University of Colorado Law School....2

    B.    David C. Yamada, Professor of Law and Director, New Workplace Institute, Suffolk University Law School...............................................5

    C.    Jeff Yates, Professor of Political Science, Binghamton University....10

    D.    Greg Riestenberg, Adjunct Design Instructor, and Former Full-Time Design Instructor, Kean University......................................................12

    E.    Antonio C. Cuyler, Assistant Professor of Arts Administration and Coordinator of Internships, Department of Art Education, Florida State University ...................................................................................15

    F.    Kerri Stone, Professor of Law, Florida International University College of Law ....................................................................................18

    G.    Victoria Pynchon, Adjunct and Assistant Professor, California State University in Northridge, and Author and Consultant on Negotiation ...............................................................................................................20

CONCLUSION .....................................................................................................24

Pursuant to Fed. R. App. P. 29, professors and educators Scott Moss, David C. Yamada, Jeff Yates, Greg Riestenberg, Antonio C. Cuyler, Kerri Stone, and Victoria Pynchon submit this brief as amici curiae, in support of Plaintiffs-Appellants' petition for rehearing and rehearing *en banc* of the panel's July 2, 2015 decisions.[1]

## STATEMENT OF INTEREST OF AMICI

Amici are seven professors and educators, each of whom has direct experience advising and placing student interns, supervising internship programs and individual interns, participating in internships, and advising institutions on their own internship programs. They seek to offer this Court their first-hand professional and academic experience of the effects that paid and unpaid internships have on students and professionals in their field. Each section is a different educator's account, providing specific, on-the-ground perspectives from varied roles, disciplines, and experiences. Amici participate in this case in their personal capacities; titles are used only for purposes of identification:

**Scott Moss**, Professor of Law, University of Colorado Law School

**David C. Yamada**, Professor of Law and Director, New Workplace Institute, Suffolk University Law School

**Jeff Yates**, Professor of Political Science, Binghamton University

---

[1] Pursuant to Fed. R. App. P. 29(c)(5) and Local Rule 29.1(b), amici confirm that no party or its counsel, and no third party other than amici and their counsel, authored this brief in whole or in part or contributed money that was intended to fund preparing or submitting the brief.

1

**Greg Riestenberg**, Adjunct Design Instructor and Former Full-Time Design Instructor, Kean University

**Antonio C. Cuyler**, Assistant Professor of Arts Administration and Coordinator of Internships, Department of Art Education, Florida State University

**Kerri Stone**, Professor of Law, Florida International University College of Law

**Victoria Pynchon**, Adjunct and Assistant Professor, California State University in Northridge, and Author and Consultant on Negotiation

## STATEMENTS OF AMICI

### A. Scott Moss, Professor of Law, University of Colorado Law School

A law professor since 2004, for several years I have been Chair of the Admissions and Career Services Committee at the University of Colorado Law School ("CU"). I have recommended and helped place dozens of students in jobs— part-time school-year work, summer jobs, and post-graduation jobs—at schools in two states (CU, and previously Marquette University Law School). My law school does not sponsor or permit for-credit unpaid internships, but it used to, and I still work with employers seeking paid and unpaid interns. I have employed numerous students and graduates on a part-time, hourly-paid basis for cases I litigate as co-counsel in Colorado and New York. Among my courses are a pretrial litigation simulation course in which students draft complaints, discovery, and motions. I thus have broad experience with the law job market and with mentoring law students as they learn new skills inside and outside the classroom. From this

2

experience, I offer several points relevant to (a) whether and in what circumstances students working for private-practice lawyers are more like employees warranting pay or, instead, are justifiably unpaid mentees, and (b) what factors, among those identified by the court and the parties, are or are not material to interns' status.

First, experience corroborates the basic labor economics point that when free labor is available, employers will not pay for labor. In law, unpaid internships definitely detract from paid work opportunities. Employers with whom I have relationships will not hire paid students because other schools provide unpaid student interns for up to full-time work. When unpaid interns divert employers from paid work, students and new law graduates alike lose paid work. While top law graduates win elite full-time jobs, many graduates work as "contract attorneys" paid $15-$35 hourly for the same tasks law students do: research, drafting, editing, reviewing discovery, and accompanying lawyers to hearings, depositions, and other events where students learn while serving as a sounding board and tracking documents (as a paralegal would, absent unpaid labor). Because paid students, unpaid interns, and new graduates seeking contract work participate in an overlapping labor pool, free labor detracts from paid work.

Second, a lack of clarity in a multi-factor test creates easily-abused ambiguity. When firms decline offers of paid student or new graduate labor because they use unpaid interns, they decline across the board, assigning unpaid

interns *all* work they could assign students; tellingly, they do not segregate "work-like" paid tasks from "intern-like" unpaid tasks. Instead, anything that *can* be assigned to unpaid interns *is*. The lack of fear of judicial inquiry into unpaid labor is striking. For example, when told in a CLE event that the federal Department of Labor's six-part test called into doubt an across-the-board practice of employing all students without pay, one law firm partner exclaimed, in front of dozens of lawyers and students: "Screw the Department of Labor!"

Third, certain factors suggested as distinguishing unpaid interns from employees have little to no relevance. Whether work hours accommodate student schedules has been identified as characterizing unpaid internships—but paid and unpaid students alike must work around their courses. Unless literally all work by students is deemed unpaid, from coffee-making to research, the fact that employers accommodate student schedules does not help distinguish paid from unpaid work.

Fourth, as an employer and a teacher of legal skills, I see little difference in educational value based on paid or unpaid status. Internships at firms are not inherently different from paid work, and neither markedly differs from paid post-graduation work. Any responsible employer teaches new paid employees a great deal, and any new paid employee has a great deal to learn. I see no distinction in learning quality based on paid versus unpaid status; students do much the same work. The presence of a learning benefit thus is no dispositive factor distinguishing

4

unpaid and paid work; all junior or apprentice-level employees, paid or unpaid, benefit from learning the industry, job, and the skills required for the job.

Fifth, law internships, typically for academic credit, consist of substantive work employers assign because they want the work done. Students often are less efficient than new associates, who are less efficient than senior associates—but that simply justifies the far lower $15-35 student pay rate. Conceivably there could be law internships akin to "take your daughter to work day," with students doing no work employers need done, just observing and seeking mentoring – but I have yet to see such an actual law firm internship, likely because such a non-substantive internship would fail ABA and law school expectations of substantive work for academic credit. Thus, the fact that the employer benefits less from student labor than from experienced labor justifies lower pay—but unless all junior labor is exempted from the minimum wage, it cannot justify complete absence of pay.

## B. David C. Yamada, Professor of Law and Director, New Workplace Institute, Suffolk University Law School[2]

Whether interns should be paid under minimum wage laws should be considered in the context of the vast expansion of the so-called intern economy over some 30 years, during which employers have become increasingly unwilling to

---

[2] Professor Yamada's statement is drawn largely from two law review articles, David C. Yamada, *The Employment Law Rights of Student Interns,* 35 CONNECTICUT LAW REVIEW 215 (2002); and David C. Yamada, *The Legal and Social Movement Against Unpaid Internships*, __ NORTHEASTERN UNIVERSITY LAW JOURNAL __ (forthcoming).

5

invest in training entry-level employees. This has dovetailed with sharp tuition increases, relative declines in grant and scholarship monies, and vast increases in student loan debt. Increasingly, those attempting to get their starts in life are finding the costs of doing so frontloaded upon them. Unpaid internships add to those burdens and are more likely to exclude those who cannot afford working for free.

The slippery slope of unpaid internships is already extending in two directions. Whereas internships were once largely confined to graduate level professional programs, they now are staples for undergraduates as well. Even more alarming is the expansion of unpaid internships into the post-graduate stage, sometimes dressed up under the label of full-time "non-stipendiary fellowships."

Defenders of unpaid internships are advantaged and powerful, and they come at this from several directions. One argument offers a chiding defense of unpaid internships, grounded in the spirit that *hey, it worked for me, so it should work for you.* In 2013, the managing editor of a popular human resources magazine reacted to the District Court's decision in this case by waxing nostalgic about his own unpaid internship experience and recommending a change in the laws:

> So sure, pay your intern, or at least hand over a stipend; it's the right thing to do. Yet with managers complaining that college grads are ill-prepared for the rigors of a daily job, unpaid internships can offer basic training for young workers they couldn't get anywhere else. Instead of letting the *Black Swan* ruling kill off a truly valuable training tool, let's revisit the laws governing all internships.[3]

---

[3] Rick Bell, *The Last Word: In Defense of Unpaid Internships*, WORKFORCE (July 2, 2013),

This kind of soggy remembrance combines with the dubious assumption that unpaid internships are mostly about "training" and less about work. It also raises questions about whether these sentimental defenders of unpaid internships confronted the same personal financial and job market pressures as today's students and graduates. While defending this oft-exploitative practice, they ignore the obvious reality that one easy way to create jobs is to pay people for their work.

A second defense of unpaid internships carries a more ridiculing tone toward those who challenge the practice. In 2011, CNN program host Anderson Cooper, son of heiress Gloria Vanderbilt, took to the airwaves to savage this lawsuit.[4] He said, "Would it be great if all unpaid internships paid really well? Sure, it also would be great if my dog made breakfast for me every morning, but I'm not going to file a lawsuit over it."[5] His dismissive tone reflected a common criticism that lowly interns seeking minimum wages are acting in an entitled manner.

A third defense comes from the higher education industry. In 2010, 13 university presidents wrote to the U.S. Secretary of Labor, urging that the DOL "reconsider undertaking the regulation of internships," which have proven to be

---

http://www.workforce.com/articles/the-last-word-in-defense-of-unpaid-internships.

[4] Anderson Cooper, *The RidicuList: Unpaid Interns*, ANDERSON COOPER 360 (Sept. 29, 2011), http://ac360.blogs.cnn.com/2011/09/29/the-ridiculist-unpaid-interns/.

[5] *Id.* (quote comes at approximately the 40-second mark of the online recording).

"valuable and sought-after opportunities for American college students."[6] Perhaps the most outrageous statement in the letter is this characterization: "Some internships are paid and some, on a mutually agreed upon basis, are uncompensated."[7] The letter suggests that students have a degree of choice over whether they are paid, perhaps even implying that some opt against compensation.

Indeed, the higher education industry has put itself in a bind. Having raised tuition to levels necessitating heavy student loan debt for all but the most fortunate, it feels enormous pressure to deliver programs maximizing employability in an era of job scarcity. The unpaid internship, either offered for credit or facilitated by a school's career office, becomes a featured component of an easy supposed fix. The university becomes, in essence, an internship broker paid with tuition dollars.

Against this backdrop, the Court's "primary beneficiary" test gives the label of intern an unwarranted legal meaning and distracts from the fundamental concept of paying for work. The test regards training, experience, and networking—normal by-products of just about any job—as replacements for income. Simply by pasting "intern" on what otherwise might be considered a part-time, summer, or post-graduate entry-level job, an employer now can take its chances and make the position

---

[6] Letter from the presidents of Ne. Univ., Bos. Univ., Montclair State Univ., Claremont McKenna Coll., Gannon Univ., Drake Univ., Roosevelt Univ., Univ. of S.F., Univ. of Wis. Sys., N.Y. Univ., S. Methodist Univ., N. Mich. Univ., & Univ. of Cal. to the Hon. Hilda L. Solis (Apr. 28, 2010), *available at* http://s1.epi.org/files/page/-/pdf/20100428_univ_presidents_letter_to_USDOL.pdf.

[7] *Id.*

unpaid, claiming that intangible benefits to the intern exceed the benefits provided to the employer by the intern's labor. The intern is left in the unenviable posture of either accepting what are likely to be unilaterally imposed terms or challenging the unpaid status and thus jeopardizing her future career.

The Court's conceptualization of the primary beneficiary test largely dismisses the major benefits of internships to employers and educational institutions. First, internship programs let employers train, mentor, and evaluate the next generation in a profession, as well as gain tangible work contributions. Second, as suggested above, colleges and universities benefit by being able to incorporate internships into degree programs, thus enhancing their marketability to prospective applicants while, in many cases, charging full tuition for student time spent in internships.

The DOL's six-part test, especially if read conjunctively, keeps the proper focus on work rendered. If the DOL test is to be set aside, then it should be replaced by a narrower standard ensuring that interns are paid for the time they work, like any other employee. Furthermore, they should be paid for on-the-job training and instruction normally devoted to preparing entry-level employees to perform work for the host entity. The label or title of the position should be irrelevant, whether it be "intern," "office clerk," "program assistant," or any other designation.

This case presents far-reaching implications concerning definitions of employee status, the labor market, and the relationship between education, on-the-

job training, and employment. The unwieldy primary beneficiary test overlooks the realities of modern internships and gives the label of intern unwarranted legal status. For these reasons and others, *en banc* review is proper.

### C. Jeff Yates, Professor of Political Science, Binghamton University

As a Ph.D./J.D., I have worked in academia since 1997, primarily in political science. I have also worked as a visiting professor at two law schools. I began my career as an assistant professor at the University of Georgia and now work at Binghamton University as a professor of political science. I regularly have supervised student internships as part of a very structured program and have also directed internships on a less formal, individual basis. I have also talked extensively with students about their work experiences, paid and unpaid.

In supervising students in a structured program (40+ hours per week in addition to academic assignments), I repeatedly found that students from lower socio-economic backgrounds and non-traditional students (older students, often with families) were disadvantaged. They needed to earn living expenses from work (20+ hours/week) in addition to already taxing unpaid internships. This took a toll on their academic and internship performance. More well-to-do students could invest all their energy in internships and academics. Thus they did better, on average, and were often rewarded with higher grades and offers of permanent employment. Paid internships would not promote such disparities.

The inequities between "haves" and "have-nots" are even more pronounced in less formal internships set up by students themselves. First, more well-to-do students have extensive social/professional contacts via their parents and land better internships. While this phenomenon does not necessarily turn on the paid/unpaid distinction, it is likely that if firms, businesses, and government organizations were required to pay interns, they might be more inclined to post formal job notices to get the best applicants from a broader pool. When interns are costless, informal arrangements with fellow elites becomes much easier and are encouraged. Further, many students from lower socio-economic backgrounds simply cannot afford unpaid internships; they need to earn money to make ends meet. Of course, the absence of such experience comes to bear later when they apply for paying jobs against their better-off counterparts, whose resumes list extensive, often unpaid, experiences. In sum, unpaid internships exacerbate income inequality by making the well-to-do more "hireable" than their lower socio-economic competitors. Thus, privilege becomes merit.

There is also a good amount of overlap regarding the "benefiting employer vs. benefiting intern" consideration with paid and unpaid positions. I received training in even fast-food and grocery jobs during high school and college. Employers taught me how to perform certain tasks (*e.g.*, operating the cash register, cleaning methods, cooking methods) that I later leveraged to gain similar

employment. Similarly, when I talk with students in paid positions in business or law, they discuss how they received training; of course, their work also benefits the employer. Such is also the case with unpaid internships: Almost all involve a mix of hours spent benefiting the intern and benefitting the employer. It is nearly impossible to parse these two concerns. Thus, paid and unpaid work often overlap and it is very hard to determine who benefits in a given scenario.

Similarly, many firms, businesses, and government entities use internships extensively for recruiting and applicant selection. Employers essentially get a "try before you buy" probation period to evaluate interns. Of course, this benefits the employer greatly, as they do not have to pay for what is essentially a probationary employee. They should pay for this evaluation opportunity.

### D. Greg Riestenberg, Adjunct Design Instructor, and Former Full-Time Design Instructor, Kean University

I am a designer, an educator, and an alumnus of the cooperative education system at the University of Cincinnati. For three years as a student, I alternated between semesters of full-time classes and full-time professional practice as an integral part of my undergraduate design program. As an intern, or "co-op," I received hourly pay. I was learning a lot as any beginning team member does, but also completing tasks expected of any professional designer: concept sketching, design intent drawings, press checks, and even participation in client and consultant meetings. The hourly wage was simply expected, as my employers were

12

billing clients for projects I worked on. My work allowed me to work in several cities, and cover basic costs of living while I was learning about my profession and contributing my time and labor to my employers. Yet some of my contemporaries in graduate school were doing the same kind of work for no compensation, as unpaid interns. Not only that, but they were in many cases paying the university for the "opportunity" to donate their labor to an employer.

More recently, I have worked as a design instructor at Kean University in New Jersey. In spring 2015, I oversaw a student internship at a local online retail company. We agreed on a set of goals and expectations for the intern, and that she would check in with me periodically. To my dismay, she received no pay. Her responsibilities included editing product photography with Adobe Photoshop and formatting images for the company's website. These are common tasks for any professional graphic designer, and had she not been there, the company would have had to hire a freelance designer (at rates anywhere between $30-$60 an hour) or had its full-time designer spend time on this work.

I was paid by the university for less than one teaching credit for my role as advisor to this student. For my part this was fair; it only took up several hours a month. However, the student paid the university for three academic credits in order to participate in this internship. Neither the employer nor the school offered much of anything in the way of academic guidance, yet she was paying for the equivalent

13

of an average college course and providing the employer with free labor. She expressed frustration with the situation, but because she needed credits to graduate, she completed the semester without bringing any grievances.

This was my most personal experience observing an unpaid internship as an educator, but I can say with certainty that this student's situation was not unique. Many students are not paid for work as interns, and many employers and administrators tell students they can work without pay "for school credit."

What troubles me the most is how many professionals, educators, and students consider this practice part of "paying your dues," when clearly my own and many others' experiences demonstrate otherwise. The unpaid interns I have met do the same work I was paid for as an undergraduate, and in many cases the same work I do now as an experienced professional. Many universities are complicit, deriving revenue from their perceived ability to offer free or underpaid labor to employers looking to avoid legal obligations to pay employees.

The Court's ruling seems to assume most internships are primarily academic experiences coordinated closely with university programs. After over a decade in design practice, as an intern, a full-time employee, educator, and freelancer, I have learned that my experience in a truly effective and mutually beneficial co-op education program was the exception. Haphazard programs, such as those offered by my graduate school colleagues and the one I oversaw as an instructor, are much

more reflective of the intern economy in 2015.

### E. Antonio C. Cuyler, Assistant Professor of Arts Administration and Coordinator of Internships, Department of Art Education, Florida State University

In addition to assisting the career development of graduate and undergraduate arts administration/management students at colleges and universities in Georgia, Florida, New York, and Washington, DC, I have advised cultural (arts) organizations hosting interns on improving internship programs. I have also directly supervised graduate assistants. In addition, my research aims to enhance the conceptualization, design, implementation, management, and planning of internship programs in the cultural sector. Serving as a faculty member for over seven years has afforded me the opportunity to encounter four observations the court may find relevant to the legality of unpaid internships.

In the cultural sector, too many host organizations do not distinguish graduate and undergraduate students. Yet graduate students have a degree and typically more professional experience than their undergraduate counterparts. Thus, they should receive compensation because they can function rather quickly as a contributing member of the organization. In my own research, I have discovered that undergraduate students require a completely different orientation to work. Whether legally or not, many do not believe they can expect compensation when offered unpaid internships. They do, however, expect and want a meaningful

15

internship experience that will grow their professional networks because they pay tuition to complete their degrees programs.

An often-cited myth I hear from cultural organizations is that because interns earn academic credit, they are exempt from pay. However, having to pay tuition to complete an unpaid internship disadvantages students, especially those from lower socio-economic statuses. Taken with rising student loan debt, unpaid internships triply disadvantage students. This issue is worse if the organization has not adopted proven best practices for a successful internship program.

Because too many cultural organizations operate in "crisis mode," they rarely take the time to assess their readiness to host interns. During the Great Recession, some organizations contacted me seeking interns without mindfully thinking about what interns would do. In addition, many do not appear to consider implementable best practices that would ensure their program display the characteristics of a successful internship program. In other words, their programs are not recruitment-oriented, displaying continuity from year to year, with support from top management, an effective program design, and an effective intern-to-full-time conversion process. Nor are they organized and managed by well-trained professionals, undergoing continuous evaluation and improvement, and using a good selection process to recruit high-caliber interns. Given these known attributes of successful internship programs, the Court should ask whether a test that broadly

permits unpaid internships will improve or worsen the problem of many unpaid internships offering little educationally, as the plaintiffs allege.

Recent research by the Strategic Arts Alumni Project (SNAAP) found that the number of paid and unpaid internships in the arts has risen respectively by 26% and 39% since before 1983. In arts administration/management, a field that typically requires students to complete an internship to attain a degree, only 59% of alumni reported completing a paid internship versus the 87% who completed an unpaid internship. Nevertheless, the data is clear that the career prospects after graduation are better for students who complete paid internships versus unpaid internships. This is because organizations that pay their interns require more from them and thus offer a true educational experience.

In sum, if the educational value and benefit to interns is in question, the Court should know that I have never asked students or graduate assistants to maintain takeout menus or other menial tasks. However, I have demanded critical and creative thinking, the ability to work with others, professionalism, and strong oral and written communication. I have also committed to providing the mentorship and supervision required to ensure students achieve these outcomes. Internships that help students refine these soft skills developed in my classrooms are the most beneficial to students. Given these observations, I implore the court to craft caselaw that will protect the emerging college-educated workforce.

17

### F. Kerri Stone, Professor of Law, Florida International University College of Law

I have taught law on the tenure track at the Florida International University (FIU) College of Law since 2007. Previously, I was a teaching fellow at Temple University's Beasley School of Law for two years. In addition to informally counseling students on coursework, work experience, and careers at both schools, I have served as the Chair of the FIU College of Law's Faculty Placement Committee, working with the Career Planning and Placement Office in a more formal capacity to plan and participate in programs to help students find jobs.

I have spent a good deal of time counseling students and advising them, not only as to the substantive value of internships for gaining work experience and skills, but also as to the strategic value of internships. Internships garner attention and opportunity for students afforded the chance to showcase their talent, professionalism, and drive to prospective employers and recommenders. Unpaid internships, then, become somewhat a grim proposition, given that they are reserved exclusively for students who can afford to work for free. Not only does this tend to be inequitable and contravene our goals of equality of access, but it limits the pool of people from which employers choose. Many talented, qualified students have shared with me that they would love to compete for certain prestigious unpaid internships that they knew could advance their career prospects and gain them exposure and access to the very people that they wanted to hire

18

them, but that they simply could not afford to, financially.

Allocating prestigious unpaid internships disproportionately by personal wealth detracts from the significance and relevance of some factors articulated by this Court to ascertain whether a so-called "intern" is actually an employee meriting wages, like the level of understanding between intern and employer that there is no expectation of compensation, or the level of understanding that the intern's time will culminate without entitlement to a paid job. Expectation of compensation as a factor seems diminished in significance because employers' ability to control and foster the understanding that there will be no compensation transforms what would ordinarily be a "meeting of the minds" into a unilateral deployment of selection criteria in which those who are selected automatically become those who least need pay among the labor pool. Similarly, expectation of a paid job becomes less about meeting of the minds than about employers selecting those with less need to take work that could grow into paid jobs.

It has been hard to watch the devolution of employers recruiting talent from schools, as we have gone from a market in which interns at places like law firms used to be compensated, to one in which employers now refuse to pay for labor because it is available for free due to market forces and student desperation. I have watched students with much to offer, performing the same work as junior associates, unable to command even minimum wage due to their susceptibility to

19

exploitation and their rational fear of being overlooked for permanent employ if they did not acquiesce to making themselves available for free like their peers do.

Finally, I concur with my colleagues that there is an undeniable benefit to law students spending time in any professional workplace environment, whether paid or unpaid. This comes not only from the day-to-day acculturation to the environment and its norms that comes with physical presence, but from the training any responsible employer should afford to anyone regularly performing any work. To view this benefit as a factor counteracting the work done and contributions made by students for the purposes of denying these students employee status and minimal compensation seems to ignore these facts.

### G. Victoria Pynchon, Adjunct and Assistant Professor, California State University in Northridge, and Author and Consultant on Negotiation

As a lawyer and consultant, I have hired law students, university students, and college graduates in various roles, inside and outside the law, for over thirty years. As an Assistant Professor at the California State University in Northridge and Adjunct Professor and guest speaker at the University of Pepperdine School of Law, I have informally counseled hundreds of students. As the co-founder of She Negotiates Consulting and Training, I have been hired by dozens of women and men to help them achieve career goals, narrow or eliminate personal wage gaps, and strategically plan and implement career growth. Based on these experiences, I submit this statement concerning the many harms and few benefits to both

20

individuals and the common welfare that unpaid internships cause.

I first became aware of the prevalence of private sector unpaid interns in 2012 during a guest lecture in a negotiation class at the University of Pepperdine School of Law. I opened my talk by asking whether any of the students had negotiated pay for summer clerkships or part-time jobs. In response, one student after another told their private sector unpaid internship story.

Approximately half the class had served or were serving unpaid internships at that time. They were doing so, they said, because their parents, professors and placement advisors told them they couldn't get the job experience necessary to find paid work if they didn't first work for free. When explaining their duties, the law students described the same type of work that young associate attorneys routinely do, including legal research, writing briefs and memos, attending court hearings, attending depositions, and reviewing documents. The employers of several of these unpaid student "interns" were billing their time out to clients.

I was in the full-time workforce in 1972-1973, 1975-1977, and 1980 through 2005, the year I started my own Alternative Dispute Resolution and consulting business. In every one of those years and positions, clerk to law firm partner, I performed clerical tasks. As personal computers moved into lawyers' offices, lawyers relied less on clerical assistance, typing their own work, accessing their firm's documentation in computer storage files, and answering their own phones

when they did not simply let those calls go to voice mail. Yet clerical help remained necessary for formatting documents, scheduling, tracking attorney schedules, making flight and hotel reservations, filing court documents, and, yes, getting coffee and ordering food for meetings.

Professional internships invariably require unpaid interns to perform many clerical tasks, work that once went to paid employees, mostly women.[8] In fact, interns doing legal research will type their own memoranda, retrieve firm files on their own, and review tens to hundreds of thousands of documents (work most often done by paid paralegals and young attorneys).

Interns thus not only provide free labor to private sector for-profit firms, but actively put other people out of work, including clerical and para-professional workers. For every unpaid internship in law, one historically paying job is lost, permitting a general lowering of wages and an increase in unemployment so severe that law school enrollment has reached an all-time low.

The promise of upward mobility is being steadily eroded by the cost of education. When I graduated from law school in 1980, I had approximately $2,000 in student loans. My step-father who supported our family was a skilled tradesman (a lithographer and photoengraver), I was raised in the middle class, and no one in

---

[8] According to the United States Department of Labor, the Leading Occupations of Employed Women for 2009 were secretaries, nurses, teachers and cashiers, in that order. And in the first three, women represent over 80 percent of all those employed.

22

my parents' circle of friends had attended, let alone graduated, from college. My step-father was a union man earning union wages, a sufficient living to allow my mother to stay at home. I was able to move up the socio-economic ladder solely because of educational opportunities provided virtually free of charge. My law school education cost me a total of $2,100.00. That same education today costs $150,000. These are the students and graduates we now ask to work free of charge.

Every employer who employs an American worker contributes a portion of that worker's pay to support the American economy. Although independent contractors also pay income and self-employment taxes, the surest way to fill America's public coffers is the practice of mandatory withholding from employee paychecks. These taxes fund our defense, public welfare, and infrastructure needs. Medicare deductions provide health care to the needy, Social Security taxes provide them a safety net, and state disability taxes provide for those too sick or injured to work. These contributions are withheld from the government by those profiting from unpaid labor, not to mention the income for the un- and under-employed, as more paying jobs are replaced by unpaid internships.

Although I have touched on the capital investments young adults make in preparing themselves for the workforce in a technological and knowledge economy, I am not advocating a return to low-cost education, an issue for another day. Query, however, whether the financial burden of unpaid work will discourage

23

ambitious members of our society from obtaining the education necessary to fuel American economic well-being. As a country, we have already chosen to shift the largest part of the burden of higher education to individuals. To further shift the burden of training well-educated individuals to equip them to perform particular duties in particular workplaces for the particular benefit of particular businesses and professional firms is unjustifiable and unsustainable.

## CONCLUSION

For the reasons set forth above, amici respectfully requests that the Court grant Plaintiffs-Appellants' petition for rehearing *en banc*.

Dated: August 21, 2015
    New York, New York

EMERY CELLI BRINCKERHOFF
& ABADY LLP

        /s/
Matthew D. Brinckerhoff
Alison Frick

600 Fifth Avenue, 10th Floor
New York, NY 10011
(212) 763-5000

*Attorneys for* Amici Curiae
*Professors and Educators*

24

**Certificate of Compliance**

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 24 pages, excluding parts of the brief exempted by Rule 32(a)(7)(B)(iii), in compliance with the Order of this Court, dated August 26, 2015, ECF No. 251.

2.      The brief complies with the typeface requirements for Federal Rule of Appellate Procedure 32(a)(5) because it was prepared on a computer using Times New Roman typeface, 14 point, double spaced, except for footnotes which are 12 point and single spaced.


_____
/s/
Matthew D. Brinckerhoff